Jeff P. Prostok
State Bar No. 16352500
Matthew G. Maben
State Bar No. 24037008
FORSHEY & PROSTOK LLP
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
mmaben@forsheyprostok.com

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Cases |
| | ) | |
| STRINGER FARMS, INC., | ) | Case No. 16-44821-rfn11 |
| CHARLES BLAKE STRINGER, | ) | Case No. 16-44871-rfn11 |
| | ) | |
| Debtors. | ) | **Jointly Administered Under** |
| | ) | **Case No. 16-44821-rfn11** |

## DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE WITH RESPECT TO THE FIRST AMENDED JOINT PLAN OF <u>REORGANIZATION OF STRINGER FARMS, INC. AND CHARLES BLAKE STRINGER</u>

Dated: December 4, 2017.

Stringer Farms, Inc. ("SFI") and Charles Blake Stringer ("Stringer" and, together with SFI, the "Debtors"), the debtors and debtors-in-possession in the above-captioned chapter 11 cases, hereby submit this Disclosure Statement Pursuant to Section 1125 of the United States Bankruptcy Code with Respect to the First Amended Joint Plan of Reorganization of Stringer Farms, Inc. and Charles Blake Stringer (the "Disclosure Statement"). This Disclosure Statement is to be used in connection with the solicitation of votes on the First Amended Joint Plan of Reorganization of Stringer Farms, Inc. and Charles Blake Stringer dated December 4, 2017 (the "Plan"). A copy of the Plan is attached hereto as **Exhibit "A"**. Unless otherwise defined herein, terms used herein have the meanings ascribed thereto in the Plan (see Article I of the Plan).

For a general summary of the proposed treatment of Claims or Interests under the Plan, please see the chart below.

## I. NOTICE TO HOLDERS OF CLAIMS

### A.    Generally

The purpose of this Disclosure Statement is to enable Creditors whose Claims are impaired to make an informed decision in exercising their right to vote to accept or reject the Plan.

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.

On December 7, 2017, the Bankruptcy Court entered an *Order* (the "Solicitation Procedures Order") conditionally approving this Disclosure Statement for use in soliciting votes to accept or reject the Plan. A copy of the Solicitation Procedures Order is included in the materials accompanying this Disclosure Statement. CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A FINAL DETERMINATION BY THE BANKRUPTCY COURT THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE OR A DETERMINATION REGARDING THE FAIRNESS OR MERITS OF THE PLAN.

The statements contained in the Disclosure Statement are made as of the date hereof unless another time is specified, and neither delivery of the Disclosure Statement nor any exchange of rights made in connection with the Plan shall, under any circumstances, create an implication that there has not been any change in the information set forth herein since the date the Disclosure Statement and the materials relied on in preparation of the Disclosure Statement were compiled.

For the convenience of Creditors and parties in interest, this Disclosure Statement summarizes the terms of the Plan, but the Plan itself qualifies all summaries. This Disclosure Statement is qualified in its entirety by the terms of the Plan. If any inconsistency exists between the Plan and the Disclosure Statement, the terms of the Plan are controlling.

Each Claimant should consult the Claimant's individual attorney, accountant and/or financial advisor as to the effect of the Plan on such Claimant.

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept

or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. Except for the Debtors and their Professionals, no person has been authorized to use or promulgate any information concerning the Debtors, their businesses, or the Plan, other than the information contained herein, in connection with the solicitation of votes to accept or reject the Plan. No holder of a Claim entitled to vote on the Plan should rely upon any information relating to the Debtors, their businesses, or the Plan other than that contained in this Disclosure Statement and the exhibits hereto. Unless otherwise indicated, the source of all information set forth herein is the Debtors.

The Disclosure Statement may not be relied on for any purpose other than to determine whether to vote in favor of or against the Plan and related options and elections, and nothing contained herein shall constitute an offer to sell or purchase a security as defined by state or Federal securities law or an admission of any fact or liability by any party, or be admissible in any proceeding involving the Debtors or any other party, or be deemed conclusive evidence of the tax or other legal effects of the reorganization of the Debtors on holders of Claims or Interests. Certain of the information contained in the Disclosure Statement, by its nature, is forward looking, contains estimates and assumptions which may prove to be wrong, and contains forecasts which may prove to be wrong or which may be materially different from actual results.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot and returning the same to the address set forth on the Ballot, in the enclosed return envelope so that it will be received by no later than **5:00 P.M., CENTRAL TIME, ON JANUARY 5, 2018**.

If you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim or Interest, you may be bound by the Plan if it is accepted by the requisite holders of Claims or Interests. See "Confirmation of the Plan – Solicitation of Votes; Vote Required for Class Acceptance" beginning on page 77 and "Cramdown" beginning on page 81 of this Disclosure Statement.

TO BE SURE YOUR BALLOT IS COUNTED, YOUR BALLOT MUST BE RECEIVED NO LATER THAN **5:00 P.M., CENTRAL TIME, ON JANUARY 5, 2018**. For detailed voting instructions and the name, address, and phone number of the person you may contact if you have questions regarding the voting procedures, see "Confirmation of the Plan – Solicitation of Votes; Voting Procedures – Parties In Interest Entitled to Vote" beginning on page 77 of this Disclosure Statement.

The Bankruptcy Court has scheduled a combined hearing on January 8, 2018 at 9:30 a.m., Central Time, in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division to consider final approval of this Disclosure Statement and confirmation of the Plan. The Bankruptcy Court has directed that objections, if any, to final approval of this Disclosure Statement and/or confirmation of the Plan be filed and served on or before January 5, 2018, in the manner described under the caption, "Confirmation of the Plan – Confirmation Hearing" beginning on page 78 of this Disclosure Statement.

THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF IMPAIRED CLAIMS TO VOTE TO ACCEPT THE PLAN.

B.      **Summary of Treatment under the Plan**

The following is an estimate of the numbers and amounts of classified Claims and Interests to receive treatment under the Plan, and a summary of the proposed treatment of such Claims and Interests under the Plan. Reference should be made to the entire Disclosure Statement and to the Plan for a complete description of the classification and treatment of Claims and Interests.

The Bar Date for filing proofs of Claim in the Chapter 11 Cases was May 4, 2017. The table below is drawn from the Debtors' Schedules and filed proofs of Claim. The final universe of Claims, as actually Allowed, may differ from this table.

| Class | Treatment |
|---|---|
| **Class 1 – Zions Secured Claims**<br><br>**Estimated Amount: $10,650,000**<br><br>**Number of Holders: 1** | **Impaired**<br><br>**If the Liquidating Trust is not required to be established under the Plan:** The Zions Secured Claims shall be paid and treated as follows:<br><br>(a) The Zions Secured Claim based on Zions Note 1 shall be paid and treated as follows:<br><br>(i) The Zions Secured Claim based on Zions Note 1 shall bear interest from and after Stringer's Petition Date through the Effective Date at the non-default contract rate of interest as set forth and calculated in Zions Note 1.<br><br>(ii) The Zions Secured Claim based on Zions Note 1 shall bear interest from and after the Effective Date at the non-default contract rate of interest as set forth and calculated in Zions Note 1.<br><br>(iii) The Allowed amount of the Zions Secured Claim based on Zions Note 1 as of the Effective Date, which shall include all unpaid principal, accrued interest and Collection Costs, to the extent Allowed, shall be paid in full as follows: the Reorganized Debtors shall make semi-annual installment payments in substantially equal amounts including both principal and interest. The first such semi-annual installment payment shall be due on November 1, 2018. Thereafter, semi-annual installment payments shall be due on April 1 and October 1 of each year, with the final installment payment being due and payable on April 1, 2045.<br><br>(iv) The holder of the Zions Secured Claim based on Zions Note 1 shall retain its Liens on its Collateral securing payment of Zions Note 1 until the Zions Secured Claim based on Zions Note 1 is |

| Class | Treatment |
|---|---|
|  | paid in full and such Liens shall be subordinate only to: (A) any Liens securing payment of Property Taxes assessed against such Collateral, to the extent that applicable nonbankruptcy law grants priority to such Liens; and (B) the Liens granted to any Exit Lender to secure repayment of the Exit Loan.<br><br>(v) All Distributions required under the Plan on account of Zions Note 1 shall be made by the Reorganized Debtors.<br><br>(b) The Zions Secured Claim based on Zions Note 2 shall be paid and treated as follows:<br><br>(i) The Zions Secured Claim based on Zions Note 2 shall bear interest from and after SFI's Petition Date through the Effective Date at the non-default contract rate of interest as set forth and calculated in Zions Note 2.<br><br>(ii) The Zions Secured Claim based on Zions Note 2 shall bear interest from and after the Effective Date at the non-default contract rate of interest as set forth and calculated in Zions Note 2.<br><br>(iii) The Allowed amount of the Zions Secured Claim based on Zions Note 2 as of the Effective Date, which shall include all unpaid principal, accrued interest and Collection Costs, to the extent Allowed, shall be paid in full as follows: (A) beginning with an installment payment on July 1, 2018, the Reorganized Debtors shall make semi-annual installment payments of accrued interest only on January 1 and July 1 of each year, with the last such semi-annual installment payment of accrued interest only being due and payable on July 1, 2020; and (B) beginning with an installment payment on January 1, 2021, the Reorganized Debtors shall make semi-annual installment payments in substantially equal amounts including both principal and interest on January 1 and July 1 of each year, with the last such semi-annual installment payment being due and payable on July 1, 2045.<br><br>(iv) The holder of the Zions Secured Claim based on Zions Note 2 shall retain its Liens on its Collateral securing payment of Zions Note 2 until the Zions Secured Claim based on Zions Note 2 is |

| Class | Treatment |
|---|---|
| | paid in full and such Liens shall be subordinate only to: (A) any Liens securing payment of Property Taxes assessed against such Collateral, to the extent that applicable nonbankruptcy law grants priority to such Liens; and (B) the Liens granted to any Exit Lender to secure repayment of the Exit Loan.<br><br>(v) All Distributions required under the Plan on account of Zions Note 2 shall be made by the Reorganized Debtors.<br><br>(c) From and after the Effective Date, the Reorganized Debtors shall market for sale a portion or portions of the SFI Farmland and/or Stringer Farmland. Notwithstanding anything to the contrary contained in the Plan, Zions will not be required to release its Lien in order to effectuate a sale of any of the SFI Farmland and/or Stringer Farmland unless it is satisfied that the sale price for the property being sold is fair and adequate. In the event that Zions objects to the proposed sale price of any portion of its Collateral as not being fair and equitable, the Bankruptcy Court shall retain jurisdiction to determine whether or not the proposed sale price is fair and equitable and to require Zions to release its Lien on the subject Collateral if the Bankruptcy Court determines, after notice and hearing, that the proposed sale price is fair and equitable. Unless otherwise agreed in writing between the Reorganized Debtors, Zions and the Exit Lender: (i) the first net proceeds of any such sale(s) of SFI Farmland and/or Stringer Farmland shall be paid to the Exit Lender to reduce the outstanding balance of the Exit Loan until the Exit Loan has been fully repaid; (ii) any net sale proceeds remaining after the Exit Loan has been fully repaid shall be paid to Zions to reduce the outstanding principal balance of Zions Note 1; and (iii) any net sale proceeds remaining after all indebtedness owing under Zions Note 1 has been paid in full shall be paid to Zions to reduce the outstanding principal balance of Zions Note 2. By no later than 24 months after the Effective Date, the Reorganized Debtors shall fully repay the Exit Loan so that Zions' Liens shall then constitute first priority liens on the SFI Farmland and Stringer Farmland then owned by the Reorganized Debtors, subordinate only to any statutory Liens securing |

| Class | Treatment |
|---|---|
| | payment of ad valorem taxes assessed against such SFI Farmland and Stringer Farmland. |
| | (d) As of the Effective Date, the Debtors, the Estates, the Reorganized Debtors and their respective predecessors, successors, assigns, and designees shall be deemed to irrevocably release, acquit and forever discharge Zions, and its predecessors, successors, assigns, agents, representatives, officers, directors, shareholders, employees, principals, members, managers, and lawyers (collectively, the "Zions Released Parties") of and from any and every Estate Claim, loss (whether consequential or direct), demand, liability, action or causes of action, damages, controversies, trespasses, and claims of any nature whatsoever, whether in law or in equity, whether known or unknown, whether asserted or unasserted, which the Debtors, the Estates, the Reorganized Debtors and their respective successors, assigns, or designees, have, ever had, or might have had, arising out of or in connection with, in whole or in part, any event, act, omission or transaction occurring from the beginning of time to the Effective Date, and relating in any way to the Debtors, the Estates or the Zions Released Parties; provided, however, nothing in the Plan shall be deemed to release, discharge, affect or impair any obligation of the Zions Released Parties under the Plan. |
| | (e) If the Reorganized Debtors (i) fail to timely make any Distribution to Zions required under the Plan and, after receiving notice of such default in accordance with the terms of section 14.5 of the Plan, fail to cure such default within fifteen (15) days of the date the notice of default is mailed to the Reorganized Debtors, and/or (ii) fail to fully repay the Exit Loan by no later than 24 months after the Effective Date, then Zions shall be immediately free to exercise its legal and contractual remedies with respect to its Collateral, including but not limited to posting its Collateral for foreclosure in accordance with the terms of applicable law and the contracts between Zions and the Debtors. Notwithstanding anything to the contrary contained in the Plan, the Reorganized Debtors are entitled to three (3) payment default notices for the remaining term of Zions Note 1 and Zions Note 2. Upon the fourth notice of default, the injunction under section 12.4 of the Plan shall immediately terminate as to |

| Class | Treatment |
|---|---|
| | Zions without further notice and Zions shall be permitted to immediately exercise its legal and contractual remedies with respect to its Collateral as provided herein. In the event that Zions takes any action following the occurrence of either condition (i) or (ii) above, or upon the occurrence of a fourth payment default notice, the Debtors hereby waive, release and relinquish any and all rights to contest, in legal proceedings or otherwise, any lawful action taken by Zions which Zions is entitled to take pursuant to applicable law and the contracts between Zions and the Debtors, and the Debtors, as Reorganized Debtors, shall take no action, in any place or manner whatsoever, to impede or otherwise interfere with Zions' exercise of any lawful action which it is entitled to take by applicable law and the contracts between Zions and the Debtors. In the event that Zions takes any action following the occurrence of either condition (i) or (ii) above and the Reorganized Debtors, or any other Person, seeks to challenge any such action, the Bankruptcy Court shall have and retain exclusive jurisdiction to hear and determine any such challenge. In the event of such a challenge, both Zions and the Person(s) challenging Zions' actions shall have an absolute right to move the Bankruptcy Court to reopen the Chapter 11 Cases so that such challenge may be submitted to and adjudicated by the Bankruptcy Court.<br><br>(f)     In the event that any of the Reorganized Debtors, Dos Ex LP and/or Dos Ex LLC commence one or more new cases under any chapter of the Bankruptcy Code after the Effective Date (each a "Subsequent Bankruptcy"), the Debtors agree that Zions shall be entitled to immediate relief from the automatic stay in any such Subsequent Bankruptcy to exercise its legal and contractual remedies with respect to its Collateral, including the continuation of any exercise of such legal and contractual remedies initiated prior to the commencement of such Subsequent Bankruptcy, and none of the Reorganized Debtors, Dos Ex LP and Dos Ex LLC shall object to, contest or otherwise take any action in such Subsequent Bankruptcy to impede the entry of an order granting relief from the automatic stay to Zions.<br><br>(g)   With the exception of the priming Liens that shall be granted to the Exit Lender providing the |

| Class | Treatment |
|---|---|
| | Exit Loan, neither the Debtors nor the Reorganized Debtors shall grant to any Person any Liens or security interests on Zions' Collateral that prime the Liens and security interests of Zions with respect to such Collateral.

(h) Until the Zions Secured Claims have been paid in full, Stringer shall not transfer, sell, convey or otherwise dispose of any Interest owned by Stringer in SFI unless Zions delivers to Stringer its prior written consent to any such transfer, sale, conveyance or other disposition.

(i) From and after the Effective Date, Zions shall continue to have the rights to access and inspect the books and records of the Reorganized Debtors to the full extent set forth in the relevant loan documents between Zions and the Debtors (the "Inspection Rights"). Furthermore, from and after the Effective Date, Zions shall have the same Inspection Rights with respect to the books and records of both Dos Ex LP and Dos Ex LLC.

**If the Liquidating Trust is required to be established under the Plan**: The Zions Secured Claims shall be paid and treated as follows:

(a) Zions shall have an Allowed Secured Claim in the amount of $10,230,286.24, plus accrued interest at the non-default rate under its loan agreements from and after the Petition Date and its Collection Costs.

(b) Zions shall retain its Liens on all of its Collateral, consisting of farmland and the improvements and fixtures thereon, as set forth in its recorded deeds of trust. The Liquidating Trustee shall be permitted to possess, market and sell Zions' Collateral for a period of 24 months from the Liquidating Trust Effective Date, after which Zions shall be permitted to exercise its legal and contractual remedies with respect to such Collateral. All sales of Zions' Collateral by the Liquidating Trustee shall satisfy at least one of the following conditions: (i) Zions shall have provided its prior written consent (which shall be deemed given if Zions does not respond within 20 days of notice of a proposed sale sent to its counsel of record or other designated address), (ii) proposed to be sold for a price that is at least 90% of the appraised value of the tract as set forth in the |

| Class | Treatment |
|---|---|
| | appraisal report of Appraisal & Realty Consultants dated August 24, 2016, or (iii) determined by the Bankruptcy Court to be for a fair and reasonable price. |
| | (c)  After satisfaction of any Exit Loan secured by the Collateral that arose from the payoff of the Sandton DIP Loan Claim and Allowed Claims for Property Taxes, and subject to funding or replenishment of the Trust Reserve, The Liquidating Trustee shall pay the net proceeds of sale of Zions' Collateral in satisfaction of Zions' Secured Claims, including accrued interest at the non-default rate under Zions' prepetition loan agreements and Collection Costs. |
| | (d) The general release of Zions by the Debtors set forth in subsection 4.1(a)(iv) of the Plan shall remain applicable. |
| | **Estimated Recovery: 100%** |
| <u>**Class 2 – Wells Fargo Secured Claims**</u><br><br>**Amount: $2,125,000**<br><br>**Number of Holders: 1** | Impaired<br><br>**If the Liquidating Trust is <u>not</u> required to be established under the Plan**: The Wells Fargo Secured Claims shall be paid and treated as follows:<br><br>(a)   The Wells Fargo Secured Claims shall constitute Allowed Secured Claims in the aggregate amount of $2,125,000.00 and shall bear interest from and after the Effective Date until paid in full at the Plan Rate.<br><br>(b)   Wells Fargo shall retain its Liens on its Collateral (including without limitation the Replacement Lien Real Estate and the 50.32-acre tract on which it received a post-petition lien) until the Wells Fargo Secured Claims are paid in full. In addition, as of the Effective Date, Wells Fargo shall be granted new Liens on all of the SFI Farmland and Stringer Farmland as additional security for repayment of the Allowed Wells Fargo Secured Claims (the "<u>New Wells Fargo Liens</u>"). The New Wells Fargo Liens shall be subordinate only to (i) any Liens securing payment of Property Taxes assessed against such Collateral, to the extent that applicable non-bankruptcy law grants priority to such Liens, (ii) the Liens granted to any Exit Lender |

| Class | Treatment |
|---|---|
| | that provides the Exit Loan, and (iii) the Liens securing repayment of the Zions Secured Claims. On request of Wells Fargo, the Debtors shall promptly execute and deliver to Wells Fargo deeds of trust evidencing the New Wells Fargo Liens in form satisfactory to Wells Fargo and consistent with the Plan.<br><br>(c) From and after the Effective Date, Stringer shall market and sell the Replacement Lien Real Estate. A sale of the Replacement Lien Real Estate shall satisfy at least one of the following conditions: (i) Wells Fargo shall have provided its prior written consent, (ii) the proposed sale is for an aggregate price that is at least 90% of the appraised value of the Replacement Lien Real Estate as set forth in the most recent appraisal report obtained by Wells Fargo with respect to the Replacement Lien Real Estate, or (iii) the proposed sale price is determined by the Bankruptcy Court to be for a fair and reasonable price. All net proceeds of any sale of the Replacement Lien Real Estate shall be paid to Wells Fargo at the closing of such sale and applied to reduce the outstanding principal balance of the Allowed Wells Fargo Secured Claims. If the Replacement Lien Real Estate remains unsold 24 months after the Effective Date, Wells Fargo shall be permitted to exercise its legal and contractual remedies with respect to such Collateral, and any net proceeds from any disposition of such Collateral remaining after full satisfaction of any Allowed Secured Property Tax Claims secured by such Collateral shall be applied to reduce the outstanding principal balance of the Allowed Wells Fargo Secured Claims.<br><br>(d) Not later than the day prior to the Confirmation Hearing, the Debtors shall designate in writing to Wells Fargo which items of Residual Equipment are not necessary to the Reorganized Debtors' continued farming operations, and shall surrender such items to Wells Fargo promptly after the Effective Date. Thereafter, Wells Fargo shall be free to exercise its legal and contractual remedies with respect to such Collateral, and any net proceeds from any disposition of such Collateral by Wells Fargo shall be applied to reduce the outstanding principal balance of the Allowed Wells Fargo Secured Claims. From and after the Effective Date, the Debtors shall remain bound by |

| Class | Treatment |
|---|---|
| | the covenants in their prepetition security agreements with Wells Fargo that are not inconsistent with the terms of the Plan. |
| | (e) On the Effective Date, the Reorganized Debtors shall make a Distribution to Wells Fargo in the amount of $125,000.00. The remaining $2,000,000.00 balance of the Allowed Wells Fargo Secured Claims as of the Effective Date shall be amortized over 120 months in substantially equal payments. The Reorganized Debtors shall make annual installment payments to Wells Fargo based on such amortization on November 1 of each year, beginning with a first installment payment due on November 1, 2018. Such annual installment payments shall continue until the earlier of: (i) the due date of an annual installment payment if, on such due date, the total remaining balance of all principal and accrued interest owing on account of the Allowed Wells Fargo Secured Claims is less than the installment payment amount based on the above amortization, in which case the Reorganized Debtors shall make a final payment on such due date equal to the full remaining unpaid balance of all principal and accrued interest owing on account of the Allowed Wells Fargo Secured Claims, and (ii) the first Business Day that is at least 84 months after the Effective Date, upon which date the Reorganized Debtors shall pay to Wells Fargo the full remaining unpaid balance of all principal and accrued interest owing on account of the Allowed Wells Fargo Secured Claims. |
| | (f) The amount by which the total amount of Wells Fargo's Allowed Claims ($5,577,949.66) exceeds the amount of the Allowed Wells Fargo Secured Claims shall constitute a Class 9 Unsecured (General) Claim and shall be paid as set forth in subsection 4.9 of the Plan. |
| | (g) As of the Effective Date, the Debtors, the Estates, the Reorganized Debtors and their respective predecessors, successors, assigns, and designees shall be deemed to irrevocably release, acquit and forever discharge Wells Fargo, and its predecessors, successors, assigns, agents, representatives, officers, directors, shareholders, employees, principals, members, managers, and lawyers (collectively, the "Wells Fargo Released Parties") of and from any and every Estate Claim, |

| Class | Treatment |
|---|---|
| | loss (whether consequential or direct), demand, liability, action or causes of action, damages, controversies, trespasses, and claims of any nature whatsoever, whether in law or in equity, whether known or unknown, whether asserted or unasserted, which the Debtors, the Estates, the Reorganized Debtors and their respective successors, assigns, or designees, have, ever had, or might have had, arising out of or in connection with, in whole or in part, any event, act, omission or transaction occurring from the beginning of time to the Effective Date, and relating in any way to the Debtors, the Estates or the Wells Fargo Released Parties; provided, however, nothing in the Plan shall be deemed to release, discharge, affect or impair any obligation of the Wells Fargo Released Parties under the Plan. <br><br> **If the Liquidating Trust is required to be established under the Plan**: The Wells Fargo Secured Claims shall be paid and treated as follows: <br><br> (a)  Wells Fargo shall have an Allowed Secured Claim equal to the liquidation value of its personal property Collateral (consisting of the Debtors' personal property other than the equipment financed by Caterpillar and WFFLI) plus the sum of $219,304.62[1] secured by its real estate Collateral consisting of two (2) tracts of real estate totaling approximately 53 acres as described in its Agreed Order with the Debtors dated April 20, 2017. <br><br> (b)  Wells Fargo shall retain its Liens on all of its Collateral (including without limitation the Replacement Lien Real Estate and the 50.32-acre tract on which it received a post-petition lien). <br><br> (c)  On the Liquidating Trust Effective Date, Wells Fargo's personal property Collateral shall be surrendered to it in partial satisfaction of its Secured Claims and Wells Fargo may proceed to |

---

[1] In June, 2017, the Debtors harvested a wheat crop financed by Wells Fargo for which they had previously agreed to provide Wells Fargo with a $43,000.00 Secured Claim as part of a $143,000.00 adequate protection lien against the 53 acre tracts.  The Debtors had represented that the wheat crop was worth only $43,000.00 because it was not planted with the intent to harvest, but instead to use for cattle grazing or as a cover crop.  Due to unexpected rainfall, the wheat recovered to a harvestable level after it was grazed.  The Debtors then harvested and sold the wheat, receiving $173,399.88 in gross proceeds, of which they determined that $119,304.62 was net of expenses.  Therefore, Wells Fargo's adequate protection lien against the 53 acre tracts has been increased to $219,304.62 from $143,000.00 to account for the difference in the value of the wheat crop ($119,304.62 - $43,000.00 = $76,304.62).

| Class | Treatment |
|---|---|
| | repossess and dispose of or attach such Collateral in accordance with its legal and contractual remedies. The Liquidating Trustee may dispose, collect, or liquidate of some or all of Wells Fargo's personal property Collateral with the consent of Wells Fargo.<br><br>(d) The Liquidating Trustee shall be permitted to possess, market and sell Wells Fargo's real property Collateral for a period of 24 months from the Liquidating Trust Effective Date, after which Wells Fargo shall be permitted to exercise its legal and contractual remedies with respect to such Collateral. All sales of Wells Fargo's real property Collateral by the Liquidating Trustee shall satisfy at least one of the following conditions: (i) Wells Fargo shall have provided its prior written consent (which shall be deemed given if Wells Fargo does not respond within 20 days of notice of a proposed sale sent to its counsel of record or other designated address), (ii) proposed to be sold for a price that is at least equal to Wells Fargo's $219,304.62 Allowed Secured Claim against such real property Collateral pursuant to the Agreed Order dated April 20, 2017, or (iii) determined by the Bankruptcy Court to be for a fair and reasonable price. Any proceeds from the sale of the real property Collateral in excess of Wells Fargo's $219,304.62 Allowed Secured Claim shall be available for distribution to Class 9 Creditors, subject to the Liquidating Trustee's costs of administration.<br><br>(e) Wells Fargo shall be entitled to an Allowed Claim in Class 9 to the extent of any deficiency in its total Claim of $5,577,949.66 after application of the net proceeds of disposition of its Collateral.<br><br>(f) The general release of Wells Fargo by the Debtors set forth in subsection 4.2(a)(vii) of the Plan shall remain applicable.<br><br>**Estimated Recovery: 100%** |
| **Class 3** – **WFFLI Secured Claims**<br><br>**Amount: $941,124.01**<br><br>**Number of Holders: 1** | Impaired<br><br>**If the Liquidating Trust is not required to be established under the Plan**: The WFFLI Secured Claims shall be paid and treated as follows: |

| Class | Treatment |
|---|---|
| | (a)  The WFFLI Secured Claims shall constitute Allowed Secured Claims in the aggregate amount of $941,124.01 and shall bear interest from and after the Effective Date until paid in full at the Plan Rate. |
| | (b)  WFFLI shall retain its Liens on its Collateral until the WFFLI Secured Claims are paid in full. |
| | (c)  Not later than the day prior to the Confirmation Hearing, the Debtors shall designate in writing to WFFLI which items of WFFLI's Collateral are not necessary to the Reorganized Debtors' continued farming operations, and shall surrender such items to WFFLI promptly after the Effective Date. Thereafter, to the extent not already authorized by an agreed order lifting the automatic stay, WFFLI shall be free to exercise its legal and contractual remedies with respect to such Collateral, and any net proceeds from any disposition of such Collateral by WFFLI shall be applied to reduce the outstanding principal balance of the Allowed WFFLI Secured Claims.  From and after the Effective Date, the Debtors shall remain bound by the covenants in their prepetition security agreements with WFFLI that are not inconsistent with the terms of the Plan. |
| | (d)  On the Effective Date, the Reorganized Debtors shall make a Distribution to WFFLI in the amount of $25,000.00.  The remaining balance of the Allowed WFFLI Secured Claims as of the Effective Date shall be amortized over 120 months in substantially equal payments.  The Reorganized Debtors shall make annual installment payments to WFFLI based on such amortization on November 1 of each year, beginning with a first installment payment due on November 1, 2018.  Such annual installment payments shall continue until the earlier of: (i) the due date of an annual installment payment if, on such due date, the total remaining balance of all principal and accrued interest owing on account of the Allowed WFFLI Secured Claims is less than the installment payment amount based on the above amortization, in which case the Reorganized Debtors shall make a final payment on such due date equal to the full remaining unpaid balance of all principal and accrued interest owing on account of the Allowed WFFLI Secured Claims, and (ii) the first Business Day that is at least 84 months after the Effective Date, upon which date the |

| Class | Treatment |
|---|---|
| | Reorganized Debtors shall pay to WFFLI the full remaining unpaid balance of all principal and accrued interest owing on account of the Allowed WFFLI Secured Claims. |
| | (e) The amount by which the total amount of WFFLI's Allowed Claims ($1,050,781.05) exceeds the amount of the Allowed WFFLI Secured Claims shall constitute a Class 9 Unsecured (General) Claim and shall be paid as set forth in subsection 4.9 of the Plan. |
| | (f) As of the Effective Date, the Debtors, the Estates, the Reorganized Debtors and their respective predecessors, successors, assigns, and designees shall be deemed to irrevocably release, acquit and forever discharge WFFLI, and its predecessors, successors, assigns, agents, representatives, officers, directors, shareholders, employees, principals, members, managers, and lawyers (collectively, the "WFFLI Released Parties") of and from any and every Estate Claim, loss (whether consequential or direct), demand, liability, action or causes of action, damages, controversies, trespasses, and claims of any nature whatsoever, whether in law or in equity, whether known or unknown, whether asserted or unasserted, which the Debtors, the Estates, the Reorganized Debtors and their respective successors, assigns, or designees, have, ever had, or might have had, arising out of or in connection with, in whole or in part, any event, act, omission or transaction occurring from the beginning of time to the Effective Date, and relating in any way to the Debtors, the Estates or the WFFLI Released Parties; provided, however, nothing in the Plan shall be deemed to release, discharge, affect or impair any obligation of the WFFLI Released Parties under the Plan.

**If the Liquidating Trust is required to be established under the Plan**: The WFFLI Secured Claims shall be paid and treated as follows:

(a) WFFLI shall have an Allowed Secured Claim in the amount of $941,124.01, plus accrued interest at the non-default rate from and after the Petition Date and its Collection Costs. |

| Class | Treatment |
|---|---|
|  | (b) WFFLI shall retain its Liens on all of its Collateral, consisting of the Debtors' equipment that WFFLI financed.<br><br>(c) On the Liquidating Trust Effective Date, WFFLI's Collateral shall be surrendered to it in satisfaction of its Secured Claims and, to the extent not already authorized by an agreed order lifting the automatic stay, WFFLI may proceed to repossess and dispose of such Collateral in accordance with its legal and contractual remedies.<br><br>(d) WFFLI shall be entitled to an Allowed Claim in Class 9 to the extent of any deficiency in its total loan-related Claim of $941,124.01 after application of the net proceeds of disposition of its Collateral.<br><br>(e) The general release of WFFLI by the Debtors set forth in subsection 4.3(a)(vi) of the Plan shall remain applicable.<br><br>**Estimated Recovery: 100%** |
| **Class 4 – Caterpillar Secured Claim**<br><br>**Estimated Amount: $22,000**<br><br>**Number of Holders: 1** | Impaired<br><br>**If the Liquidating Trust is not required to be established under the Plan**: The Caterpillar Secured Claim shall be paid and treated as follows:<br><br>(a) The Caterpillar Secured Claim shall bear interest from and after the Effective Date until paid in full at the Plan Rate.<br><br>(b) The Caterpillar Secured Claim shall be amortized over 120 months in substantially equal payments. The Reorganized Debtors shall make annual installment payments to Caterpillar based on such amortization on November 1 of each year, beginning with a first installment payment due on November 1, 2018. Such annual installment payments shall continue until the first Business Day that is at least 84 months after the Effective Date, upon which date the Reorganized Debtors shall pay to Caterpillar the full remaining unpaid balance of all principal and accrued interest owing on account of the Allowed Caterpillar Secured Claim.<br><br>(c) Caterpillar shall retain its Lien on its Collateral until the Caterpillar Secured Claim is paid in full. |

| Class | Treatment |
| --- | --- |
| | (d) The amount, if any, by which the total amount of Caterpillar's Allowed Claim exceeds the amount of the Allowed Caterpillar Secured Claim shall constitute a Class 9 Unsecured (General) Claim and shall be paid as set forth in subsection 4.9 of the Plan.<br><br>**If the Liquidating Trust is required to be established under the Plan**: The Caterpillar Secured Claim shall be paid and treated as follows:<br><br>(a) Caterpillar shall have an Allowed Secured Claim in the amount of $23,325.62.<br><br>(b) Caterpillar shall retain its Liens on all of its Collateral, consisting of the Debtors' equipment that Caterpillar financed.<br><br>(c) On the Liquidating Trust Effective Date, Caterpillar's Collateral shall be surrendered to it in satisfaction of its Secured Claim and, to the extent not already authorized by an agreed order lifting the automatic stay, Caterpillar may proceed to repossess and dispose of such Collateral in accordance with its legal and contractual remedies.<br><br>(d) Caterpillar shall be entitled to an Allowed Claim in Class 9 to the extent of any deficiency in its total Claim after application of the net proceeds of disposition of its Collateral.<br><br>(e) No Estate Claims on behalf of the Debtors against this Creditor shall be preserved under this Plan for prosecution by the Liquidating Trust.<br><br>**Estimated Recovery: 100%** |
| **Class 5 – FNMA Secured Claim**<br><br>**Estimated Amount: $406,000**<br><br>**Number of Holders: 1** | **Unimpaired**<br><br>**If the Liquidating Trust is not required to be established under the Plan**: The FNMA Secured Claim shall be paid and treated as follows:<br><br>(a) On the Effective Date, Stringer shall pay to FNMA any and all amounts past due and owing pursuant to the terms of the relevant loan documents.<br><br>(b) From and after the Effective Date, Stringer shall make payments to FNMA in the amounts specified, |

| Class | Treatment |
|---|---|
| | and in accordance with the terms of, the relevant loan documents until the FNMA's Allowed Claim has been paid in full.<br><br>(c) FNMA shall retain its Lien on its Collateral until the FNMA's Allowed Claim has been paid in full.<br><br>**If the Liquidating Trust <u>is</u> required to be established under the Plan**: The FNMA Secured Claim shall be paid and treated as follows:<br><br>(a) FNMA shall have an Allowed Secured Claim in the amount of $405,783.79, less any principal reductions since the Petition Date.<br><br>(b) FNMA shall retain its lien on its Collateral, which consists of Stringer's exempt homestead real property in Amarillo, Texas.<br><br>(c) On the Liquidating Trust Effective Date, FNMA's Collateral shall be surrendered to it in satisfaction of its Secured Claim and FNMA may proceed to repossess and dispose of such Collateral in accordance with its legal and contractual remedies; provided, that on or before 20 days following the Liquidating Trust Effective Date, Stringer shall be entitled to reaffirm his prepetition loan obligations to FNMA and to continue to occupy his homestead by filing a notice of such election in the Bankruptcy Court and curing any arrearage to FNMA.<br><br>(d) FNMA shall not participate in any distributions to Class 9 under the Plan.<br><br>**Estimated Recovery: 100%** |
| <u>**Class 6**</u> **– Ally Bank Secured Claim**<br><br>**Estimated Amount: $41,000**<br><br>**Number of Holders: 1** | **Unimpaired**<br><br>**If the Liquidating Trust is <u>not</u> required to be established under the Plan**: The Ally Bank Secured Claim shall be paid and treated as follows:<br><br>(a) On the Effective Date, Stringer shall pay to Ally Bank any and all amounts past due and owing pursuant to the terms of the relevant loan documents.<br><br>(b) From and after the Effective Date, Stringer shall make payments to Ally Bank in the amounts |

| Class | Treatment |
|---|---|
| | specified, and in accordance with the terms of, the relevant loan documents until Ally Bank's Allowed Claim has been paid in full.<br><br>(c) Ally Bank shall retain its Lien on its Collateral until Ally Bank's Allowed Claim has been paid in full.<br><br>**If the Liquidating Trust _is_ required to be established under the Plan**: The Ally Bank Secured Claim shall be paid and treated as follows:<br><br>(a) Ally Bank shall have an Allowed Secured Claim in the amount of $41,245.07, less any principal reductions since the Petition Date.<br><br>(b) Ally Bank shall retain its lien on its Collateral, which consists of a 2015 GMC Sierra truck claimed as exempt property by Stringer.<br><br>(c) On the Liquidating Trust Effective Date, Ally Bank's Collateral shall be surrendered to it in satisfaction of its Secured Claim and Ally Bank may proceed to repossess and dispose of such Collateral in accordance with its legal and contractual remedies; provided, that on or before 20 days following the Liquidating Trust Effective Date, Stringer shall be entitled to reaffirm his prepetition loan obligations to Ally Bank by filing a notice of such election in the Bankruptcy Court and curing any arrearage to Ally Bank.<br><br>(d) Ally Bank shall not participate in any distributions to Class 9 under the Plan.<br><br>**Estimated Recovery: 100%** |
| **Class 7 – Secured Property Tax Claims**<br><br>**Estimated Amount: $63,000**<br><br>**Number of Holders: 3** | **Unimpaired**<br><br>**If the Liquidating Trust is _not_ required to be established under the Plan**: Any Allowed Secured Property Tax Claim shall be paid and treated as follows (except to the extent that the holder of a Secured Property Tax Claim and the Debtors or Reorganized Debtors agree otherwise in writing):<br><br>(a) Interest on each Allowed Secured Property Tax Claim shall accrue as follows: (i) for the postpetition period beginning on the date any portion of the tax |

| Class | Treatment |
|---|---|
|  | underlying the Allowed Secured Property Tax Claim was, became or becomes delinquent under state law, and to the extent of such delinquency, and continuing through the Effective Date, interest shall accrue at the applicable statutory rate of interest determined under nonbankruptcy law in compliance with section 511 of the Bankruptcy Code; and (ii) for the period beginning on the day after the Effective Date and continuing through the day on which such Allowed Secured Property Tax Claim is paid in full, interest shall accrue on the unpaid tax at the applicable statutory rate of interest determined under nonbankruptcy law in compliance with sections 511 and 1129 of the Bankruptcy Code, determined during the month in which the Confirmation Date occurs.<br><br>(b) Any Allowed Secured Property Tax Claim shall be paid in full by the Reorganized Debtors on the Initial Distribution Date.<br><br>(c) Each holder of an Allowed Secured Property Tax Claim shall retain its Lien on its Collateral until its Allowed Secured Property Tax Claim is paid in full.<br><br>**If the Liquidating Trust is required to be established under the Plan**: Any Allowed Secured Property Tax Claim shall be paid and treated as follows (except to the extent that the holder of a Secured Property Tax Claim and the Liquidating Trustee agree otherwise in writing):<br><br>(a) The holders of Allowed Secured Claims for Property Taxes shall retain their liens on their respective Collateral.<br><br>(b) Class 7 Claims shall be amortized with 12% interest using a 60-month amortization and paid monthly, commencing on the 15th day of the first calendar month following the Liquidating Trust Effective Date, and continuing each month until the 25th month, at which time the remaining balance of such Claims shall be paid in full in satisfaction thereof. Notwithstanding the foregoing, within 30 days of the sale by the Liquidating Trustee of Collateral securing a Class 7 Claim, such Claim shall be paid in full with the first net proceeds of such sale. No Collateral subject to a Class 7 holder's lien shall be sold by the Liquidating Trustee |

| Class | Treatment |
|---|---|
| | unless the proposed sale price exceeds the remaining Allowed amount of such Secured Claim.<br><br>(c) To the extent that a Class 7 Claim has not been satisfied as provided hereinabove by the date of the 25th monthly payment, the holder thereof shall be permitted to exercise its legal and contractual remedies with respect to such Collateral.<br><br>(d) Secured Claims for Property Taxes that are secured by liens on Stringer's Exempt Property surrendered to him shall not be entitled to payment under this Class, but shall retain their Liens and remedies with respect to such Exempt Property.<br><br>**Estimated Recovery: 100%** |
| **Class 8 – Other Secured Claims**<br><br>**Estimated Amount: unknown**<br><br>**Number of Holders: unknown** | **Impaired**<br><br>**If the Liquidating Trust is <u>not</u> required to be established under the Plan**: Secured Claims, other than the Sandton DIP Loan Claim and Secured Claims included in Classes 1, 2, 3, 4, 5, 6 and 7 shall be paid and treated as follows:<br><br>Each holder of a Secured Claim not included in Classes 1, 2, 3, 4, 5, 6 and 7 shall be placed within a separate subclass of this Class 8. Each such Class 8 Claim shall, for purposes of accepting or rejecting the Plan and for receiving Distributions under the Plan, be treated as though in a separate Class. A Claim shall be treated as a Class 8 Secured Claim only to the extent of the greater of the amount of the Allowed Claim or the value of the Collateral securing such Claim as determined by the Bankruptcy Court. As to each holder of a Class 8 Secured Claim, the Reorganized Debtors may either (a) object to the Claim, (b) return the Collateral in full satisfaction of such Secured Claim, (c) pay cash in an amount equivalent to the lesser of the value of the Collateral or the full amount of the Secured Claim, (d) allow the Secured Claimant to offset in satisfaction of its Claim, (e) file a Valuation Motion to determine the value of the Claimant's Collateral, or (f) provide such other treatment as may be agreed to in writing by such holder of the Secured Claim and the Reorganized Debtors. In the event that any such Claimant's total Allowed Claim exceeds the value of the Collateral, any such excess (exclusive of postpetition interest, |

| Class | Treatment |
|---|---|
|  | fees or other charges that such Secured Creditor could otherwise assert) shall constitute an Unsecured (General) Claim for purposes of the Plan, unless such Claimant has elected treatment pursuant to section 1111(b) of the Bankruptcy Code and in accordance with Bankruptcy Rule 3014. The Reorganized Debtors shall, at their sole discretion, determine whether the treatment afforded will be a return of the Collateral or payment in cash. Any Lien held by any holder of a Class 8 Secured Claim against the Assets shall be deemed released as of the Effective Date. <br><br> **If the Liquidating Trust is required to be established under the Plan**: Secured Claims, other than the Sandton DIP Loan Claim and Secured Claims included in Classes 1, 2, 3, 4, 5, 6 and 7 shall be paid and treated as follows: <br><br> (a) To the extent that such holder's Lien or security interest is perfected under applicable law, secures an Allowed Claim, and does not involve the Debtors' real estate, such holder shall retain its Lien on its Collateral, which shall be surrendered to it on the Liquidating Trust Effective Date (subject to any senior Liens) in satisfaction of its Secured Claim, and such holder may proceed to repossess and dispose of its Collateral in accordance with its legal and contractual remedies. <br><br> (b) To the extent that such holder's Lien secures an Allowed Claim and is perfected upon the Debtors' real estate, such holder shall retain its Lien on its Collateral and the Liquidating Trustee shall be permitted to possess, market and sell such real estate Collateral for a period of 24 months from the Liquidating Trust Effective Date, after which the holder shall be permitted to exercise its legal and contractual remedies with respect to such Collateral. All sales of such holder's Collateral by the Liquidating Trustee shall satisfy at least one of the following conditions: (a) the holder shall have provided its prior written consent (which shall be deemed given if the holder does not respond within 20 days of notice of a proposed sale sent to it via certified U.S. mail), (b) proposed to be sold for a price that is at least 90% of the appraised value of the tract in the appraisal report of Appraisal & Realty Consultants dated August 24, 2016, or (c) determined by the Bankruptcy Court to be for a fair |

| Class | Treatment |
|---|---|
| | and reasonable price.<br><br>(c) Any such holder shall not participate in any distributions to Class 9 under the Plan. |
| **Class 9 – Unsecured (General) Claims**<br><br>**Estimated Amount: $6,050,000**<br><br>**Estimated Number of Holders: 40** | **Impaired**<br><br>**If the Liquidating Trust is _not_ required to be established under the Plan**:  The holders of Unsecured (General) Claims shall be paid and treated as follows:<br><br>In full, final and complete satisfaction of its Allowed Unsecured (General) Claim, each holder of an Allowed Class 9 Claim shall receive, promptly after the Effective Date, but in no event later than January 31, 2017, a Pro Rata Share of the sum of two million dollars ($2,000,000.00) (the "Class 9 Distribution Amount").  The Class 9 Distribution Amount shall be funded from one or both of (a) a portion of the proceeds received by the Debtors from the sale of their 2017 corn and hybrid seed crops and/or proceeds received by the Debtors from insurance claims made with respect to their 2017 corn crops, and (b) a portion of the proceeds of the Exit Loan.<br><br>**If the Liquidating Trust _is_ required to be established under the Plan**:  The holders of Unsecured (General) Claims shall be paid and treated as follows:<br><br>(a) Each holder shall receive a Pro Rata Share of the Net Liquidating Trust Assets, if any, after all Administrative Expense, Priority Claims, and Allowed Claims in Classes 1 through 8 have been satisfied in accordance with the Plan.<br><br>(b)  To the extent that there are sufficient Net Liquidating Trust Assets, each holder shall be entitled to receive interest on its Allowed Claim from January 1, 2017 at the Plan Rate.<br><br>(c) Claims of the Debtors and their affiliates (as that term is defined in the Bankruptcy Code) shall not be entitled to distributions under the Plan.<br><br>**Estimated Recovery: 33%** |

| Class | Treatment |
|---|---|
| **Class 10 – Interests Owned by Stringer**<br><br>**Number of Holders: 1** | **Unimpaired**<br><br>**If the Liquidating Trust is not required to be established under the Plan**: Interests owned by Stringer shall be treated as follows:<br><br>Class 10 consists of all Interests in SFI, which are owned by Stringer. Stringer shall retain his Interests in SFI.<br><br>**If the Liquidating Trust is required to be established under the Plan**: Interests owned by Stringer shall be treated as follows:<br><br>This Class consists of all interests in SFI, which are owned by Stringer, and Stringer's interest in his Exempt Property. Stringer shall not retain his interests in SFI, which shall be transferred to the Liquidating Trust; however, he shall retain his interest in his Exempt Property, subject to all Liens existing as of the Petition Date (including Secured Claims for Property Taxes). In addition, Stringer shall receive all Net Liquidating Trust Assets, if any, following satisfaction of all Allowed Claims in Class 9, including interest on such Allowed Claims at the Plan Rate. |

The total universe of Claims, as ultimately Allowed, may be greater or smaller than as reflected in the above analysis.

## II. **EXPLANATION OF CHAPTER 11**

### A. **Overview of Chapter 11**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Pursuant to chapter 11, the debtor-in-possession attempts to reorganize its business for the benefit of the debtor, its creditors, and other parties in interest. The present Chapter 11 Cases commenced with the filing of voluntary chapter 11 petitions by SFI and Stringer on December 14, 2016 and December 20, 2016, respectively.

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor in property as of the date the petition is filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee. In the present chapter 11 cases, the Debtors have remained in possession of their property and have continued to operate their businesses as debtors-in-possession.

The filing of a chapter 11 petition also triggers the automatic stay provisions of the

Bankruptcy Code. Section 362 of the Bankruptcy Code provides, *inter alia,* for an automatic stay of all attempts to collect pre-petition claims from the debtor or otherwise interfere with its property or business. Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed plan of reorganization.

The formulation of a plan of reorganization is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying the claims against and interests in the debtor. Generally, unless a trustee is appointed, only the debtor may file a plan during the first 120 days of a chapter 11 case (the "Filing Period"). However, section 1121(d) of the Bankruptcy Code permits the court to extend or reduce the Filing Period upon a showing of "cause." After the Filing Period has expired, a creditor or any other party in interest may file a plan, unless the debtor has filed a plan within the Filing Period, in which case, the debtor is generally given 60 additional days (the "Solicitation Period") during which it may solicit acceptances of its plan. The Solicitation Period may also be extended or reduced by the court upon a showing of "cause."

## B.      Plan of Reorganization

Although referred to as a plan of reorganization, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of the debtor's assets. In these Chapter 11 Cases, the Plan, as proposed by the Debtors, provides for continuation of the Debtors' businesses if certain conditions are met after confirmation of the Plan. If such conditions are not met, then the Plan will require the Liquidating Trust to be established and the Liquidating Trustee to conduct an orderly liquidation of the Debtors' non-exempt Assets.

After a plan of reorganization has been filed, the holders of impaired claims against or interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. This Disclosure Statement is presented to holders of Claims against the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code.

If all classes of claims and interests accept a plan of reorganization, the bankruptcy court may nonetheless still not confirm the plan unless the court independently determines that the requirements of section 1129 of the Bankruptcy Code have been satisfied. Section 1129 sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests of creditors" test and be "feasible." The "best interests of creditors" test generally requires that the value of the consideration to be distributed to the holders of claims and interests under a plan may not be less than those parties would receive if the debtor were liquidated pursuant to a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code. Under the "feasibility" requirement, the court generally must find that there is a reasonable probability that the debtor will be able to meet its obligations under its plan without the need for further financial reorganization.

The Debtors believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code, including, in particular, the "best interests of creditors" test and the "feasibility" requirement. The Debtors support confirmation of the Plan and urge all holders of impaired Claims to accept the Plan.

Chapter 11 does not require that each holder of a claim against or interest in a debtor vote

in favor of a plan of reorganization in order for the bankruptcy court to confirm the plan. At a minimum, however, the plan must be accepted by a majority in number and two-thirds in amount of those claims actually voting in at least one class of impaired claims under the plan. The Bankruptcy Code also defines acceptance of the plan by a class of interests (equity securities) as acceptance by holders of two-thirds of the number of shares actually voting. In the present case, only the holders of Claims who actually vote will be counted as either accepting or rejecting the Plan.

In addition, classes of claims or interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or interests in an impaired class. A class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or interests of that class are modified in any way under the plan. However, if holders of the claims or interests in a class do not receive or retain any property on account of such claims or interests, then each such holder is deemed to have voted to reject the plan and does not actually cast a vote to accept or reject the plan.

Classes 1, 2, 3, 4, 8 and 9 are impaired under the Plan and the holders of Claims in such Classes are therefore entitled to vote on the Plan. Classes 5, 6, and 7 are unimpaired under the Plan and the holders of Claims in such Classes are therefore deemed to have accepted the Plan and are not entitled to vote on the Plan. Stringer, the sole Interest holder of Class 10, shall retain his Interests in SFI under the Plan if certain conditions are met after confirmation of the Plan. Class 10 is therefore unimpaired and Stringer is deemed to have accepted the Plan and is not entitled to vote on the Plan.

The bankruptcy court may also confirm a plan of reorganization even though fewer than all the classes of impaired claims and interests accept it. For a plan of reorganization to be confirmed despite its rejection by a class of impaired claims or interests, the proponents of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or interests that has not accepted the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class of rejecting claims if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and interests, that the holder of any claim or interests that is junior to the claims or interests of such class will not receive or retain on account of such junior claim or interests any property at all unless the senior class is paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims, and (b) no senior class of claims is to receive more than 100% of the amount of the claims in such class.

## III. THE DEBTORS AND THEIR BUSINESSES

### A. The Debtors' Businesses and their Management

SFI, a Texas corporation, operates a fully irrigated farm covering approximately 2,600 acres in Moore County, Texas. Stringer is the President and sole Director of SFI. Crops

previously or currently grown by SFI include various types of feed and food corn, various types of wheat, and hybrid sorghum products. SFI is one of the larger seed farmers in the United States and has business relationships with many of the large seed developers in the United States, some of which relationships have existed for over 25 years.

Stringer owns, individually, additional real estate in Moore County, Texas covering approximately 4,000 acres. Approximately 1,100 acres constitutes Conservation Reserve Program lands. Stringer conducts farming operations on the remaining acreage under the dba CBS Farms. Stringer, through SFI and CBS Farms, has been involved in the research and development of many new strains and parent line hybrid plants for seed production and certain of the Debtors' products are sold worldwide. The Debtors also conduct additional farming operations on certain farmland leased by them as tenants.

In connection with the Debtors' farming operations, Stringer employees three individuals under the dba CBS Farms, including himself. The two employees other than Stringer are a farm boss and office administrator. Each employee is paid a salary. Additional labor required in connection with the Debtors' farming operations is obtained by Stringer through contract laborers and other independent contractors.

Stringer also operates a 39 acre feed lot in Moore County, Texas (the "Feed Lot") through his interests in Dos Ex LP and Dos Ex LLC, neither of which are debtors in a bankruptcy case. Stringer owns 100% of the membership interests in Dos Ex LLC and owns 76% of the partnership interests in Dos Ex LP. The Feed Lot is permitted for 8,000 head of cattle and is capable of turning 15,000-20,000 head of cattle per year.

Stringer also owns 100% of the membership interests in Revelation Oil & Gas, LLC ("Revelation"), a Texas limited liability company. Revelation has previously engaged in business including the operation of oil and/or gas wells. Presently, Revelation owns certain mineral interests that provide income for Stringer, though not in a substantial amount. Stringer is also a licensed real estate broker and has previously successfully closed multiple sales involving significant amounts of farmland in the Texas panhandle. At present, Stringer's primary business is the Debtors' farming operations and the Feed Lot operations of Dos Ex LP and Dos Ex LLC.

**B.    Prepetition Financing Structure of the Debtors**

Prior to the Petition Dates, the Debtors' farming operations, as well as Dos Ex LP's and Dos Ex LLC's Feed Lot operations, were financed by loans made to Stringer by Wells Fargo. The loans made by Wells Fargo are evidenced by the Wells Fargo Notes. Stringer is additionally indebted to Wells Fargo pursuant to the prepetition Card Agreement. SFI guaranteed payment of each of the Wells Fargo Notes as well as Stringer's debt to Wells Fargo under the Card Agreement.

To secure payment of the Wells Fargo Notes, the debt pursuant to the Card Agreement and SFI's obligations pursuant to its guaranty, Wells Fargo alleges that is possesses perfected security interests in and liens on various personal property of the Debtors, including all: (a) accounts and other rights to payment of every kind; (b) inventory; (c) equipment; (d) documents of title; and (e) farm products, including crops, livestock, poultry, and all supplies and feed used in the Debtors' farming operations.

Stringer also financed certain prepetition equipment purchases. The majority of debt owed on account of prepetition equipment financings is owed to WFFLI, as evidenced by the WFFLI

Finance Agreements. SFI and Dos Ex LP guaranteed some, but not all, of Stringer's obligations under the WFFLI Finance Agreements. The equipment financed by WFFLI includes certain tractors, planters, generators, a plow and a spreader. Stringer also obtained financing from Caterpillar in connection with another prepetition purchase of a generator used for farming operations.

## IV. FINANCIAL PROJECTIONS AND ASSUMPTIONS / FEASIBILITY

The Debtors' long term business plan and the underlying operating projections and assumptions serve as the basis for the Plan. The Debtors believe that the assumptions that underlie the projections are reasonable under the circumstances and that achieving the projections set forth herein will maximize the value of the Debtors' businesses and Assets. The Debtors' seven-year annualized operating projections for fiscal years ending February, 2018 through February, 2025 are attached to this Disclosure Statement as **Exhibit "B"**. The Debtors' fiscal years run March 1 through February 28.

The Bankruptcy Code conditions confirmation of a plan of reorganization on, among other things, a finding that it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. For purposes of determining whether the Plan satisfies this condition, the Debtors have analyzed their capacity to service their obligations under the Plan. Based upon this analysis and the supporting projections, the Debtors believe they will be able to make all payments and Distributions required under the Plan.

## V. THE CHAPTER 11 CASES

### A. Factors Leading To Filing of the Chapter 11 Cases

Pursuant to a letter dated September 23, 2016 from its counsel, Wells Fargo alleged that certain events of default had occurred under the Wells Fargo Notes, including that one of the Wells Fargo Notes had matured by its terms and not been paid in full. Such letter advised that Wells Fargo had accelerated the other two Wells Fargo Notes, and demand was made on the Debtors to immediately pay the full balance allegedly owed pursuant to the Wells Fargo Notes and the Card Agreement.

Thereafter, the Debtors engaged in negotiations with Wells Fargo in an attempt to avoid bankruptcy. During these negotiations, Wells Fargo permitted very limited use of its alleged cash collateral to pay operating expenses of the Debtors' businesses. The Debtors and Wells Fargo entered into a Temporary Forbearance Agreement dated November 10, 2016 (the "Forbearance Agreement"), but Wells Fargo declared certain defaults under the Forbearance Agreement as of November 18, 2016 and advised that it would recommence attempts to exercise its remedies. Between the beginning of November, 2016 and commencement of SFI's bankruptcy case, Wells Fargo setoff well over $2 million in funds. This included setoffs of funds deposited into accounts held by Stringer at Wells Fargo from the sale of harvested crops and over $850,000 held in a commodities hedge account belonging to Stringer. As a result of Wells Fargo's actions and the severe limitations placed on the use of alleged cash collateral, bankruptcy became unavoidable. The Debtors had no option but to file the Chapter 11 Cases and obtain the protection of the Bankruptcy Code.

### B. Commencement of the Chapter 11 Cases and Joint Administration

On December 14, 2016, SFI filed a voluntary petition for protection under chapter 11 of

the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division. SFI's chapter 11 case was designated Case No. 16-44821-rfn11 and assigned to the Honorable Russell F. Nelms, United States Bankruptcy Judge.

On December 20, 2016, Stringer filed a voluntary petition for protection under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division. Stringer's chapter 11 case was designated Case No. 16-44871-mxm11 and assigned to the Honorable Mark X. Mullin, United States Bankruptcy Judge.

On Stringer's Petition Date, the Debtors filed their *Motion of Stringer Farms, Inc. and Charles Blake Stringer Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and N.D. Tex. L.B.R. 1015-1 for an Order Directing Joint Administration.* The Bankruptcy Court granted such motion pursuant to an *Order Regarding Filing of Pleadings and Directing Joint Administration of Cases* entered on December 23, 2016, which directed joint administration of the Chapter 11 Cases under Case No. 16-44821-rfn11 and transferred Stringer's case from the Honorable Mark X. Mullin to the Honorable Russell F. Nelms.

## C.     The Debtors' Professionals

The following is a list of each of the Professionals that has been employed by the Debtors in the Chapter 11 Cases, with a description of the role of each such Professional:

| Professional | Role of Professional | Status of Employment |
|---|---|---|
| Forshey & Prostok, LLP | Bankruptcy counsel for the Debtors | Order granting employment entered February 9, 2017 [Docket No. 73][2] |
| Chiron Financial, LLC | Investment Bankers and Financial Advisors for the Debtors | Order granting employment entered February 10, 2017 [Docket No. 75] |
| Young & Newsome, PC | Special Litigation Counsel for Stringer | Order granting employment entered February 16, 2017 [Docket No. 87] |
| Lovell, Lovell, Isern & Farabough, L.L.P. | Special Litigation Counsel for Stringer | Order granting employment entered February 16, 2017 [Docket No. 88] |
| Brosier & Buchanan Partners | Accountants for the Debtors | Order granting employment entered February 16, 2017 [Docket No. 89] |
| Watts Guerra LLP | Special Litigation Counsel for the Debtors | Order granting employment entered November 9, 2017 [Docket No. 238] |

---

[2] Unless otherwise stated, all references herein to the "Docket" are to the Bankruptcy Court's Docket maintained for Case No. 16-44821-rfn11.

| Daniel M. Homolka, P.A. | Special Litigation Counsel for the Debtors | Order granting employment entered November 9, 2017 [Docket No. 238] |

## D.     Creditors' Committees

The U.S. Trustee has not appointed a creditors' committee in either of the Chapter 11 Cases.

## E.     Professional Fees and Expenses

Pursuant to an *Order Establishing Procedures for Interim Compensation and Reimbursement of Professionals* entered on March 16, 2017 (the "Compensation Order") [Docket No. 128] the Bankruptcy Court approved procedures whereby Professionals may submit invoices on a monthly basis to the Debtors. After expiration of a ten-day objection period, the Debtors are authorized to pay 80% of uncontested fees and 100% of uncontested out-of-pocket expenses included in such invoice submissions.

Forshey & Prostok, LLP ("F&P") received one retainer and two additional payments prior to SFI's Petition Date. The full amount received by F&P prepetition was applied to prepetition fees and expenses incurred by F&P. As of SFI's Petition Date, F&P was owed $45,087.66 on account of prepetition fees and expenses, which amount was waived by F&P to qualify as bankruptcy counsel for the Debtors. F&P filed its first interim fee application [Docket No. 143] on April 28, 2017, seeking interim allowance of $312,287.50 for professional fees and reimbursement of $14,702.55 in expenses for the period between SFI's Petition Date and March 31, 2017. Such application was granted pursuant to an *Order* [Docket No. 159] entered on May 25, 2017. F&P filed its second interim fee application [Docket No. 193] on August 30, 2017, seeking interim allowance of $114,572.50 for professional fees and reimbursement of $3,130.62 in expenses for the period of April 1, 2017 through July 31, 2017. Such application was granted pursuant to an *Order* [Docket No. 216] entered on October 5, 2017. Postpetition, F&P has received a total of $432,151.33 in payments authorized by the Bankruptcy Court. F&P estimates that it will be owed approximately $185,000 on account of fees and expenses incurred (whether previously approved or yet to be approved by the Bankruptcy Court) through October 31, 2017.

Lovell, Lovell, Isern & Farabough ("LLI&F") was not paid any prepetition retainer by Stringer. However, LLI&F discovered postpetition that Stringer overpaid his share of fees and expenses in connection with one of the legal matters on which LLI&F was engaged. The overpayment amount is $1,319.19, and LLI&F will treat such amount as a retainer to be applied to its fees and expenses approved in Stringer's case. LLI&F filed its first interim fee application [Docket No. 149] on May 10, 2017, seeking interim allowance of $7,435.00 for professional fees and reimbursement of $77.65 in expenses for the period between Stringer's Petition Date and March 31, 2017. Such application was granted pursuant to an *Order* [Docket No. 171] entered on June 15, 2017. LLI&F filed its second interim fee application [Docket No. 191] on August 30, 2017, seeking interim allowance of $5,954.25 for professional fees and reimbursement of $20.54 in expenses for the period April 1, 2017 through July 31, 2017. Such application was granted pursuant to an *Order* [Docket No. 217] entered on October 5, 2017. Postpetition, LLI&F has received payments totaling $12,123.48 authorized by the Bankruptcy Court.

Brosier & Buchanan Partners ("B&B") was not paid any prepetition retainers by the Debtors. B&B filed its first interim fee application [Docket No. 140] on April 27, 2017, seeking interim allowance of $3,398.75 for professional fees and reimbursement of $51.90 in expenses

for the period between SFI's Petition Date and March 31, 2017. Such application was granted pursuant to an *Order* [Docket No. 160] entered on May 25, 2017. B&B filed its second interim fee application [Docket No. 190] on August 30, 2017, seeking interim allowance of $7,870.00 for professional fees for the period of April 1, 2017 through July 31, 2017. Such application was granted pursuant to an *Order* [Docket No. 215] entered on October 5, 2017. Postpetition, B&B has received payments totaling $7,153.85 authorized by the Bankruptcy Court.

Young & Newsom, PC ("Y&N") was not paid any prepetition retainer by Stringer. Y&N filed its first interim fee application [Docket No. 192] on August 30, 2017, seeking interim allowance of $1,175.00 for professional fees and reimbursement of $47.72 in expenses for the period between Stringer's Petition Date and August 28, 2017. Such application was granted pursuant to an *Order* [Docket No. 218] entered on October 5, 2017. Y&N has not received any postpetition payments.

The Order approving the Debtors' employment of Chiron Financial, LLC ("Chiron") authorizes the Debtors to pay all fees and expenses due under the Debtors' engagement agreement with Chiron. Therefore, Chiron is not required to obtain Bankruptcy Court approval of interim fee applications or to follow the monthly invoice submission procedures established in the Compensation Order to be entitled to payment of fees and expenses incurred. Chiron received a total of $496,664.62 in postpetition payments as of September 30, 2017 and has applied a prepetition retainer in the amount of $10,015.12 to its postpetition charges.

The law firms of Watts Guerra LLP and Daniel M. Homolka, P.A. (the "Contingent Fee Firms") are engaged as special litigation counsel and jointly represent the Debtors in connection with the two Pending Lawsuits in Minnesota state court against Syngenta Corporation and certain affiliated defendants. The Bankruptcy Court has approved the fee agreements between the Debtors and the Contingent Fee Firms pursuant to section 328(a) of the Bankruptcy Code. Pursuant to such fee agreements, the Debtors will not be required to fund any costs of the Pending Lawsuits in which they are represented by the Contingent Fee Firms. The Contingent Fee Firms will be entitled to contingent fees equal to 40% of any recoveries without further application to or order by the Bankruptcy Court, which such contingent fees will be divided between the Contingent Fee Firms.

The Debtors' estimates of Professional fees and expenses to be paid in accordance with the Plan are included in the projections attached hereto as Exhibit "B."

## F.    Continuation of Businesses after the Petition Dates

Since the Petition Dates, the Debtors have continued to operate their businesses and manage their property as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. As discussed below the Debtors sought and obtained authority from the Bankruptcy Court during the period immediately following the Petition Dates with respect to certain matters deemed by the Debtors to be essential to a smooth and efficient transition into chapter 11. The Debtors also sought Bankruptcy Court approval for transactions that were outside the ordinary course of their businesses and resolved various disputes with certain Secured Creditors with the approval of the Bankruptcy Court.

### 1.    Debtors' Use of Cash Collateral

From and after the Petition Dates, the Debtors funded their continuing operations by using alleged cash collateral of Wells Fargo. The terms on which the Debtors used cash collateral of

Wells Fargo are set forth in (a) the *Agreed Interim Order Authorizing Use of Cash Collateral, Providing Adequate Protection and Granting Related Relief* (the "First Cash Collateral Order") [Docket No. 21], (b) the *Second Agreed Interim Order Authorizing Use of Cash Collateral, Providing Adequate Protection and Granting Related Relief* (the "Second Cash Collateral Order") [Docket No. 42], and (c) the *Third Agreed Interim Order Authorizing Use of Cash Collateral, Providing Adequate Protection and Granting Related Relief* (the "Third Cash Collateral Order" and, together with the First Cash Collateral Order and Second Cash Collateral Order, the "Cash Collateral Orders") [Docket No. 71]. The Debtors' authorization to use cash collateral under the Cash Collateral Orders expired after February 24, 2017.

Each of the Cash Collateral Orders provided that the Debtors would use their best efforts to obtain debtor-in-possession financing and file a motion seeking approval of such financing on or before a date certain. The Cash Collateral Orders required the Debtors to request in any such motion authorization to pay back Wells Fargo at least the amount of cash collateral consumed by the Debtors pursuant to the Cash Collateral Orders, save and except for any cash collateral used to (a) make premium payments to maintain insurance policies under which certain crops were insured against casualty loss, and (b) make a payment to Wells Fargo equal to an amount to be paid to certain custom harvesters as critical vendors. As discussed below, the Debtors later obtained debtor-in-possession financing from Sandton and a portion of the proceeds of the initial draw on such financing was used to fully repay Wells Fargo the amount of Cash Collateral used by the Debtors pursuant to the Cash Collateral Orders.

### 2. Payment of Prepetition Employee Obligations

On Stringer's Petition Date, Stringer filed his *Motion for Order Authorizing Payment of Prepetition Employee Compensation, Withholding Taxes, Benefits and Other Employee-Related Expenses* (the "Employee Wage Motion") [Docket No. 8 in Case No. 16-44871-rfn11] seeking authority to, among other things, immediately pay all compensation owed to employees and to honor all other obligations with respect to employee benefits, regardless of whether such compensation and benefits were earned prior to Stringer's Petition Date. The Bankruptcy Court granted the Employee Wage Motion pursuant to an *Order* [Docket No. 21] entered on December 23, 2016.

### 3. Relief with Respect to Utility Service Providers

On Stringer's Petition Date, the Debtors filed their *Motion Pursuant to 11 U.S.C. § 366(b) for an Interim and Final Order (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service, (II) Deeming Utility Companies Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment* (the "Utility Motion") [Docket No. 14]. The Utility Motion was granted by the Bankruptcy Court pursuant to an *Interim Order* [Docket No. 22] entered on December 23, 2016 and a *Final Order* [Docket No. 41] entered on January 12, 2017. Pursuant to such orders, the Debtors issued deposits to utility providers as adequate assurance of future payment. By issuing such deposits in the manner and amounts authorized the orders granting the Utility Motion, the Debtors ensured that utility service essential to the continued operation of the Debtors' businesses would not be disrupted or terminated on account of the Debtors' bankruptcy filings.

### 4. Debtor-in-Possession Financing

As contemplated by the Cash Collateral Orders, the Debtors filed their *Motion for the Entry of Order Approving Post-Petition Financing Under Sections 364(c) and 364(d) of the Bankruptcy*

*Code* (the "DIP Financing Motion") [Docket No. 79] on February 13, 2017. In the DIP Financing Motion, the Debtors sought authorization to obtain debtor-in-possession financing from Sandton. Sandton agreed to provide up to $3.57 million in postpetition financing (the "DIP Loan") pursuant to and subject to the terms of the DIP Loan Documents. The Court conducted an expedited hearing on the DIP Financing Motion on February 28, 2017 and granted the same pursuant to an *Order Pursuant to 11 U.S.C. §§ 105, 364(c), and 364(d) Approving Post-Petition Financing* (the "DIP Financing Order") [Docket No. 108] entered on March 1, 2017. Under the DIP Financing Order and DIP Loan Documents, Sandton has been granted security interests in and Liens on all Assets of the Debtors to secure repayment of the DIP Loan. Sandton's security interests and Liens prime the security interests and Liens securing repayment of the Zions Secured Claims, which previously were first priority Liens on the SFI Farmland and Stringer Farmland, subject only to Liens securing payment of Property Taxes.

The DIP Loan Documents contemplated that all advances under the DIP Loan would be made prior to expiration of an initial DIP Loan budget on the week ending June 30, 2017. The DIP Loan was fully funded prior to the end of June, 2017. The proceeds of the DIP Loan have enabled the Debtors to continue funding their farming operations and have also financed purchases of cattle in connection with the operations of Dos Ex LP and Dos Ex LLC. In addition, a portion of the proceeds of the initial draw on the DIP Loan was used to fully repay Wells Fargo the amount of cash collateral used by the Debtors in accordance with the terms of the Cash Collateral Orders.

Sandton has approved a revised operating budget which runs through the week ending December 29, 2017. Such budget allows the Debtors to continue to fund operations, including through use of Sandton's cash collateral. A true and correct copy of such operating budget is attached hereto as **Exhibit "C."** The initial maturity date of the DIP Loan was August 28, 2017. On that date, Sandton became entitled to an additional fee of $185,000 pursuant to the terms of the DIP Loan Documents. However, pursuant to the terms of the DIP Loan Documents, the maturity date of the DIP Loan extended for an additional 180 days, as Sandton had not declared any ongoing events of default by the Debtors under the DIP Loan Documents. The extended maturity date of the DIP Loan is February 24, 2018. Sandton agreed to forego immediate payment of the $185,000 extension fee and instead has increased the outstanding principal balance of the DIP Loan by such amount.

5.    **Resolution of Certain Motions for Relief from the Automatic Stay**

On February 24, 2017, Wells Fargo and WFFLI both filed a *Motion for Relief from the Automatic Stay Against Property or, Alternatively, for Adequate Protection* (the "Lift Stay Motions") [Docket Nos. 97 and 100]. In the Lift Stay Motions, Wells Fargo and WFFLI sought relief from the automatic stay to exercise rights against various items of Collateral or, alternatively, for entry of orders requiring the Debtors to provide adequate protection. Thereafter, the Debtors responded to certain written discovery requests made in connection with the Lift Stay Motions and negotiated consensual resolutions of the Lift Stay Motions. The parties' agreements are reflected in one agreed interim order and two agreed final orders [Docket Nos. 127, 137 and 138]. Among other things, the agreed orders resolving the Lift Stay Motions permitted the Debtors to retain possession of certain equipment and require the Debtors to make monthly adequate protection payments.

Stringer also negotiated an agreement with Caterpillar permitting Stringer to retain certain equipment financed by Caterpillar in exchange for, among other things, monthly adequate protection payments. Caterpillar sought Bankruptcy Court approval of such agreement pursuant

to an *Agreed Motion for Adequate Protection as to One (1) 2015 Caterpillar 3306 Generator Set, Serial Number 66X09656* [Docket No. 145]. Such agreed motion was granted pursuant to an *Agreed Order* [Docket No. 148] entered on May 5, 2017.

### G.  Schedules and Bar Dates

After having received three extensions from the Bankruptcy Court, the Debtors filed their original Schedules on February 10, 2017 [see Docket No. 76 in Case No. 16-44821-rfn11 and Docket No. 31 in Case No. 16-44871-rfn11]. The Debtors then filed amended Schedules on August 18, 2017 [see Docket No. 188 in Case No. 16-44821-rfn11 and Docket No. 37 in Case No. 16-44871-rfn11]. Subsequently, the Debtors filed further amended Schedules on September 28, 2017 [see Docket Nos. 211, 212 and 213 in Case No. 16-44821-rfn11 and Docket Nos. 38 and 39 in Case No. 16-44871-rfn11].

Pursuant to a *Notice of Chapter 11 Bankruptcy Case* entered in both of the Chapter 11 Cases, May 4, 2017, was fixed as the deadline for all holders of alleged Claims against the Debtors (except for governmental units) to file proofs of claim against the Debtors.

### H.  Operating Information During Pendency of the Chapter 11 Cases

The Debtors file monthly operating reports with the Bankruptcy Court. Copies of the filed monthly operating reports are available for inspection and copying at the office of the Clerk of the Bankruptcy Court. Copies of the most recently filed monthly operating reports for the Debtors are attached hereto as **Exhibit "D"**.

### I.  Matters Relating to Executory Contracts, Unexpired Leases, and Bar Dates for Rejection Claims

Section 365 of the Bankruptcy Code grants a debtor the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. Section 365(d)(4) of the Bankruptcy Code provides that if a debtor does not assume or reject an unexpired lease of nonresidential real property under which a debtor is the lessee (a) within 120 days after the petition date (the "365(d)(4) Deadline"), (b) within an additional 90-day period as the bankruptcy court, for cause, may allow, or (c) within such additional time as the bankruptcy court may permit with the consent of the landlord of the leased premises, then such lease is deemed rejected.

If the Liquidating Trust is **not** required to be established under the Plan, then the Plan provides that all Executory Contracts of the Debtors shall be deemed as assumed by the Debtors upon the Effective Date unless an Executory Contract (a) has been previously assumed or rejected pursuant to an order of the Bankruptcy Court, (b) is otherwise identified in the Plan or the Confirmation Order to be rejected, or (c) is the subject of a motion to reject filed on or before the Effective Date. The Plan shall constitute a motion to assume the Debtors' Executory Contracts. Alternatively, if the Liquidating Trust **is** required to be established under the Plan, then the Plan provides that all Executory Contracts of the Debtors shall be deemed as rejected by the Debtors upon the Liquidating Trust Effective Date unless an Executory Contract is expressly assumed pursuant to an order of the Bankruptcy Court or is otherwise identified in the Plan or the Confirmation Order to be assumed. However, the Debtors may file a separate motion for the assumption or rejection of any Executory Contract at any time through the Confirmation Date.

On March 7, 2017, the Debtors filed their *Debtors' Motion Pursuant to 11 U.S.C. § 365(d)(4) for Extension of Time Period Within Which they May Assume or Reject Unexpired Leases of Nonresidential Real Property* (the "365(d)(4) Motion") [Docket No. 118]. The 365(d)(4) Motion was granted pursuant to an *Order* [Docket No. 136] entered by the Bankruptcy Court on April 7, 2017, which extended the 365(d)(4) Deadline as to SFI to and through July 12, 2017 and extended the 365(d)(4) Deadline as to Stringer to and through July 18, 2017. Thereafter, the Debtors filed their *Motion Pursuant to 11 U.S.C. § 365(a) for Authority to Assume an Unexpired Lease of Nonresidential Real Property Between Debtors and Loura Ferne Nowlin* [Docket No. 169] on June 8, 2017 seeking authorization to assume a lease under which the Debtors are tenant farmers. Such motion was granted pursuant to an *Order* [Docket No. 174] entered on July 12, 2017, pursuant to which the subject lease was assumed by the Debtors. On June 8, 2017, Stringer filed his *Motion Pursuant to 11 U.S.C. § 365(a) for Authority to Assume an Unexpired Lease of Nonresidential Real Property Between Charles Blake Stringer and Smith Trust* [Docket No. 167] seeking authorization to assume a lease under which Stringer is a tenant farmer. Such motion was granted pursuant to an *Order* [Docket No. 173] entered on July 12, 2017, pursuant to which the subject lease was assumed by Stringer. Consequently, all unexpired leases of nonresidential real property under which the Debtors are lessees have been assumed.

To date, only one Executory Contract has been rejected by the Debtors. On March 16, 2017, Stringer filed his *Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rules 3002, 606 and 9014 for an Order Authorizing the Rejection of an Unexpired Lease Concerning a 2011 John Deere Planter, and Setting a Deadline for the Filing of Rejection Damage Claim* [Docket No. 129]. Pursuant to such motion, Stringer sought authorization to reject an unexpired equipment lease between Stringer and WFFLI pursuant to which Stringer leased a John Deere planter. Such motion was granted pursuant to *Order* [Docket No. 139] entered on April 25, 2017. Stringer's rejection of the unexpired lease with WFFLI was a component of the agreement reached between Stringer and WFFLI to resolve WFFLI's Lift Stay Motion.

## J. Exclusivity

Pursuant to sections 1121(b) and (c)(3) of the Bankruptcy Code, a debtor has (a) 120 days after the petition date within which to file its plan of reorganization (the "Filing Period"), and (b) 180 days after the petition date to solicit acceptances of its timely filed plan of reorganization (the "Solicitation Period") before other parties in interest are permitted to file plans.

The Debtors filed their *Motion Pursuant to Section 1121(d) of the Bankruptcy Code to Extend Exclusive Periods During which only the Debtors May File and Solicit Acceptances of a Plan of Reorganization* [Docket No. 117] on March 7, 2017, seeking extensions of both the Filing Period and Solicitation Period. Such motion was granted pursuant to *Order Granting Debtors' Motion Pursuant to Section 1121(d) of the Bankruptcy Code to Extend Exclusive Periods During which only the Debtors May File and Solicit Acceptances of a Plan of Reorganization* [Docket No. 135] entered on April 7, 2017. Such Order extended the Filing Period to and through August 31, 2017 and extended the Solicitation Period to and through October 30, 2017. The Debtors filed a *Joint Plan of Reorganization of Stringer Farms, Inc. and Charles Blake Stringer* (the "Prior Plan") [Docket No. 198] on August 30, 2017, prior to expiration of the extended Filing Period. Accordingly, other parties remained prohibited from filing a plan until expiration of the extended Solicitation Period.

On August 2, 2017, the Debtors filed their *Second Motion Pursuant to Section 1121(d) of the Bankruptcy Code to Extend Exclusive Periods During which only the Debtors May File and Solicit Acceptances of a Plan of Reorganization* [Docket No. 177] seeking additional extensions

of the Filing Period and Solicitation Period. However, such motion became unnecessary based on the Debtors' decision to file the Prior Plan prior to August 31, 2017, and such motion was therefore withdrawn by the Debtors pursuant to a *Notice of Withdrawal* [Docket No. 187] filed on August 14, 2017.

The Debtors did not solicit acceptances of the Prior Plan. Consequently, the extended Solicitation Period expired as of October 31, 2017 and thereafter creditors and other parties in interest have been free to file a plan if they choose. After the Solicitation Period expired, Wells Fargo and Zions filed their *Creditors' Liquidating Plan of Reorganization* (the "Wells Fargo – Zions Plan") [Docket No. 229]. However, after the filing of the Wells Fargo – Zions Plan, the Debtors engaged in negotiations with both Wells Fargo and Zions. Such negotiations resulted in formulation of the Plan, which is now supported by both Wells Fargo and Zions.

## K.     Anticipated Post-Confirmation Future of the Debtors

If the Liquidating Trust is **not** required to be established under the Plan, then the Plan contemplates that the Debtors will continue to operate their business from and after the Effective Date as Reorganized Debtors. No change in the Debtors' current management structure is contemplated under the Plan.

Alternatively, if the Liquidating Trust **is** required to be established under the Plan, then the Plan contemplates that the operation of the Debtors' businesses will generally cease on the Liquidating Trust Effective Date, with the possible exception of completing the cultivation and harvest of growing crops and finish-out of cattle in the Feed Lot. The Liquidating Trustee will focus his efforts on the marketing and sale of the Assets, particularly the Debtors' farmland, in an orderly process in order to maximize sale proceeds for the benefit of Creditors. The Liquidating Trustee will also collect all revenues generated from the Assets, including payments from the Wind Leases, mineral royalties, and rent from farmland pending sale. Stringer will no longer be in control or management of the Assets or SFI. It will be necessary for him to make a living and to pay his living costs from new employment utilizing his real estate broker's license or otherwise.

## L.     Preservation of NOLs

If the Liquidating Trust is **not** required to be established under the Plan, the Debtors shall preserve any net operating loss carry-forwards ("NOLs") under the Plan to offset taxable income resulting from future operations.

Alternatively, If the Liquidating Trust **is** required to be established under the Plan, to the extent permissible and necessary, the Liquidating Trustee shall seek to preserve any NOLs under the Plan to offset taxable income resulting from future operations. However, because it is not anticipated that the Debtors' businesses will be continued by the Liquidating Trustee, he may not be able to use the Debtors' NOLs.

## M.     Projected Avoidance Action Recoveries

If the Liquidating Trust is **not** required to be established under the Plan, all Estate Claims, including Avoidance Actions (unless expressly set forth otherwise in the Plan), shall be vested in the Reorganized Debtors as of the Effective Date. The Reorganized Debtors shall have the authority to assert, prosecute, settle, or otherwise resolve all such Estate Claims, including any Avoidance Actions. However, the performance of the Plan is not premised or dependent on prosecution of and recovery on any Avoidance Actions. At present, the Debtors have not

determined whether or not to pursue any Avoidance Actions and, consequently, are not projecting any recoveries on Avoidance Actions. Notwithstanding the foregoing, the Debtors reserve all rights to prosecute any and all Avoidance Actions, and nothing stated herein may be construed as a representation that the Debtors or the Reorganized Debtors will or will not file, prosecute and seek to recover on any Avoidance Action.

Alternatively, if the Liquidating Trust **is** required to be established under the Plan, all Estate Claims, including Avoidance Actions (unless expressly set forth otherwise in the Plan), shall be vested in the Liquidating Trust as of the Liquidating Trust Effective Date. The Liquidating Trustee shall have the authority to assert, prosecute, settle, or otherwise resolve all such Estate Claims, including any Avoidance Actions. However, the performance of the Plan is not premised or dependent on prosecution of and recovery on any Avoidance Actions. The Liquidating Trustee will not be in place or in position to determine whether or not to pursue any Avoidance Actions until after the Liquidating Trust Effective Date and, consequently, the Plan does not project, nor is it dependent upon, any proceeds of Avoidance Actions. Notwithstanding the foregoing, the Plan reserves all rights of the Liquidating Trustee to prosecute any and all Avoidance Actions, and nothing stated herein may be construed as a representation that the Liquidating Trustee will or will not file, prosecute and seek to recover on any Avoidance Action.

## VI. LITIGATION INVOLVING THE DEBTORS

### A. Litigation By and Against the Debtors

The Debtors were parties to the following legal proceedings which remained opened as of Petition Dates:

1.  *Blake Stringer v. DCP Midstream, LP*, Cause No. 13-81, in the 69th District Court, Moore County, Texas (the "DCP Lawsuit");

2.  *Blake Stringer, Individually and D/B/A CBS Farms v. Curtis Scheffe and Jacqueline Scheffe*, Cause No. 4905H, in the 69th District Court, Hartley County, Texas (the "Scheffe Lawsuit");

3.  *Charles Blake Stringer v. Out-Back Pool & Spa, LLC and Gary Roger Mayfield*, Cause No. 69,544-A, in the 47th District Court, Randall County, Texas (the "Out-Back Lawsuit");

4.  *Crooked Gate Inc., et al. v. Syngenta Corporation, et al.*, Case No. 27-CV-15-16994, in the District Court, Fourth Judicial District, County of Hennepin, State of Minnesota; and *Ulic Martin Henehan III, et al. v. Syngenta Corporation, et al.*, Case No. 27-CV-16-16681, in the District Court, Fourth Judicial District, County of Hennepin, State of Minnesota (together, the "Syngenta Lawsuits").

Stringer is plaintiff in the DCP Lawsuit. LLI&F represented Stringer in the DCP Lawsuit prepetition and the Bankruptcy Court has approved Stringer's employment of LLI&F as special litigation counsel to, *inter alia*, continue its representation of Stringer in the DCP Lawsuit. The defendant has pipeline easements over certain real estate owned by Stringer in Moore County, Texas. Stringer asserts that the defendant caused damages to various property of Stringer due to the defendant's actions in excavating and refilling pipeline ditches. Stringer asserts claims against the defendant for negligence and breach of contract and seeks recovery of damages in excess of $400,000. As of Stringer's Petition Date, discovery in the DCP Lawsuit was underway,

but not completed. On May 10, 2017, Stringer filed his *Motion to Modify Automatic Stay to Allow Continuation of Pending State Court Lawsuit Against DCP Midstream, LP* [Docket No. 155] seeking entry of an order by the Bankruptcy Court modifying the automatic stay to allow Stringer to continue prosecuting and to fully liquidate his claims in the DCP Lawsuit in state court. Such motion was granted pursuant to a *Default Order* [Docket No. 165] entered on June 7, 2017. The DCP Lawsuit remains pending. Performance of the Plan is not dependent on Stringer obtaining a judgment in his favor in the DCP Lawsuit and recovering any such judgment. However, in the event that Stringer does obtain and collect on a judgment against the defendant in the DCP Lawsuit, any such recovery may serve as an additional source of funding for Stringer to meet his obligations under the Plan as a Reorganized Debtor.

Stringer is plaintiff in the Scheffe Lawsuit. LLI&F represented Stringer in the Scheffe Lawsuit prepetition and the Bankruptcy Court has approved Stringer's employment of LLI&F as special litigation counsel to, *inter alia*, continue its representation of Stringer in the Scheffe Lawsuit. Defendant Curtis Scheffe is a former landlord of Stringer. At Curtis Scheffe's request, Stringer performed many capital improvements on the defendants' farmland for which Stringer has not been paid. In the Scheffe Litigation, Stringer has requested declaratory relief, asserted a claim for breach of contract, and seeks recovery of damages in excess of $100,000. The defendants have asserted a counterclaim against Stringer in an amount of no less than $115,000. As of the Petition Date, discovery in the Scheffe Litigation was underway, but not completed. On May 10, 2017, Stringer filed his *Motion to Modify Automatic Stay to Allow Continuation of Pending State Court Lawsuit Against Curtis and Jacqueline Scheffe* [Docket No. 153] seeking entry of an order by the Bankruptcy Court modifying the automatic stay to allow Stringer to continue prosecuting and to fully liquidate his claims in the Scheffe Lawsuit in state court. Such motion was granted pursuant to a *Default Order* [Docket No. 164] entered on June 7, 2017. The Scheffe Lawsuit remains pending. Performance of the Plan is not dependent on Stringer obtaining a judgment in his favor in the Scheffe Lawsuit and recovering any such judgment. However, in the event that Stringer does obtain and collect on a judgment against the defendants in the Scheffe Lawsuit, any such recovery may serve as an additional source of funding for Stringer to meet his obligations under the Plan as a Reorganized Debtor.

Stringer is plaintiff in the Out-Back Lawsuit. Y&N represented Stringer in the Out-Back Lawsuit prepetition and the Bankruptcy Court has approved Stringer's employment of Y&N as special litigation counsel to continue its representation of Stringer in the Out-Back Lawsuit. The Out-Back Lawsuit stems from a contract entered into on April 9, 2015 pursuant to which the defendants were to design and construct a residential pool on real estate owned by Stringer. In the Out-Back Lawsuit, Stringer seeks declaratory relief and asserts claims against the defendants for negligence, breach of warranty, breach of contract, common law fraud, violations of the Texas Deceptive Trade Practices – Consumer Protection Act, and violations of the Texas Property Code. Stringer seeks recovery of actual damages of no less than $200,000, statutory damages, exemplary and/or punitive damages and recovery of attorney's fees and costs, and has made a jury trial demand in the Out-Back Lawsuit. The Out-Back Lawsuit remains pending. Performance of the Plan is not dependent on Stringer obtaining a judgment in his favor in the Out-Back Lawsuit and recovering any such judgment. However, in the event that Stringer does obtain and collect on a judgment against the defendants in the Out-Back Lawsuit, any such recovery may serve as an additional source of funding for Stringer to meet his obligations under the Plan as a Reorganized Debtor.

The Debtors are among numerous plaintiffs in the Syngenta Lawsuits. The Contingent Fee Firms represented the Debtors in the Syngenta Lawsuits prepetition and the Bankruptcy Court has approved the Debtors' employment of the Contingent Fee Firms as special litigation

counsel to continue their representation of the Debtors in the Syngenta Lawsuits. The Syngenta Lawsuits stem from commercialization by the defendants (collectively, "Syngenta") of corn seeds containing the genetically modified trait known as MIR 162. In 2010, Syngenta's new genetically modified corn containing the MIR 162 genetic trait was approved for sale in the United States. However, one of the largest and growing export markets for U.S. corn farmers – China – had not approved MIR 162. Nevertheless, Syngenta commercialized its new corn product. In late-2013, U.S. exports of corn to China were found to be contaminated with MIR 162, which had still not been approved by China. Consequently, China began rejecting shipments of corn from the U.S. China's embargo resulted in a dramatic drop in the price of corn, damaging corn farmers across the United States. Thousands of corn farmers have already filed lawsuits, including class actions, against Syngenta in various courts across the country. The Debtors, as producers of corn throughout the relevant time period, have asserted claims and causes of action against Syngenta for public nuisance, common law negligence, tortious interference with prospective economic advantage, and violation of the Minnesota Uniform Deceptive Trade Practices Act in the Syngenta Lawsuits. The Debtors suffered significant damages as a result of Syngenta's actions and the corresponding devastating effect on corn prices. The Debtors believe their combined claims against Syngenta may exceed seven figures. The Syngenta Lawsuits remain pending. Performance of the Plan is not dependent on the Debtors obtaining judgments in their favor in the Syngenta Lawsuits and recovering any such judgments. However, in the event that the Debtors do obtain and collect on one or more judgments against Syngenta, any such recoveries may serve as an additional source of funding for the Debtors to meet their obligations under the Plan as Reorganized Debtors.

If the Liquidating Trust is **not** required to be established under the Plan, the Debtors intend to continue prosecuting their claims and causes of action in each of the above-described pending lawsuits as Reorganized Debtors.

Alternatively, if the Liquidating Trust **is** required to be established under the Plan, the Liquidating Trustee will evaluate the above-described pending lawsuits originated by the Debtors to determine whether their merits, when weighed against the anticipated legal expenses, defenses and counterclaims, reflect a net benefit to Creditors, and will either dismiss, settle, or pursue them accordingly.

## B.      Additional and Potential Litigation by the Debtors

Additional litigation involving Stringer may arise in the Dumas Matter. The City of Dumas, Texas ("Dumas") owns water rights under certain land owned by Stringer. Dumas seeks to obtain easements across the surface to lay electrical lines, pipelines, and to condemn sanitary easements surrounding water wells on the property. Stringer and the Dumas entered into a tolling agreement prepetition in order to engage in mediation in an effort to reach an agreement on compensation to Stringer for such easements. Mediation has yet to occur, but the parties are close to the point at which mediation can be scheduled. LLI&F represented Stringer in connection with the Dumas Matter prepetition and the Bankruptcy Court has approved Stringer's employment of LLI&F as special litigation counsel to, *inter alia*, continue its representation of Stringer with respect to the Dumas Matter. On May 10, 2017, Stringer filed his *Motion to Modify Automatic Stay to Allow Mediation with and, if Necessary, Commencement of Condemnation Lawsuit by the City of Dumas, Texas* [Docket No. 151]. In such motion, Stringer sought an order from the Bankruptcy Court modifying the automatic stay to allow Stringer and Dumas to (a) engage in mediation as contemplated by the parties' prepetition tolling agreement and, (b) in the event that mediation is not successful, to allow Dumas to file a condemnation lawsuit in state court and allow the parties to thereafter prosecute such lawsuit to conclusion. Such motion was granted pursuant

to a *Default Order* [Docket No. 166] entered on June 7, 2017. Performance of the Plan is not dependent on any particular outcome of the Dumas Matter or Stringer obtaining any particular recovery from Dumas. However, any recovery obtained by Stringer through the Dumas Matter may serve as an additional source of funding for Stringer to meet his obligations under the Plan as a Reorganized Debtor.

If the Dumas matter is not consensually resolved through mediation, Stringer anticipates that Dumas will then commence a condemnation lawsuit in state court. If such a lawsuit is filed, and if the Liquidating Trust is **not** required to be established under the Plan, Stringer intends to seek all damages and remedies to which he may be entitled in such lawsuit.

Alternatively, if the Liquidating Trust **is** required to be established under the Plan, the Liquidating Trustee will evaluate Stringer's claims and rights in connection with the Dumas Matter to determine whether their merits, when weighed against the anticipated legal expenses, defenses and counterclaims, reflect a net benefit to Creditors, and will either dismiss, settle, or pursue them accordingly.

Except as expressly provided in the Plan, nothing contained in the Disclosure Statement, the Plan or the Confirmation Order shall waive, relinquish, release or impair the Debtors', the Reorganized Debtors', or the Liquidating Trustee's rights, as the case may be, to object to any Claim.

The Reorganized Debtors or the Liquidating Trustee, as the case may be, will retain all rights pursuant to section 505 of the Bankruptcy Code as to any tax Claim.

If the Liquidating Trust is **not** required to be established under the Plan, then except as expressly set forth in the Plan, all causes of action, claims, counterclaims, defenses and rights of offset or recoupment (including but not limited to all Estate Claims, Estate Defenses and Avoidance Actions) belonging to the Debtors shall, upon the occurrence of the Effective Date, be retained by, received by and vested in the Reorganized Debtors for the benefit of the Debtors and the Estates. Except as expressly set forth in the Plan, the rights of the Reorganized Debtors to commence, prosecute or settle such causes of action shall be preserved notwithstanding the occurrence of the Effective Date. **No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any cause of action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) against them. The Debtors and their estates expressly reserve all rights to prosecute any and all causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) against any Person, except as otherwise provided in the Plan.** Unless any causes of action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, the Debtors expressly reserve all causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) for later adjudication, and, therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such causes of action upon or after the confirmation or consummation of the Plan. The Debtors or the Reorganized Debtors may also assert Estate Defenses as a defense to the allowance of any Claim not otherwise Allowed.

If the Liquidating Trust **is** required to be established under the Plan, then except as expressly set forth in the Plan, all causes of action, claims, counterclaims, defenses and rights of offset or recoupment (including but not limited to all Estate Claims, Estate Defenses and

Avoidance Actions) belonging to the Debtors shall, upon the occurrence of the Liquidating Trust Effective Date, be retained by, received by and vested in the Liquidating Trust. Except as expressly set forth in the Plan, the rights of the Liquidating Trust to commence, prosecute or settle such causes of action shall be preserved notwithstanding the occurrence of the Liquidating Trust Effective Date. **No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any cause of action against them as any indication that the Debtors or the Liquidating Trust will not pursue any and all available causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) against them. The Liquidating Trust expressly reserves all rights to prosecute any and all causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) against any Person, <u>except</u> as otherwise provided in the Plan.** Unless any causes of action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, all causes of action are reserved (including all Estate Claims, Estate Defenses and Avoidance Actions) for later adjudication, and, therefore, no preclusion doctrine, <u>including</u> without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such causes of action upon or after the confirmation or consummation of the Plan. The Liquidating Trust may also assert Estate Defenses as a defense to the allowance of any Claim not otherwise Allowed.

## VII. <u>THE PLAN</u>

THE FOLLOWING IS A SUMMARY OF THE MATTERS CONTEMPLATED TO OCCUR EITHER PURSUANT TO OR IN CONNECTION WITH THE CONSUMMATION OF THE PLAN. THIS SUMMARY HIGHLIGHTS THE SUBSTANTIVE PROVISIONS OF THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN. THE FOLLOWING SUMMARY IS COMPLETELY QUALIFIED BY THE TERMS OF THE PLAN. IN THE EVENT OF ANY CONFLICT BETWEEN THE FOLLOWING SUMMARY AND THE PLAN, THE PLAN WILL CONTROL.

### A. Classification and Treatment Summary

The Plan classifies the various Claims against and Interests in the Debtors. These Classes take into account the different nature and priority of Claims against and Interests in the Debtors. In addition, in accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified for purposes of voting under the Plan. Rather, all such Claims are treated separately as unclassified Claims.

Classes 1, 2, 3, 4, 8 and 9 are impaired under the Plan and Classes 5, 6, 7 and 10 are unimpaired. If a controversy arises as to the classification of any Claim or Interest, or as to whether any Class of Claims or Interests is impaired under the Plan, the Bankruptcy Court shall determine such controversy as a part of the confirmation process.

### 1. Unclassified Claims Against the Debtors

Unclassified Claims against the Debtors consist of Administrative Expense Claims and Priority Tax Claims. An Administrative Expense Claim is a Claim based on any cost or expense of administration of the Chapter 11 Cases allowed under subsections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the Estates, any actual and necessary expenses of operating the businesses of the Debtors, any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during

the Chapter 11 Cases including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, all compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the Estates under section 1930 of title 28 of the United States Code.

Administrative Expense Claims include both ordinary postpetition business expenses and Claims attributable to Professionals. Trade debt will be paid in the ordinary course of business. Fees and expenses owed to Professionals are payable upon the Allowance of an appropriate fee application.

### a. Treatment of Administrative Expense Claims

Administrative Expenses shall be treated as follows:

Each holder of an Allowed Administrative Expense shall receive, at the Estate Representative's option, (i) the amount of such holder's Allowed Administrative Expense in one cash payment on the later of the Effective Date or the tenth (10th) Business Day after such Administrative Expense becomes an Allowed Administrative Expense, (ii) the amount of such holder's Allowed Administrative Expense in accordance with the ordinary business terms of such expense or cost, or (iii) such other treatment as may be agreed to in writing by such Administrative Expense Creditor and the applicable Debtor or Estate Representative, or as ordered by the Bankruptcy Court.

Unless the Bankruptcy Court orders to the contrary or the applicable Debtor or Estate Representative agrees to the contrary in writing, the holder of a Claim for an Administrative Expense, other than such a Claim by a Professional, a liability incurred and paid in the ordinary course of business by the Debtors, or an Allowed Administrative Expense, shall file with the Bankruptcy Court and serve upon the Estate Representative and its counsel a written notice of such Claim for an Administrative Expense within thirty (30) days after the Effective Date. Such notice shall include at a minimum: (i) the name, address, telephone number and fax number (if applicable) of the holder of such Claim, (ii) the amount of such Claim, and (iii) the basis of such Claim. **Failure to timely and properly file and serve such notice shall result in such Claim for an Administrative Expense being forever barred and discharged.** Notwithstanding the foregoing, a Taxing Authority shall not be required to file any notice of a Claim for Administrative Expense or any other request for payment with respect to any Property Taxes assessed against the Debtors for the year 2017 and subsequent years and a Taxing Authority shall retain the Liens securing all amounts owed for Property Taxes for postpetition tax years, including all penalties and interest that may accrue, until all such amounts have been paid in full.

A Claim for an Administrative Expense, for which a proper notice was filed and served under subsection 3.1(b) of the Plan, shall become an Allowed Administrative Expense if no Objection is filed within thirty (30) days of the filing and service of such notice. If a timely Objection is filed, the Claim shall become an Allowed Administrative Expense only to the extent allowed by a Final Order.

The procedures set forth in subsections 3.1(b) and (c) of the Plan shall not apply to Professionals, who shall each file and submit a final fee application to the Bankruptcy Court no later than sixty (60) days after the Effective Date. A Claim for Administrative Expense by a Professional in respect of which a final fee application has been properly filed and served shall become an Allowed Administrative Expense only to the extent allowed by Final Order and, if so

Allowed, shall be paid in accordance with subsection 3.1(a) of the Plan. Professional fees and expenses to any Professional incurred on or after the Effective Date may be paid without necessity of application to or order by the Court.

Section 3.1 of the Plan shall not apply to expenses incurred by the Debtors in the ordinary course of their businesses after the Petition Date, or by the Liquidating Trustee on or after the Liquidating Trust Effective Date. The Debtors, or Liquidating Trustee, as applicable, may pay such expenses in the ordinary course as agreed.

b. **Treatment of Priority Tax Claims**

**If the Liquidating Trust is not required to be established under the Plan**: Any Allowed Priority Tax Claim shall be paid and treated as follows (except to the extent that the holder of a Priority Tax Claim and the Debtors or Reorganized Debtors agree otherwise in writing):

Interest on each Allowed Priority Tax Claim shall accrue as follows: (i) for the postpetition period beginning on the date any portion of the tax underlying the Allowed Priority Tax Claim was, became or becomes delinquent under applicable law, and to the extent of such delinquency, and continuing through the Effective Date, interest shall accrue at the applicable statutory rate of interest determined under nonbankruptcy law in compliance with section 511 of the Bankruptcy Code; and (ii) for the period beginning on the day after the Effective Date and continuing through the day on which such Allowed Priority Tax Claim is paid in full, interest shall accrue on the unpaid tax at the applicable statutory rate of interest determined under nonbankruptcy law in compliance with sections 511 and 1129 of the Bankruptcy Code, determined during the month in which the Confirmation Date occurs.

Any Allowed Priority Tax Claim shall be paid in full by the Reorganized Debtors on the Initial Distribution Date.

**Alternatively, if the Liquidating Trust is required to be established under the Plan**: Each Holder of an Allowed Priority Tax Claim, at the Liquidating Trustee's option, shall receive (i) the amount of such holder's Allowed Claim in one Cash payment on or before the Initial Distribution Date; (ii) the amount of such holder's Allowed Claim, in equal annual Cash payments on each anniversary of the Initial Distribution Date with interest thereon at the non-default statutory rate applicable to the tax in question, without penalties, until the last anniversary of the Initial Distribution Date that precedes the fifth (5th) anniversary of the Petition Date; or (iii) such other treatment as may be agreed to in writing by the holder of the Priority Tax Claim and the Liquidating Trustee.

c. **Sandton DIP Loan Claim**

Except to the extent that Sandton agrees to less favorable treatment in full and final satisfaction, settlement, release, and discharge of, and in exchange for, the Sandton DIP Loan Claim, the Sandton DIP Loan Claim shall be (i) deemed to be Allowed in the full amount due and owing under the DIP Loan Documents and (ii) paid in full in Cash after the Effective Date and promptly after the Exit Loan has fully closed and funded, but in no event later than January 31, 2018.

If the Liquidating Trust is required to be established under this Plan, the Liquidating Trustee shall use the Debtors' 2017 harvest proceeds and the proceeds of an Exit Loan of up to $4,000,000.00 to repay the Sandton DIP Loan Claim.

### d. Treatment of United States Trustee's Fees

The Estate Representative shall pay the U.S. Trustee's quarterly fees incurred pursuant to 28 U.S.C., section 1930(a)(6). Any fees due as of the Confirmation Date or that become due after the Confirmation Date, but prior to the Effective Date, shall be paid in full by the Estate Representative. After the Effective Date, the Estate Representative shall pay quarterly fees as they accrue until final decrees are entered and the Chapter 11 Cases are closed. The Estate Representative shall file with the Bankruptcy Court and serve on the U.S. Trustee quarterly financial reports for each quarter, or portion thereof, that the Chapter 11 Cases remain open.

### 2. Classified Claims and Interests

Classified Claims and Interests shall receive the treatment as described in Article IV of the Plan, which treatment is summarized in the table set forth in Article I.B of this Disclosure Statement above.

## B. Acceptance or Rejection of the Plan

Each impaired Class of Claims entitled to vote shall separately vote to accept or reject the Plan. Any unimpaired Class shall not be entitled to vote to accept or reject the Plan. Any unimpaired Class is deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan. Any Class of Claims that is not occupied as of the date of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. Section 5.4 of the Plan shall constitute the request by the Plan Proponents, pursuant to section 1129(b) of the Bankruptcy Code, that the Bankruptcy Court confirm the Plan notwithstanding the fact that the requirements of section 1129(a)(8) of the Bankruptcy Code have not been met.

## C. Means of Implementation of the Plan if the Liquidating Trust is <u>not</u> Required to be Established Under the Plan

### 1. Satisfaction of Conditions Eliminating Requirement to Establish Liquidating Trust

If (a) the Exit Loan is fully closed and funded on or before January 26, 2018 in an amount sufficient to allow the Reorganized Debtors to fully repay the Sandton DIP Loan Claim in accordance with subsection 3.3(a) of the Plan, <u>and</u> (b) the Reorganized Debtors make the Distribution to holders of Allowed Class 9 Claims as required by subsection 4.9(a)(1) of the Plan on or before January 31, 2018, then there shall be no requirement under the Plan to establish the Liquidating Trust. In the event that establishment of the Liquidating Trust is <u>not</u> required, then the provisions of Article VI of the Plan shall constitute the means for implementation of the Plan and the provisions of Article VII of the Plan shall be null and void. As an assurance of the Debtors' performance in the event that the foregoing conditions (a) and (b) are not timely satisfied, the Debtors shall execute, notarize, and deliver to Wells Fargo's counsel, not later than ten (10) days after the Confirmation Date, (1) the Liquidating Trust Agreement attached as Exhibit "A" to the Plan, and (2) special warranty deeds conveying all Stringer Farmland and SFI Farmland to the Liquidating Trustee in form satisfactory to Wells Fargo, to be held in escrow by Wells Fargo's

counsel for disposition as follows: (x) in the event that conditions (a) and (b) above are timely satisfied, such Liquidating Trust Agreement and deeds shall be returned to the Debtors, and (y) in the event that either condition (a) or (b) above are not timely satisfied, such Liquidating Trust Agreement and deeds shall be delivered to the Liquidating Trustee for recordation, as he deems appropriate.

**2. Assumption of Allowed Claims**

As of the Effective Date, the Reorganized Debtors shall assume the liability for and obligation to perform and make all Distributions or payments on account of all Allowed Claims in the manner provided in Articles III and IV of the Plan. All Distributions or payments shall be made as set forth in Articles III and IV of the Plan in accordance with the provisions thereof that specify treatment of Allowed Claims if the Liquidating Trust is **not** required to be established under the Plan.

**3. Vesting of Assets**

As of the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, each Debtor's Assets shall be transferred to, and vested in, the applicable Reorganized Debtor, free and clear of all rights, title, interests, claims, liens, encumbrances and charges, except as expressly set forth in the Plan. Without limiting the generality of the foregoing, all Assets shall vest in the Reorganized Debtors free and clear of any Lien except as expressly provided in the Plan. On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any claim without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for all fees, disbursements, expenses or related support services of Professionals (including fees relating to the preparation of Professional fee applications) without application to, or approval of, the Bankruptcy Court.

**4. Actions by the Debtors and the Reorganized Debtors to Implement Plan**

The entry of the Confirmation Order shall constitute authorization for the Debtors and the Reorganized Debtors (as the case may be) to take or cause to be taken all actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including without limitation, (a) all transfers of Assets that are to occur pursuant to the Plan; (b) the incurrence of all obligations contemplated by the Plan and the making of all Distributions required under the Plan; (c) taking of all actions to preserve and provide for the prosecution of retained causes of action, including but not limited to any Estate Claims that are not expressly released pursuant to the Plan; and (d) entering into any and all transactions, contracts, or arrangements permitted by applicable law, order, rule or regulation.

Stringer, the management of SFI and the Reorganized Debtors, as the case may be, shall be authorized and directed to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary action required in connection therewith, in the name of and on behalf of Stringer, SFI and the Reorganized Debtors, as the case may be.

5. **Exit Financing**

The Exit Loan will be closed and fully funded by no later than January 26, 2018. Among other things, proceeds of the Exit Loan will be used by the Reorganized Debtors to repay the Sandton DIP Loan Claim in full. Prior to the Confirmation Hearing, the Exit Lender providing the Exit Loan will be identified and the terms of the Exit Loan will be set. The Debtors expect that the Exit Loan will bear interest at a rate of less than twelve percent (12%) per annum and will mature 24 months after the Effective Date. The Debtors may also obtain one or more New Revolvers or other loans prior to or after the Effective Date, the proceeds of which may be used by the Reorganized Debtors to fund input costs for future crops and/or future purchases of cattle. Any Exit Lender providing a New Revolver or other loan will be identified in the future and the terms of such financing will be later set. The Debtors expect that any New Revolver or other similar financing will bear interest at a rate of less than ten percent (10%) per annum and will be paid with available cash from the operations of the Reorganized Debtors.

6. **Source of Funding for Stringer's Living Expenses**

From and after the Effective Date, payment of Stringer's living expenses shall be funded primarily from remaining available cash generated by the Reorganized Debtors' operations after payment of obligations under the Plan. Stringer shall maintain a separate bank account into which a monthly living allowance shall be funded so that personal expenditures are not commingled with business expenditures.

7. **Source of Funding for Plan Obligations**

The Distributions to be made by the Reorganized Debtors under the Plan shall be funded from the proceeds of the Exit Loan and cash generated by the Reorganized Debtors' operations. In addition to revenue generated by the Debtors' traditional farming operations and the cattle business conducted through Dos Ex LP and Dos Ex LLC, the Debtors anticipate generating significant revenue after the Effective Date based on the Wind Leases. The Wind Leases contemplate the installation of wind farms on portions of the SFI Farmland and Stringer Farmland by Swinford Wind, LLC ("Swinford"). The process of obtaining regulatory approvals to commence construction of the wind farms is ongoing. Consequently, Swinford has yet to begin the project of constructing the wind turbines and other structures necessary to collect and transmit electrical energy converted from wind energy. The Debtors project that the wind farms will be established and generating revenue for the Reorganized Debtors by early 2019. Once the wind farms are fully constructed and operational, the Debtors expect the Wind Leases to provide the Reorganized Debtors with additional revenue of approximately $600,000 per year. In addition, any recoveries obtained through the Pending Lawsuits, and/or Dumas Matter may serve as an additional source of funding for Plan obligations.

8. **Retention and Assertion of Causes of Action and Defenses**

Except as expressly set forth in the Plan, all causes of action, claims, counterclaims, defenses and rights of offset or recoupment (including but not limited to all Estate Claims, Estate Defenses and Avoidance Actions) belonging to the Debtors shall, upon the occurrence of the Effective Date, be retained by, received by and vested in the Reorganized Debtors for the benefit of the Debtors and their Estates. Except as expressly set forth in the Plan, the rights of the Reorganized Debtors to commence, prosecute or settle such causes of action shall be preserved notwithstanding the occurrence of the Effective Date. **No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any cause of action against**

them as any indication that either the Debtors or the Reorganized Debtors will not pursue any and all available causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) against them. The Debtors and their Estates expressly reserve all rights to prosecute any and all causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) against any Person, _except_ as otherwise provided in the Plan. Unless any causes of action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, the Debtors expressly reserve all causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) for later adjudication, and, therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such causes of action upon or after the confirmation or consummation of the Plan. The Debtors and the Reorganized Debtors may also assert Estate Defenses as a defense to the allowance of any Claim not otherwise Allowed.

9.     **Prosecution of Claims in Pending Lawsuits and Dumas Matter**

Funding of the Plan does not depend on the Debtors or Reorganized Debtors obtaining a recovery in connection with the Pending Lawsuits and/or Dumas Matter. However, it is expected that the Debtors and Reorganized Debtors will continue to prosecute all claims and causes of action, including Estate Claims, against the defendants in the Pending Lawsuits. Likewise, it is expected that Stringer will prosecute all claims and causes of action, including Estate Claims, against the City of Dumas, Texas in the Dumas Matter. Any recoveries that the Debtors or Reorganized Debtors may obtain in connection with the Pending Lawsuits and/or Dumas Matter may provide an additional source of funding to meet the obligations under the Plan.

10.     **Post-Effective Date Reporting and Operational Oversight**

From and after the Effective Date, the Reorganized Debtors shall engage Tyrone Tyll (or if Mr. Tyll fails or refuses to serve, then another suitable person acceptable to Wells Fargo and Zions) (the "Oversight Party") to provide oversight and to assist in the preparation of and to approve the terms of quarterly and annual budgets (the "Operating Budgets") pertaining to the Reorganized Debtors' operations (including but not limited to Dos Ex LP and Dos Ex LLC, and other entities involving the Reorganized Debtors as well as any other new joint venture, partnership or other entity formed by the Reorganized Debtors after the Effective Date) commencing with the period January 1 – March 31, 2018.   If the parties cannot agree on an alternative Oversight Party to be engaged, the Reorganized Debtors shall promptly file a motion with the Bankruptcy Court identifying the Oversight Party they propose to engage, along with any other Oversight Parties that Wells Fargo and/or Zions propose to be engaged, and the proposed terms of engagement of such proposed Oversight Parties.  After notice and a hearing, the Bankruptcy Court shall determine which of the proposed Oversight Parties may be engaged by the Reorganized Debtors and the terms on which the Reorganized Debtors may engage such Oversight Parties.  Promptly after each Operating Budget has been prepared and approved by the Reorganized Debtors and the Oversight Party, but in no event later than the 1st business day of each quarter, a copy thereof shall be provided to each of Wells Fargo and Zions.  Unless otherwise agreed in writing, on the fourth Business Day of each month, beginning with the fourth Business Day following the first month covered by an Operating Budget, the Reorganized Debtors shall provide to the Oversight Party, for purposes of audit, a report setting forth a comparison of actual receipts and expenses to budgeted receipts and expenses in the current Operating Budget for the preceding month ("Reconciliation Reports") and, after review and approval by the Oversight Party, shall transmit such Reconciliation Reports, with appropriate corrections and signed by the Oversight Party as reviewer, to each of Wells Fargo, Zions, and the Exit Lender,

not later than the 15th day of the month. The Reorganized Debtors shall provide the Oversight Party with on-line access to their business bank accounts and shall furnish the Oversight Party, promptly upon his request, with such backup documentation as he may request from time to time, and shall otherwise reasonably cooperate with him. The Oversight Party shall receive a monthly fee as compensation, plus reimbursement for reasonable and necessary out of pocket expenses incurred in connection with performance of his duties. The Reorganized Debtors shall indemnify and hold harmless the Oversight Party from any and all claims and demands brought against him by either of the Reorganized Debtors or any third party arising from the performance of his duties. Unless Wells Fargo and/or Zions provides notice to the Reorganized Debtors in accordance with notice provisions of the Plan designating the identity and address of the Person to receive such Operating Budgets and Reconciliation Reports, all such Operating Budgets and Reconciliation Reports shall be provided by the Reorganized Debtors to Wells Fargo and Zions in accordance with the notice provisions of the Plan. Notwithstanding anything to the contrary contained in the Plan, if the Reorganized Debtors seek to transfer any funds of the Reorganized Debtors, Dos Ex LP, Dos Ex LLC, or any other entity involving the Reorganized Debtors to establish any new joint ventures or partnership or other entity, the Oversight Party shall have the authority to review, object to or approve any such transfer.

## D.    Means of Implementation of the Plan if the Liquidating Trust is Required to be Established Under the Plan

### 1.    Conditions Triggering Requirement to Establish Liquidating Trust

If (a) the Debtors fail to obtain an Exit Loan that is fully closed and funded on or before January 26, 2018 in an amount sufficient to allow the Reorganized Debtors to fully repay the Sandton DIP Loan Claim in accordance with subsection 3.3(a) of the Plan, or (b) the Reorganized Debtors fail to make the Distribution to holders of Allowed Class 9 Claims as required by subsection 4.9(a)(1) of the Plan on or before January 31, 2018, then the Liquidating Trust shall be established pursuant to the Plan effective on the following Business Day. In the event that establishment of the Liquidating Trust is required, then the provisions of Article VII of the Plan shall constitute the means for implementation of the Plan and the provisions of Article VI of the Plan shall be null and void. Time is of the essence in construing this provision.

### 2.    Substantial Consolidation, Liquidating Trust and Orderly Liquidation

On the Liquidating Trust Effective Date, the Assets and liabilities of Stringer and SFI shall be substantially consolidated into a single estate. The Debtors' Assets will be transferred to the Liquidating Trust. The Liquidating Trustee shall promptly repay the Sandton DIP Loan using the Debtors' 2017 harvest proceeds and the proceeds of an exit loan of up to $4,000,000.00 from an Exit Lender secured by a first lien on the Debtors' Assets to the same extent, and with the same priority, as the Sandton DIP Loan, and subject to other reasonable and customary commercial loan terms and conditions. The Liquidating Trustee will thereafter conduct an orderly liquidation of the Debtors' non-exempt Assets (other than Collateral surrendered to certain secured creditors), and shall use the proceeds of such liquidation (subject to maintaining the Trust Reserve) to repay the bridge loan, the Secured Claims for Property Taxes, Zions' Secured Claims, and ultimately the holders of Unsecured (General) Claims. On the Liquidating Trust Effective Date, Stringer shall physically surrender possession and control of all of the Assets, other than his Exempt Property, and shall deliver to, and endorse in favor of, the Liquidating Trustee, all certificates evidencing his ownership in SFI, Dos Ex LP, Dos Ex LLC, Revelation Oil & Gas, LLC, and any other entity in which he holds an ownership interest, and thereafter shall promptly and reasonably cooperate with requests by the Liquidating Trustee to provide information and

assistance in effectuating the Plan. If requested to do so by Wells Fargo, the Liquidating Trustee shall be empowered to wind up the Dos Ex LP partnership, liquidate its property, and to collect the Debtors' share of Dos Ex LP's property, for the benefit of Wells Fargo.

### 3.     The Liquidating Trust

The Liquidating Trust is established under the Plan to administer the Claims against and Assets (including Estate Claims) of the Debtors' Estates. The Debtors shall be required to execute the trust agreement and special warranty deeds in accordance with section 6.1 of the Plan conveying such Assets to the Liquidating Trustee not later than ten (10) days after the Confirmation Date (and in the event that the Debtors fail or refuse to do so, Wells Fargo shall be the designated representative of such Debtors and their Estates for the limited purpose of authorizing and executing such conveyance in their names) and such executed trust agreement and special warranty deeds shall be held in escrow pending the occurrence of one of the events set forth in subsection 7.1 of the Plan triggering the requirement to establish the Liquidating Trust. The holders of Allowed Claims shall be the beneficiaries of such trust. Management of the Liquidating Trust Assets and Distributions from the Liquidating Trust shall be consistent with the terms of the Liquidating Trust Agreement. The Liquidating Trust shall exist from and after the Liquidating Trust Effective Date, with all the powers of a trust under applicable Texas law. Within the limits of applicable law, the Liquidating Trust may be a qualified settlement fund or a grantor trust for tax purposes, as the Liquidating Trustee determines to be in the best interest of Creditors and the Estates. The Liquidating Trustee shall serve as the successor in interest to the Debtors' Estates pursuant to Section 1123(b)(3) of the Bankruptcy Code and, as such, shall have all rights and authority to administer Claims, pursue Estate Claims, and liquidate and distribute the Liquidating Trust Assets for the benefit of Creditors. The Liquidating Trust shall aim to conclude its administration of the Assets not later than 30 months following the Liquidating Trust Effective Date. A copy of the proposed Liquidating Trust Agreement is attached as Exhibit "A" to the Plan.

### 4.     Appointment and Powers of the Liquidating Trustee

Unless otherwise ordered by the Bankruptcy Court, there shall be one Liquidating Trustee, who shall be appointed on the Liquidating Trust Effective Date in the Confirmation Order or as established by the Liquidating Trust Agreement. Tyrone H. Tyll shall act as the Liquidating Trustee. The Liquidating Trustee will serve from and after the Liquidating Trust Effective Date for as long as the Liquidating Trust remains in existence, or until a successor is appointed. Unless expressly required in the Plan, the Liquidating Trustee shall have the authority to take such actions as necessary to implement the Plan without further order or approval from the Bankruptcy Court. In implementing the Plan, the Liquidating Trustee shall have the authority to exercise the following powers and perform the following acts:

(a)     Perfect and secure all rights, titles and interests in and to any and all Liquidating Trust Assets;

(b)     Conserve, protect, collect and liquidate or otherwise convert all Liquidating Trust Assets into Cash (without limitation, the Liquidating Trustee shall be permitted to collect all revenue and income from Wind Leases and mineral interests and royalties of the Debtors);

(c)     Sell and convey, for Cash, all of the interests of the Debtors, their bankruptcy Estates, and the Liquidating Trust, in and to Liquidating Trust Assets to one or more third party purchasers, and to do so free and clear of liens, claims, and encumbrances under section 363 of the Bankruptcy Code with approval of the Bankruptcy Court;

(d)     Borrow funds, secured by the Assets of the Liquidating Trust, for the purpose of discharging the Sandton DIP Loan Claim, with such new loan to be subrogated to the lien priority of Sandton in the Assets to the extent that the new loan proceeds are used to pay off the Debtors' obligations to Sandton;

(e)     Make Distributions to the appropriate beneficiaries as specified in the Plan and the Liquidating Trust Agreement;

(f)     Release, convey, subordinate or assign any right, title or interest in or to the Liquidating Trust Assets, to the extent provided for in the Plan;

(g)     Establish and maintain the Trust Reserve in an amount not to exceed $200,000.00 pursuant to the provisions of the Plan and the Liquidating Trust Agreement, or such other reserves as the Liquidating Trustee deems necessary or appropriate;

(h)     Consistent with the allocations provided in the Plan, pay and discharge any costs, expenses, fees or obligations deemed necessary to preserve and maximize the value of the Liquidating Trust Assets, and to protect the Liquidating Trust and the Liquidating Trustee from liability;

(i)     Deposit Liquidating Trust funds and draw checks and make Distributions thereof;

(j)     Employ such attorneys, accountants, engineers, agents, tax specialists, other professionals, and clerical assistance as the Liquidating Trustee may deem necessary;

(k)     Pay reasonable fees and expenses of all such professionals of the Liquidating Trust on a monthly basis;

(l)     Exercise any and all powers granted the Liquidating Trustee by any agreements or by Texas common law or any statute that serves to increase the extent of the powers granted to the Liquidating Trustee hereunder;

(m)     Take any action required or permitted by the Plan or the Liquidating Trust Agreement;

(n)     Assert claims or Estate Claims in federal or state court or any other tribunal with competent jurisdiction and authority to adjudicate such actions;

(o)     Settle, compromise or adjust by arbitration, or otherwise, any disputes or controversies in favor or against the Liquidating Trust, including Estate Claims;

(p)     Waive or release rights of any kind;

(q)     Appoint, remove and act through agents, managers and employees and confer upon them such power and authority as may be necessary or advisable;

(r)     Negotiate, renegotiate or enter into any contract or agreements binding the Liquidating Trust, and to execute, acknowledge and deliver any and all investments that are necessary, required or deemed by the Liquidating Trustee to be advisable in connection with the performance of his/her duties;

(s)     Commence, prosecute, and settle objections to Claims against the Debtors or their Estates; and

(t)     In general, without in any manner limiting any of the foregoing, deal with the Liquidating Trust Assets or any part or parts thereof in all other ways as would be lawful for any Person owning the same to deal therewith, whether similar to or different from the ways above specified, at any time or times hereafter. In connection with the handling of Liquidating Trust Assets, the Liquidating Trustee shall comply with all provisions of the Internal Revenue Code by, among other things, filing Liquidating Trust tax returns as required by applicable law and by paying any and all taxes incurred by the Liquidating Trust as such taxes come due.

## 5.     Trust Committee

The Trust Committee, an oversight committee comprised of three (3) members, shall provide guidance and maintain accountability over the Liquidating Trustee. It shall meet monthly, or as frequently as it shall determine. The Trust Committee may act with a quorum of at least two (2) members. It shall be comprised of one (1) representative each designated by (a) Zions, (b) Wells Fargo, and (c) the holder of the largest Allowed Unsecured (General) Claim that is willing to participate and serve. At such time as Zions' Secured Claim has been fully repaid, its position on the Trust Committee shall be filled with the next largest holder of an Allowed Unsecured (General) Claim that is willing to serve, failing which the remaining member(s) of the Trust Committee may petition the Bankruptcy Court to approve an appropriate person(s) to fill one or more vacancies. The Trust Committee may, by unanimous vote, remove the Liquidating Trustee and appoint an interim Liquidating Trustee pending approval of his or her appointment by the Bankruptcy Court. The Trust Committee shall be entitled to reimbursement by the Liquidating Trust for its reasonable attorneys' fees and expenses up to the annual sum of $10,000.00. The members of the Trust Committee shall serve without compensation, and shall not be individually liable for any loss or damage to a third party while acting in their official capacity on behalf of the Trust Committee.

## 6.     Future Trust Expenses and Fees

The Liquidating Trustee shall be compensated for services rendered as provided for in the Liquidating Trust Agreement. Professionals retained by the Liquidating Trustee shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred. No Bankruptcy Court approval shall be required for the employment, compensation, or reimbursement of the Liquidating Trustee, or any employees or professionals retained by the Liquidating Trustee.

## 7.     Exculpation; Indemnification

The Liquidating Trustee and his or her officers, employees, agents, partners, shareholders, members and representatives, and professionals, and the members of the Trust Committee, shall not be personally liable to the Liquidating Trust or any beneficiary except for such of his, her or its own acts as shall constitute fraudulent or willful misconduct or gross negligence. The Liquidating Trustee and his or her officers, employees, agents, partners, shareholders, members, representatives, and professionals, and the members of the Trust Committee, shall be exculpated by all persons and entities, including, without limitation, beneficiaries and other parties-in-interest, from any and all claims, causes of action and other assertions of liability arising out of any act or omission of the Liquidating Trustee or Trust

Committee, except for claims of fraudulent or willful misconduct or gross negligence. No beneficiary or other party-in-interest will have or be permitted to pursue any claim or cause of action against the Liquidating Trustee or his or her officers, employees, agents, partners, shareholders, members, representatives, and professionals for making payments in accordance with the Plan or the Confirmation Order. Any act taken or not taken by the Liquidating Trustee or his or her officers, employees, agents, partners, shareholders, members, representatives and professionals with the approval of the Bankruptcy Court will be conclusively deemed not to constitute fraudulent or willful misconduct or gross negligence; provided, however, that such approval of the Bankruptcy Court is not subsequently deemed void. Except as aforesaid, the Liquidating Trustee and the members of the Trust Committee shall be defended, held harmless and indemnified from time to time from the Liquidating Trust Assets against any and all losses, claims, costs, expenses and liabilities (including legal costs and expenses), and any costs of defending any action to which the Liquidating Trustee may be subject by reason of the Liquidating Trustee's execution in good faith of his or her duties under the Liquidating Trust Agreement. The officers, employees, attorneys, agents, and professionals of the Liquidating Trustee may be likewise defended, held harmless and indemnified. The Liquidating Trustee may obtain for his or her benefit and the benefit of his or her officers, agents, attorneys and employees and the benefit of the Liquidating Trust and the Trust Committee, at the expense of the Liquidating Trust, insurance against claims of liability, damage awards and settlement.

**8.     Retention of Funds Prior to Distribution**

The Liquidating Trustee shall collect all funds constituting Liquidating Trust Assets and, pending distribution, shall deposit funds with a federally insured financial institution that has banking services. The Liquidating Trustee will deposit funds so that they are adequately insured. Notwithstanding the foregoing, the Liquidating Trustee may (but is not obligated to) invest all Cash funds received into the Liquidating Trust (including any earnings thereon or proceeds therefrom) in the same manner as chapter 7 trustees are required to invest funds pursuant to the guidelines of the Unites States Trustee's Office, provided that the Liquidating Trustee shall invest funds held in only demand and time deposits, such as Treasury bills, short-term certificates of deposit in banks or savings institutions, or other temporary, liquid and low-risk investments. The Liquidating Trustee shall hold all such funds until they are distributed pursuant to the Plan to Creditors with Allowed Claims.

**9.     Quarterly Operating Reports**

The Liquidating Trustee shall continue to file quarterly operating reports with the Bankruptcy Court as may be required by the United States Trustee after confirmation of the Plan until the Chapter 11 Cases are closed.

**10.     Registry of Beneficial Interests**

The Liquidating Trustee shall establish and retain registries of all beneficial interests in the Liquidating Trust, as issued to the holders of Allowed Claims against each Estate. The Liquidating Trustee shall be responsible to maintain and update such registry; *provided, however*, the Liquidating Trustee shall not be obligated to change any Liquidating Trust beneficiary's name or address until receiving written correspondence from the party seeking to change the address for receipt of notices and Distributions, together with the written consent of the party previously owning the Claim or interest, if applicable. The Liquidating Trustee retains the right to request additional information to confirm the name and address of such party before making any modification to the registry.

11.     **Termination of the Liquidating Trust**

The Liquidating Trust shall remain and continue in full force and effect until all of the Liquidating Trust Assets have been wholly converted to Cash, abandoned, or assigned, and all costs, expenses, and obligations incurred in administering the Liquidating Trust have been fully paid, and all remaining income and proceeds of the Liquidating Trust Assets have been distributed in payment of Allowed Claims pursuant to the provisions of the Plan; *provided, however*, that upon complete liquidation of the Liquidating Trust Assets and satisfaction as far as possible of all remaining obligations, liabilities and expenses of the Liquidating Trust pursuant to the Plan prior to such date, the Liquidating Trustee may, with approval of the Bankruptcy Court, sooner terminate the Liquidating Trust. On the termination date of the Liquidating Trust, the Liquidating Trustee will execute and deliver any and all documents and instruments reasonably requested to evidence such termination. Upon termination and complete satisfaction of its duties under the Liquidating Trust Agreements, the Liquidating Trustee will be forever discharged and released from all powers, duties, responsibilities and liabilities pursuant to the Liquidating Trust other than those attributable to fraud, gross negligence or willful misconduct of the Liquidating Trustee, or the failure of the Liquidating Trustee to pay any taxes.

12.     **Replacement of the Liquidating Trustee**

The Liquidating Trustee may resign at any time by giving written notice to the Bankruptcy Court (unless the Chapter 11 Cases have been closed). Upon resignation, the Bankruptcy Court may appoint a successor Liquidating Trustee upon nomination of the Trust Committee. In addition to the power of the Trust Committee to remove the Liquidating Trustee, after notice to all Creditors and a hearing, the Bankruptcy Court may remove the Liquidating Trustee for cause. If the office of the Liquidating Trustee becomes vacant for any reason, the Trust Committee (or any member thereof) may move for the appointment of a successor Liquidating Trustee by the Bankruptcy Court. Upon the entry of an order appointing a successor Liquidating Trustee, the resigning Liquidating Trustee shall convey, transfer and set over to such successor Liquidating Trustee by appropriate instrument or instruments all of the Liquidating Trust Assets then unconveyed or otherwise undisposed of and all other assets then in his or her possession under the Liquidating Trust Agreement. Without further act, deed or conveyance, a successor Liquidating Trustee shall be vested with all the rights, privileges, powers and duties of the Liquidating Trustee, except that the successor Liquidating Trustee shall not be liable for the acts or omissions of his or her predecessor(s). Each succeeding Liquidating Trustee may in like manner resign and another may in like manner be appointed in his or her place.

13.     **Liquidating Trust Transactions**

On the Liquidating Trust Effective Date, or as soon as reasonably practicable thereafter, the Liquidating Trustee may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or contemplated by the Plan, including: (a) the execution and delivery of appropriate agreements, bylaws, resolutions or other documents of liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; and (c) any other action that the Liquidating Trustee determines is necessary and appropriate. Each of the matters provided for by the Plan involving the corporate structure of SFI or corporate or related actions to be taken by or required of the Liquidating Trustee shall, as of the Liquidating Trust Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be

authorized, approved, and, to the extent taken prior to the Liquidating Trust Effective Date, ratified in all respects without any requirement of further action by holders of Claims or Interests, members of the Debtors or beneficiaries of the Liquidating Trust, as the case may be, or any other entity. From and after the Liquidating Trust Effective Date, the Liquidating Trustee may operate (or liquidate and wind up) its business and use, acquire, and dispose of property and settle and compromise claims or interests without supervision by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. Without limiting the generality of the foregoing, the Liquidating Trustee may, without application to or approval by the Bankruptcy Court, pay fees that they incur after the Liquidating Trust Effective Date for professional fees and expenses. Nothing in section 7.13 of the Plan shall be deemed to prevent the Liquidating Trustee from seeking the Approval of the Bankruptcy Court.

E.    **Provisions Governing Distribution**

   1.    **If the Liquidating Trust is not required to be established under the Plan: The following provisions shall govern Distributions under the Plan:**

      (a)    Source of Distributions. All Distributions to be made to Creditors under the Plan shall be made by the Reorganized Debtors.

      (b)    Collection Costs. To the extent any holder of a Secured Claim asserts a right to attorney's fees and costs pursuant to section 506(b) of the Bankruptcy Code, unless otherwise agreed between the Reorganized Debtors and such Secured Creditor, the allowance of Collection Costs shall be handled as set forth in subsection 8.1(b) of the Plan. Within twenty (20) days after the Effective Date, the Secured Creditor shall file an application with the Bankruptcy Court for allowance of such Collection Costs. Such application shall follow the same rules and guidelines as a fee application for a Professional seeking compensation from a Debtor, including the Bankruptcy Court's Guidelines for Compensation and Reimbursement of Professionals in Chapter 11 Cases. No later than twenty (20) days after each such application for Collection Costs is filed, the Reorganized Debtors may file any Objections thereto, and the Secured Creditor shall file any response within twelve (12) days thereafter. If the Secured Creditor and the Reorganized Debtors are unable to reach agreement, the matter shall then be submitted to the Bankruptcy Court for determination on no less than twenty (20) days notice of the hearing.

      (c)    Timing and Amount of Distributions. No Distribution shall be made on account of any Claim until such Claim is Allowed, except as otherwise set forth in the Plan or ordered by the Bankruptcy Court pursuant to a Final Order. No Distribution shall be made on account of any Contested Claim until such Claim is Allowed. Any Distributions pursuant to the Plan shall be made on the respective Initial Distribution Dates applicable to each such Allowed Claim except as otherwise provided in the Plan or ordered by the Bankruptcy Court. Any Unclaimed Property may be paid into the registry of the Bankruptcy Court or otherwise distributed in accordance with the orders of the Bankruptcy Court. Except as expressly set forth in the Plan or in the Confirmation Order, the Reorganized Debtors shall determine the timing and amount of all Distributions which they are required to make under the Plan, consistent with the goal of making such Distributions as expeditiously as possible. The Reorganized Debtors may, but shall not be required to, seek approval of the Bankruptcy Court for any such Distributions.

      (d)    Means of Cash Payment. Cash payments pursuant to the Plan shall be made by check drawn on, or by wire transfer from, a domestic bank, or by other means agreed to by the payor and payee.

     (e)    <u>Record Date for Distributions</u>. As of the close of business on the Effective Date, (the "<u>Distribution Record Date</u>"), the register for Claims and Interests will be closed, and there shall be no further changes in the holder of record of any Claim or Interest. The Reorganized Debtors shall have no obligation to recognize any transfer of any Claim or Interest occurring after the Distribution Record Date, and shall instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those holders of record stated on the register of Claims and/or Interests as of the Distribution Record Date for Distributions under the Plan.

     (f)    <u>Delivery of Distributions</u>. All Distributions, deliveries and payments to the holders of any Allowed Claims shall be made to the addresses set forth on the respective proofs of Claim filed in the Chapter 11 Cases. Any such Distribution, delivery or payment shall be deemed as made for all purposes relating to the Plan when deposited in the United States Mail and served as provided in section 14.5 of the Plan. Whether secured or unsecured, if no proof of Claim is filed, any Distribution shall be made to the Creditor at the last known address or as reflected in the Schedules. If any Distribution is returned as undeliverable, no further Distribution shall be made on account of such Allowed Claim unless and until the Reorganized Debtors are notified of such holder's then current address, at which time all missed Distributions shall be made to the holder of such Allowed Claim. All claims for undeliverable Distributions shall be made on or before the first anniversary of the attempted Distribution. After such date, all Unclaimed Property shall revert to the Reorganized Debtors and the Claim of any holder with respect to such property shall be discharged and forever barred.

     (g)    <u>Time Bar to Cash Payments</u>. Checks issued in respect of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Reorganized Debtors by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of the first anniversary of the Initial Distribution Date or ninety (90) days after the date of issuance of such check. After such date, all claims in respect of void checks shall be discharged and forever barred.

     (h)    <u>Cure Period</u>. Except as otherwise set forth in the Plan, the failure by the Reorganized Debtors to timely perform any term, provision or covenant contained in the Plan, or to make any payment or Distribution required by the Plan to any Creditor, or the failure to make any payment or perform any covenant on any note, instrument or document issued pursuant to the Plan, shall not constitute an Event of Default unless and until the Reorganized Debtors have been given thirty (30) days written notice of such alleged default in the manner provided in the Plan, and provided an opportunity to cure such alleged default. Until the expiration of such thirty (30) day cure period, the Reorganized Debtors shall not be in default, and performance during such thirty (30) day cure period shall be deemed as timely for all purposes. Such written notice and passage of the thirty (30) day cure period shall constitute conditions precedent to declaring or claiming any default under the Plan or bringing any action or legal proceeding by any Person to enforce any right granted under the Plan.

     (i)    <u>Pre-Payment of Claims</u>. Any other term of the Plan notwithstanding, the Reorganized Debtors may pre-pay any Allowed Claim in whole or in part without penalty.

     (j)    <u>Distributions after Substantial Consummation</u>. All Distributions of any kind made to any of the Creditors after Substantial Consummation and any and all other actions taken under the Plan after Substantial Consummation shall not be subject to relief, reversal or modification by any court unless the implementation of the Confirmation Order is stayed by an order granted under Bankruptcy Rule 8007.

2. **Alternatively, if the Liquidating Trust is required to be established under the Plan: The following provisions shall govern Distributions under the Plan:**

(a) <u>Initial Distributions</u>. With respect to each Allowed Claim, the Liquidating Trustee shall make the initial Distribution on account of such Claim, if any, on or before the Initial Distribution Date for such Claim. Distributions that are contingent upon liquidation of the Assets shall be made at such time(s) as the Liquidating Trustee determines in his or her business judgment. All Distributions shall be made in accordance with Article III and IV of the Plan.

(b) <u>Means of Payments</u>. Payments made pursuant to the Plan shall be in Cash unless stated otherwise.

(c) <u>Delivery of Distributions and Time Bar to Payments</u>. Subject to Bankruptcy Rule 9010, Distributions under the Plan shall be made at the address of each holder of an Allowed Claim, as set forth on the proofs of Claim filed by such holders (or at the last known address of such holder as of the Confirmation Date if the Debtor has not been notified in writing of a change of address). If any Distribution on an Allowed Claim is returned as undeliverable, no further Distributions on account of such Claim shall be made unless and until the Liquidating Trustee is notified in writing of the holder of such Claim's then current address, at which time all missed Distributions shall be made to such holder on account of such Claim without interest. Any holder of an Allowed Claim whose Distribution is undeliverable must make demand for such Distribution to the Liquidating Trustee in writing on or before 90 days after the date such undeliverable Distribution was initially made. After such date, the Claim of any holder with respect to such Distribution shall be forever barred. All such unclaimed Distributions shall be deemed "Unclaimed Property" and shall be redistributed by the Liquidating Trustee to holders of Allowed Claims whose Distributions have been deliverable in amounts to which such holders would have been entitled had the barred claim never been Allowed. The Liquidating Trustee and its agents and professionals shall have no duty to take any action to either attempt to locate any holder of a Claim, or obtain an executed Internal Revenue Service Form W-9 from any holder of a Claim.

(d) <u>Withholding and Reporting Requirements</u>. Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law in relation to a Distribution under the Plan shall be deducted from the Distribution and remitted by the Liquidating Trustee to the applicable Taxing Authority(ies). To the extent that subsection 8.2(d) of the Plan affects the holder of a particular Allowed Claim, such holder shall provide to the Liquidating Trustee all such information as the Liquidating Trustee requires in order to comply with such law(s), and no Distribution shall be made to such holder unless and until such information is provided.

(e) <u>*De Minimis* Distributions</u>. Notwithstanding any provision of the Plan to the contrary, no distribution of less than twenty-five dollars ($25.00) must be made from the Liquidating Trust on account of an Allowed Claim, until such time as final Distribution is made.

(f) <u>Unclaimed Property</u>. Any Distribution that becomes Unclaimed Property shall be retained by the Liquidating Trust free and clear of any claims or restrictions thereon, and any entitlement of any holder of any Claim to such Distributions shall be extinguished and forever barred. Unclaimed Property shall be deposited into a pool for redistribution to other holders of Allowed Claims in the same Class as the intended recipient of the Unclaimed Property.

(g) <u>Uncashed Checks</u>. Checks issued in respect of Allowed Claims will be **null and void if not negotiated within ninety (90) days** after the date of issuance thereof. In no

event shall any funds escheat to a Governmental Unit. Any holder of an Allowed Claim whose Distribution is uncashed must make demand for such Distribution to the Liquidating Trustee in writing on or before 90 days after the date such uncashed Distribution was initially made. After such date, the Claim of any holder with respect to such Distribution shall be forever barred. All such unclaimed Distributions shall be deemed "Unclaimed Property" and shall be redistributed by the Liquidating Trustee to holders of Allowed Claims whose Distributions have been deliverable in amounts to which such holders would have been entitled had the barred claim never been Allowed. The Liquidating Trustee and its agents and professionals shall have no duty to take any action to either attempt to locate any holder of a Claim, or obtain an executed Internal Revenue Service Form W-9 from any holder of a Claim.

     (h)    <u>Tax Treatment</u>.

     (i)    The Liquidating Trust shall be created for the primary purpose of collecting, liquidating and distributing the assets transferred to it with no objective to continue or engage in the conduct of a trade or business. The Liquidating Trust is intended to be classified as a "Liquidating Trust" for federal income tax purposes within the meaning of Treasury Regulation § 301.7701-4( d). The Liquidating Trustee shall ascribe valuations to the Liquidating Trust Assets on the date of transfer of such assets to the Liquidating Trust, and such valuations shall be used by the Debtors and the Liquidating Trustee for all federal income tax reporting purposes.

     (ii)    The transfer of the Liquidating Trust Assets to the Liquidating Trust shall be treated for all purposes of the Internal Revenue Code of 1986, as amended, as a deemed transfer to the Creditors by the Debtors and their Estates of any rights that they may have to the Liquidating Trust Assets, followed by a deemed transfer by the Creditors to the Liquidating Trust, thereby establishing their beneficial ownership in the Liquidating Trust and making them beneficiaries of the Liquidating Trust.

     (iii)    The beneficiaries shall be treated as the grantors and deemed owners of the Liquidating Trust. The Liquidating Trustee shall allocate the Liquidating Trust income for each taxable year among the beneficiaries in accordance with their respective interests in the Liquidating Trust, as determined from time to time by the Liquidating Trustee, and the beneficiaries shall be responsible for any tax liability that results from said income. The Liquidating Trustee shall execute and file tax returns on behalf of the Liquidating Trust as a grantor trust pursuant to Treasury Regulation § 1.671.4(a).

     (iv)    Each beneficiary shall be required, before any distribution of Liquidating Trust Assets is made to such holder, to provide the Trustee with an executed IRS Form W-9 or such other appropriate taxpayer identification information as will allow the Trustee to file the appropriate tax return on behalf of the Liquidating Trust. If a beneficiary shall fail to provide the Liquidating Trustee with any requested taxpayer identification information within 90 days after a request for this information, this failure shall be deemed a waiver of all claims against the Liquidating Trust, including the right to Distributions, and the funds that would otherwise have been distributed to such holder shall revert to the Liquidating Trust as Unclaimed Property to be redistributed to other beneficiaries who have provided the requested taxpayer identification information, or as otherwise provided under the Plan.

F.    **Procedures for Resolving and Treating Contested and Contingent Claims**

1.    **Objection Deadline**

**If the Liquidating Trust is <u>not</u> required to be established under the Plan**: All Objections to Claims shall be served and filed by the Objection Deadline; *provided, however,* the Objection Deadline shall not apply to Claims which are not reflected in the claims register, including any alleged informal proofs of Claim. The Reorganized Debtors may seek to extend the Objection Deadline pursuant to a motion filed on or before the then applicable Objection Deadline with respect to any Claims. Any such motion may be granted without notice or a hearing. In the event that the Reorganized Debtors file such a motion and the Bankruptcy Court denies such motion, the Objection Deadline shall nevertheless be automatically extended to that date which is ten (10) Business Days after the date of entry of the Bankruptcy Court's order denying such motion. Any proof of Claim filed more than thirty (30) days after the Effective Date shall be of no force and effect and need not be objected to by the Reorganized Debtors. Nothing contained in the Plan shall limit the right of the Reorganized Debtors to object to Claims, if any, filed or amended after the Objection Deadline.

**Alternatively, if the Liquidating Trust <u>is</u> required to be established under the Plan**: All Objections to Claims shall be served and filed by the Objection Deadline; *provided, however,* the Objection Deadline shall not apply to any Claim that is not reflected in the claims register, including any alleged informal proofs of Claim. The Liquidating Trustee may seek to extend the Objection Deadline pursuant to a motion filed on or before the then applicable Objection Deadline with respect to any Claim. Any such motion may be granted without notice or a hearing. In the event that the Liquidating Trustee files such a motion and the Bankruptcy Court denies such motion, the Objection Deadline shall nevertheless be automatically extended to that date which is ten (10) Business Days after the date of entry of the Bankruptcy Court's order denying such motion. Any proof of Claim filed more than sixty (60) days after the Liquidating Trust Effective Date shall be of no force and effect and need not be objected to by the Liquidating Trustee. Nothing contained in the Plan shall limit the rights of the Liquidating Trustee to object to any Claim filed or amended after the Objection Deadline. Nothing in the Plan shall be construed as extending the existing bar date requiring the filing of a Claim or extending a previously ordered time period for asserting a Claim.

2.    **Responsibility for Objecting to Claims and Settlement of Claims**

**If the Liquidating Trust is <u>not</u> required to be established under the Plan**: From and after the Effective Date, the Reorganized Debtors shall have the sole and exclusive right to (a) file, settle, or litigate to Final Order any Objections to any Claims; and (b) seek to subordinate any Claim. Any Contested Claim may be litigated to Final Order. From and after the Effective Date, the Reorganized Debtors shall have the sole and exclusive right to settle, compromise or otherwise resolve any Contested Claim without the necessity of any further notice or approval of the Bankruptcy Court. Bankruptcy Rule 9019 shall not apply to any settlement or compromise of a Contested Claim after the Effective Date.

**Alternatively, if the Liquidating Trust <u>is</u> required to be established under the Plan**: From and after the Liquidating Trust Effective Date, the Liquidating Trustee shall have the exclusive right to (i) file, settle, or litigate to Final Order any Objection to any Claim; and (ii) seek to subordinate any Claim. Any Contested Claim may be litigated to Final Order. From and after the Liquidating Trust Effective Date, the Liquidating Trustee shall have the exclusive right to settle, compromise, or otherwise resolve any Contested Claim without the necessity of any further notice

or approval of the Bankruptcy Court. Bankruptcy Rule 9019 shall not apply to any settlement or compromise of a Contested Claim after the Liquidating Trust Effective Date. Nothing in subsection 9.2(b) of the Plan shall be deemed to prevent the Liquidating Trustee from seeking the Approval of the Bankruptcy Court.

### 3. Distributions on Account of Contested Claims

**If the Liquidating Trust is not required to be established under the Plan**: If a Claim is Contested, then the Initial Distribution Date as to such Contested Claim shall be determined based upon its date of Allowance, and thereafter distribution shall be made on account of such Allowed Claim pursuant to the provisions of the Plan. No Distribution shall be made on account of a Contested Claim until Allowed. Until such time as a contingent Claim becomes fixed and absolute by a Final Order allowing such Claim, such Claim shall be treated as a Contested Claim for purposes of estimates, allocations, and Distributions under the Plan. Any contingent right to contribution or reimbursement shall continue to be subject to section 502(e) of the Bankruptcy Code.

**Alternatively, if the Liquidating Trust is required to be established under the Plan**: No Distribution shall be made on account of a Contested Claim until Allowed. Until such time as a contingent Claim becomes fixed and absolute by a Final Order allowing such Claim, such Claim shall be treated as a Contested Claim for purposes of estimates, allocations, and Distributions under the Plan; provided however, a Final Order shall not be required in connection with any Claim that is not a contingent Claim, or a Claim compromised and settled by the Liquidating Trustee. Any contingent right to contribution or reimbursement shall continue to be subject to Section 502(e) of the Bankruptcy Code.

### 4. No Waiver of Rights to Object

**If the Liquidating Trust is not required to be established under the Plan**: Except as expressly provided in the Plan, nothing contained in the Disclosure Statement, the Plan or the Confirmation Order shall waive, relinquish, release or impair the Reorganized Debtors' rights to object to any Claim.

**Alternatively, if the Liquidating Trust is required to be established under the Plan**: Except as expressly provided in the Plan, nothing contained in the Disclosure Statement, the Plan, or the Confirmation Order shall waive, relinquish, release, or impair the Liquidating Trustee's rights to object to any Claim.

### 5. Rights Under Section 505

**If the Liquidating Trust is not required to be established under the Plan**: The Reorganized Debtors shall retain all rights pursuant to section 505 of the Bankruptcy Code.

**Alternatively, if the Liquidating Trust is required to be established under the Plan**: The Liquidating Trustee shall retain all rights pursuant to Section 505 of the Bankruptcy Code.

### 6. Liquidating and Allowance of Contested or Disputed Claims

**If the Liquidating Trust is not required to be established under the Plan**: subsection 9.6(a) of the Plan shall apply to all Contested Claims. Nothing contained in the Plan, Disclosure Statement or Confirmation Order shall change, waive or alter any requirement under applicable

law that the holder of a Contested Claim must file a timely proof of Claim, and the Claim of any such Creditor who is required to file a proof of Claim and fails to do so shall be discharged and shall receive no Distribution through the Plan. The adjudication and liquidation of Contested Claims is a determination and adjustment of the debtor/creditor relationship, and is, therefore, an exercise of the Bankruptcy Court's equitable power to which the legal right of trial by jury is inapplicable. The holder of any Contested Claim shall not have a right to trial by jury before the Bankruptcy Court in respect of any such Claim. Exclusive venue for any Contested Claim proceeding shall be in the Bankruptcy Court or a court of competent jurisdiction located in Tarrant County, Texas. Contested Claims shall each be determined separately, except as otherwise ordered by the Bankruptcy Court. Texas Rule of Civil Procedure 42 and Federal Rule of Civil Procedure 23 shall not apply to any Contested Claim proceeding. The Reorganized Debtors shall retain all rights of removal to federal court as to any Contested Claim proceeding. All Contested Claims shall be liquidated and determined as follows:

        (a)    <u>Application of Adversary Proceeding Rules</u>. Unless otherwise ordered by the Bankruptcy Court or provided by the Bankruptcy Rules, any Objection to a Contested Claim shall be treated as a contested proceeding subject to Bankruptcy Rule 9014. However, any party may move the Bankruptcy Court to apply the rules applicable to adversary proceedings to any Claim Objection. The Reorganized Debtors may, however, at their election, make and pursue any Objection to a Claim in the form of an adversary proceeding.

        (b)    <u>Scheduling Order</u>. With respect to an Objection to a Claim treated as a contested proceeding subject to Bankruptcy Rule 9014, the Reorganized Debtors may request entry of a scheduling order as to each Objection to a Claim. The Reorganized Debtors may tender a proposed scheduling order with each Objection and/or include a request for a scheduling conference for the entry of a scheduling order. Any such scheduling order may include (i) discovery cut-off, (ii) deadlines to amend pleadings, (iii) deadlines for designation of and objections to experts, (iv) deadlines to exchange exhibit and witness lists and for objections to the same, and (v) such other matters as may be appropriate.

        (c)    <u>Mediation</u>. The Bankruptcy Court may order the parties to mediate in connection with any Objection to a Claim. The Reorganized Debtors may include a request for mediation in an Objection to a Claim and may request that the Bankruptcy Court require mediation as a part of any scheduling order.

**Alternatively, if the Liquidating Trust <u>is</u> required to be established under the Plan**: Nothing contained in the Plan, the Disclosure Statement, or the Confirmation Order shall change, waive, or alter any requirement under applicable law that the holder of a Contested Claim must file a timely proof of Claim, and the Claim of any such Creditor who is required to file a proof of Claim and fails to do so shall be discharged and shall receive no Distribution through the Plan. The adjudication and liquidation of Contested Claims is a determination and adjustment of the debtor/creditor relationship, and is, therefore, an exercise of the Bankruptcy Court's equitable power to which the legal right of trial by jury is inapplicable. The holder of any Contested Claim shall not have a right to trial by jury before the Bankruptcy Court in respect of any such Claim. Exclusive venue for any Contested Claim proceeding shall be in the Bankruptcy Court or a court of competent jurisdiction located in Tarrant County, Texas. Contested Claims shall each be determined separately, except as otherwise ordered by the Bankruptcy Court. Texas Rule of Civil Procedure 42 and Federal Rule of Civil Procedure 23 shall not apply to any Contested Claim proceeding. The Liquidating Trustee shall retain all rights of removal to federal court as to any Contested Claim proceeding. All Contested Claims shall be liquidated and determined as follows:

(a) <u>Application of Adversary Proceeding Rules</u>. Unless otherwise ordered by the Bankruptcy Court or provided by the Bankruptcy Rules, any Objection to a Contested Claim shall be treated as a contested matter subject to Bankruptcy Rule 9014. However, any party may move the Bankruptcy Court to apply the rules applicable to adversary proceedings to any Claim Objection. The Liquidating Trustee may, however, at its election, make and pursue any Objection to a Claim in the form of an adversary proceeding.

(b) <u>Scheduling Order</u>. With respect to an Objection to a Claim treated as a contested matter subject to Bankruptcy Rule 9014, the Liquidating Trustee may request entry of a scheduling order as to each Objection to a Claim. The Liquidating Trustee may tender a proposed scheduling order with each Objection and/or include a request for a scheduling conference for the entry of a scheduling order. Any such scheduling order may include (i) discovery cut-off, (ii) deadlines to amend pleadings, (iii) deadlines for designation of and objections to experts, (iv) deadlines to exchange exhibit and witness lists and for objections to the same, and (v) such other matters as may be appropriate.

(c) <u>Mediation</u>. The Bankruptcy Court may order the parties to mediate in connection with any Objection to a Claim. The Liquidating Trustee may include a request for mediation in an Objection to a Claim and may request that the Bankruptcy Court require mediation as a part of any scheduling order.

**7. Offsets and Defenses**

**If the Liquidating Trust is <u>not</u> required to be established under the Plan**: Unless otherwise expressly set forth in the Plan, the Reorganized Debtors shall be vested with and retain all Estate Claims and Estate Defenses, including without limitation all rights of offset or recoupment and all counterclaims against any Claimant holding a Claim. Assertion of counterclaims by the Reorganized Debtors against any Claimants shall constitute "core" proceedings.

**Alternatively, if the Liquidating Trust <u>is</u> required to be established under the Plan**: The Liquidating Trustee shall be vested with and retain all Estate Claims and Estate Defenses, including without limitation all rights of offset or recoupment and all counterclaims against any Claimant. Assertion of any counterclaim by the Liquidating Trustee against a Claimant shall constitute a "core" proceeding.

**8. Claims Paid or Reduced Prior to Effective Date**

**If the Liquidating Trust is <u>not</u> required to be established under the Plan**: Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by the Debtors prior to the Effective Date, including pursuant to orders of the Bankruptcy Court. To the extent such payments are not reflected in the Schedules, such Schedules will be deemed amended and reduced to reflect that such payments were made. Nothing in the Plan shall preclude the Reorganized Debtors from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

**Alternatively, if the Liquidating Trust <u>is</u> required to be established under the Plan**: Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated, and not contingent shall be deemed to be reduced by the amount, if any, that was paid by the Debtors prior to the Liquidating Trust Effective Date, including pursuant to orders of the

Bankruptcy Court. To the extent such payments are not reflected in the Schedules, such Schedules will be deemed amended and reduced to reflect that such payments were made. Nothing in this Plan shall preclude the Liquidating Trustee from paying any Claim that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

### G.     Executory Contracts and Unexpired Leases

#### 1.     Assumption and Rejection of Executory Contracts

**If the Liquidating Trust is <u>not</u> required to be established under the Plan**:   All Executory Contracts of the Debtors shall be deemed as assumed by the Reorganized Debtors upon the Effective Date unless an Executory Contract (a) has been previously assumed or rejected pursuant to an order of the Bankruptcy Court, (b) is identified in the Plan or the Confirmation Order to be rejected, or (c) is the subject of a motion to reject filed on or before the Confirmation Date. Any Executory Contract to be assumed under the Plan that has been amended or modified at any time after the Petition Date of the Debtor that is party to such Executory Contract shall be deemed assumed as amended or modified. The Plan shall constitute a motion to assume the Executory Contracts. However, the Debtors may file a separate motion for the assumption or rejection of any Executory Contract at any time through the Confirmation Date.

**Alternatively, if the Liquidating Trust <u>is</u> required to be established under the Plan**: All Executory Contracts of the Debtors shall be deemed rejected by the Debtors upon the Liquidating Trust Effective Date unless an Executory Contract (a) has been previously assumed or rejected pursuant to an order of the Bankruptcy Court, (b) is identified in the Plan or the Confirmation Order to be assumed, or (c) is the subject of a motion to assume filed on or before the Confirmation Date. The Plan shall constitute a motion to reject the Executory Contracts except as stated in subsection 10.1(b) of the Plan. However, the Debtors may file a separate motion for the assumption or rejection of any Executory Contract at any time through the Confirmation Date.

#### 2.     Cure Payments and Release of Liability

**If the Liquidating Trust is <u>not</u> required to be established under the Plan**: Unless the holder of a Cure Claim and the applicable Debtor or Reorganized Debtor agree in writing to other treatment of such holder's Cure Claim, or other treatment of such holder's Cure Claim is provided for under the Plan, each Cure Claim against the Debtors shall be paid and treated as follows:

(a)     Any cure payment which may be required by section 365 of the Bankruptcy Code under an Executory Contract that is assumed under the Plan shall be made by the Reorganized Debtors on the Initial Distribution Date. Notwithstanding the foregoing, in the event of a dispute regarding the amount of any Cure Claim, the cure of any other defaults, the provision of adequate assurance of future performance, or any other matter pertaining to assumption or assignment, the Reorganized Debtors shall make such cure payments and cure such other defaults and provide adequate assurance of future performance, all as may be required by section 365 of the Bankruptcy Code, following the entry of a Final Order by the Bankruptcy Court resolving such dispute.

(b)     Any other term of the Plan notwithstanding, the Reorganized Debtors may pre-pay any Cure Claim in whole or in part without penalty.

**Alternatively, if the Liquidating Trust is required to be established under the Plan**: All payments that may be required by Section 365(b)(1) of the Bankruptcy Code to satisfy any Cure Claim shall be made by the Liquidating Trustee on the Initial Distribution Date unless other treatment is provided for such Cure Claim under the Plan; *provided, however*, in the event of a dispute regarding the amount of any Cure Claim, the cure of any other defaults, the ability of the Liquidating Trustee to provide adequate assurance of future performance, or any other matter pertaining to assumption or assignment of an Executory Contract, the Liquidating Trustee shall make such cure payments and cure such other defaults and provide adequate assurance of future performance, all as may be required by Section 365(b)(1) of the Bankruptcy Code, following the entry of a Final Order by the Bankruptcy Court resolving such dispute.

3.    **Bar to Rejection Claims**

**If the Liquidating Trust is not required to be established under the Plan**:  Except as otherwise ordered by the Bankruptcy Court, any Rejection Claim based on the rejection of an Executory Contract shall be forever barred and shall not be enforceable against the Reorganized Debtors or the Assets unless a proof of Claim is filed with the Bankruptcy Court and served upon the Reorganized Debtors and their counsel by the earlier of thirty (30) days after the Effective Date or thirty (30) days after entry of the Final Order approving rejection of such Executory Contract.

**Alternatively, if the Liquidating Trust is required to be established under the Plan**: Except as otherwise ordered by the Bankruptcy Court, any Rejection Claim based on the rejection of an Executory Contract shall be forever barred and shall not be enforceable against the Liquidating Trustee or the Liquidating Trust Assets unless a proof of Claim is filed with the Bankruptcy Court and served upon the Liquidating Trustee and his counsel by the earlier of thirty (30) days after the Liquidating Trust Effective Date or thirty (30) days after entry of the Final Order approving rejection of such Executory Contract.

4.    **Rejection Claims**

**If the Liquidating Trust is not required to be established under the Plan**:  Any Rejection Claim not barred by section 10.3(a) of the Plan shall be classified as a Class 9 Unsecured (General) Claim subject to the provisions of section 502(g) of the Bankruptcy Code; provided, however, that any Rejection Claim based upon the rejection of an unexpired lease of real property, either prior to the Confirmation Date, upon the entry of the Confirmation Order, or upon the Effective Date, shall be limited in accordance with section 502(b)(6) of the Bankruptcy Code and state law mitigation requirements.  Nothing contained in the Plan shall be deemed an admission by the Debtors or the Reorganized Debtors that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Reorganized Debtors of any objections to such Claim if asserted.

**Alternatively, if the Liquidating Trust is required to be established under the Plan**: Any Rejection Claim not barred by the Plan shall be classified as a Class 9 Unsecured (General) Claim subject to the provisions of Section 502(g) of the Bankruptcy Code; *provided, however*, that any Rejection Claim based upon the rejection of an unexpired lease of real property, either prior to the Confirmation Date, upon the entry of the Confirmation Order, or upon the Liquidating Trust Effective Date, shall be limited in accordance with Section 502(b)(6) of the Bankruptcy Code and state law mitigation requirements. Nothing contained in the Plan shall be deemed an admission by the Debtors or the Liquidating Trustee that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Liquidating Trustee of any objections to such Claim if asserted.

### 5. Reservation of Rights

**If the Liquidating Trust is not required to be established under the Plan**: Nothing contained in the Plan shall constitute an admission by either Debtor that any contract or lease is in fact an Executory Contract or that the Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Reorganized Debtors shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

**Alternatively, if the Liquidating Trust is required to be established under the Plan**: Nothing contained in the Plan shall constitute an admission by the Liquidating Trustee that any contract or lease is in fact an Executory Contract or that the Debtors or the Liquidating Trustee have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Liquidating Trustee shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

### 6. Pass-Through

**If the Liquidating Trust is not required to be established under the Plan**: Except as otherwise provided in the Plan, any rights or arrangements necessary or useful to the Reorganized Debtors' performance under the Plan, but not otherwise addressed as a Claim or Interest, including non-exclusive or exclusive patent, trademark, copyright, maskwork or other intellectual property licenses and other executory and/or non-executory contracts not assumable under section 365(c) of the Bankruptcy Code, shall, in the absence of any other treatment under the Plan or Confirmation Order, be passed through the Chapter 11 Cases for the benefit of the Reorganized Debtors and the counterparty unaltered and unaffected by the Debtors' bankruptcy filings and the Chapter 11 Cases.

## H. Conditions Precedent to Confirmation and Effectiveness of Plan

### 1. Conditions to Confirmation and Effectiveness of Plan

The Plan shall not become effective until the following conditions shall have been satisfied or waived by the Debtors, as determined in their discretion: (a) the Confirmation Order shall have been entered, in form and substance acceptable to the Debtors; (b) all other conditions precedent have been satisfied to the satisfaction of the Debtors, and the Debtors shall have executed, notarized, and delivered to escrow the documents required pursuant to section 6.1 of the Plan; (c) the Bar Dates have passed, and no additional Claims have been filed which, in the discretion of the Debtors, adversely impact the Plan; and (d) a notice of the Effective Date has been filed by the Debtors and thereafter served upon all Creditors and parties in interest. Any or all of the above conditions other than (a) may be waived at any time by the Debtors.

### 2. Revocation of the Plan

The Debtors may revoke and withdraw the Plan at any time before the Effective Date. If either Debtor revokes or withdraws the Plan, or if confirmation of the Plan does not occur, then the Plan shall be deemed null and void and nothing contained therein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors, as the case may be, or any other Person, or to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors.

I.    **Effect of the Plan on Claims and Interests**

1.    **Compromise and Settlement**

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the classification, potential Distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising prior to the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtors. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, Creditors and other parties in interest, and are fair, equitable and within the range of reasonableness.

It is not the intent of the Plan that confirmation of the Plan shall in any manner alter or amend any settlement and compromise (including those contained in agreed orders) between the Debtors and any Person that has been previously approved by the Bankruptcy Court (each, a "Prior Settlement"). To the extent of any conflict between the terms of the Plan and the terms of any Prior Settlement, the terms of the Prior Settlement shall control and such Prior Settlement shall be enforceable according to its terms.

2.    **Satisfaction of Claims**

The rights afforded in the Plan and the treatment of all Claims and Interests therein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever against the Debtors, the Estates, and the Assets. Except as otherwise provided in the Plan, on the Effective Date, all Claims against the Debtors and the Estates shall be satisfied, discharged, and released in full. Except as otherwise provided in the Plan, all Persons shall be precluded and forever barred from asserting against the Debtors and their affiliates, successors, assigns, the Estates and the Assets any event, occurrence, condition, thing, or other or further Claims or causes of action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

3.    **Discharge**

**If the Liquidating Trust is not required to be established under the Plan:**

(a)    With respect to Stringer, the terms, covenants and consideration under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever against Stringer as Debtor and Reorganized Debtor, or the Assets. Stringer and his successors in interest and assigns shall be deemed discharged and released pursuant to section 1141(d)(5) of the Bankruptcy Code from any and all Claims provided for in the Plan upon completion of all payments required to be made by Stringer under the Plan and the granting of a discharge by the Bankruptcy Court in favor of Stringer; provided, however, nothing contained in the Plan shall be deemed a waiver of the Stringer's right to petition the Bankruptcy Court for a discharge following confirmation of the Plan, but prior to completion of all payments

required to be made under the Plan, pursuant to section 1141(d)(5) of the Bankruptcy Code.

(b)  With respect to SFI, the terms, covenants and consideration under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever against SFI as Debtor and Reorganized Debtor, or the Assets.  SFI and its successors in interest and assigns shall be deemed discharged and released pursuant to section 1141(d)(1) of the Bankruptcy Code from any and all Claims provided for in the Plan.

**Alternatively, if the Liquidating Trust _is_ required to be established under the Plan**:

(a)  With respect to SFI, the terms, covenants and consideration under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever against SFI as Debtor or its Assets.  SFI and its successors in interest shall be deemed discharged and released pursuant to section 1141(d)(1) of the Bankruptcy Code from any and all Claims provided in the Plan.

(b)  With respect to Stringer, the terms, covenants and consideration under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature against Stringer's Assets.  Subject to his execution of the Liquidating Trust Agreement as required by the Plan, Stringer shall be discharged pursuant to section 1141(d)(1) of the Bankruptcy Code (except for any obligations arising under the Plan), on the condition that Stringer turns over to the Liquidating Trust all earnings from personal services he performs, in excess of $10,000.00 per month which he may retain for his reasonable and necessary living expenses, during the 24-month period following the Liquidating Trust Effective Date.  Such payments shall be due not later than the 15th day of the month following the date of receipt of such earnings, together with a written accounting of his earnings.  Upon request by the Liquidating Trustee, Stringer shall provide such additional documentation, including without limitation pay stubs, bank records, and income tax returns, as the Liquidating Trustee may from time to time request.  Stringer may apply to the Bankruptcy Court for a discharge upon conclusion of the Liquidating Trustee's liquidation of the Assets.  Stringer's failure to faithfully comply with the foregoing obligations, or failure to promptly execute the Liquidating Trust Agreement as required by the Plan, shall be grounds for denial or revocation of his discharge upon application by the Liquidating Trustee to the Bankruptcy Court.

4.  **Injunction**

**If the Liquidating Trust is _not_ required to be established under the Plan:  On the Effective Date and _except_ as otherwise provided in the Plan, all Persons who have been, are, or may be holders of Claims against or Interests in the Debtors shall be permanently restrained and enjoined from taking any of the following actions against or affecting the Debtors, the Reorganized Debtors, the Estates, the Assets, or their respective assets and property, with respect to such Claims or Interests (other than actions brought to enforce any rights or obligations under the Plan):  (a) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind with respect to any such Claim or Interest; (b) enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order; (c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind; (d) asserting any control over, interest, rights or title in or to any of the Assets except as expressly provided in the Plan; (e) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Reorganized Debtors as assignee or any assignees of the**

Reorganized Debtors, except upon order of the Bankruptcy Court; and (f) performing any act, by any manner or means, whether directly or indirectly, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; provided, however, that this injunction shall not bar any Creditor from asserting any right granted pursuant to the Plan; provided, further, however, that each holder of a Contested Claim shall be entitled to enforce its rights under the Plan, including seeking allowance of such Contested Claim pursuant to the Plan.

Alternatively, if the Liquidating Trust is required to be established under the Plan: On the Liquidating Trust Effective Date and except as otherwise provided in the Plan, all Persons who have been, are, or may be holders of Claims against or Interests in the Debtors shall be permanently restrained and enjoined from taking any of the following actions against or affecting the Liquidating Trustee, the Debtors (following Debtors' execution of the Liquidating Trust Agreement), the Estates, the Assets, or their respective assets and property, with respect to such Claims or Interests (other than actions brought to enforce any rights or obligations under this Plan): (a) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind with respect to any such Claim or Interest; (b) enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order; (c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind; (d) asserting any control over, interest, rights or title in or to any of the Assets except as expressly provided in the Plan; (e) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Liquidating Trustee as assignee, except upon order of the Bankruptcy Court; and (f) performing any act, by any manner or means, whether directly or indirectly, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; provided, however, that this injunction shall not bar any Creditor from asserting any right granted pursuant to the Plan; and provided, further, that each holder of a Contested Claim shall be entitled to enforce its rights under the Plan, including seeking allowance of such Contested Claim pursuant to the Plan.

5. **Setoffs**

If the Liquidating Trust is **not** required to be established under the Plan: Except as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the holder of a Claim, the Reorganized Debtors may setoff against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim (before such Distribution is made), any claims, rights, Estate Claims and Estate Defenses of any nature that the Debtors may hold against the holder of such Allowed Claim, to the extent such claims, rights, Estate Claims and Estate Defenses against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by the Debtors of any such claims, rights, Estate Claims and Estate Defenses that the Debtors may possess against such Claimant. In no event shall any Claimant or Interest holder be entitled to setoff any Claim or Interest against any claim, right, or Estate Claim of the Debtors without the consent of the applicable Debtor or Reorganized Debtor unless such holder files a motion with the Bankruptcy Court requesting the authority to perform such setoff notwithstanding any indication in any proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

**Alternatively, if the Liquidating Trust is required to be established under the Plan**: Except as otherwise expressly provided in the Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the holder of a Claim, the Liquidating Trustee may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim (before such Distribution is made), any claim, right, Estate Claim, or Estate Defense of any nature that the Debtors may hold against the holder of such Allowed Claim, to the extent such claim, right, Estate Claims, or Estate Defense has not been otherwise compromised or settled on or prior to the Liquidating Trust Effective Date (whether pursuant to the Plan or otherwise); *provided, however,* that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by the Debtors of any such claim, right, Estate Claim, or Estate Defense that the Debtors may possess against such Claimant. In no event shall any Creditor or Interest holder be entitled to set off any Claim or Interest against any claim, right, or Estate Claim of the Debtors without the consent of the Liquidating Trustee unless such holder files a motion with the Bankruptcy Court requesting the authority to perform such setoff notwithstanding any indication in any proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

6.     **Recoupment**

**If the Liquidating Trust is not required to be established under the Plan**: Except as otherwise expressly provided for in the Plan, in no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, account receivable, or Estate Claim of the Debtors or the Reorganized Debtors unless (a) such holder actually provides notice thereof in writing to the applicable Debtor or the Reorganized Debtor of its intent to perform a recoupment; (b) such notice includes the amount to be recouped by the holder of the Claim or Interest and a specific description of the basis for the recoupment, and (c) the applicable Debtor or the Reorganized Debtor has provided a written response to such Claim or Interest holder, stating unequivocally that the applicable Debtor or the Reorganized Debtor consents to the requested recoupment. The Debtors and the Reorganized Debtors shall have the right, but not the obligation, to seek an order of the Bankruptcy Court allowing any or all of the proposed recoupment. In the absence of a written response from the applicable Debtor or the Reorganized Debtor consenting to a recoupment or an order of the Bankruptcy Court authorizing a recoupment, no recoupment by the holder of a Claim or Interest shall be allowed.

**Alternatively, if the Liquidating Trust is required to be established under the Plan**: Except as otherwise expressly provided in the Plan, in no event shall any holder of a Claim or Interest be entitled to recoup any Claim or Interest against any claim, right, account receivable, or Estate Claim of the Debtors or the Liquidating Trustee unless (a) such holder actually provides notice thereof in writing to the Debtors or the Liquidating Trustee of its intent to perform a recoupment; (b) such notice includes the amount to be recouped by the holder of the Claim or Interest and a specific description of the basis for the recoupment; and (c) the Debtors or the Liquidating Trustee have provided a written response to such Claim or Interest holder, stating unequivocally that the Debtors or the Liquidating Trustee consent to the requested recoupment. The Liquidating Trustee shall have the right, but not the obligation, to seek an order of the Bankruptcy Court allowing any or all of the proposed recoupment. In the absence of a written response from the Liquidating Trustee consenting to a recoupment or an order of the Bankruptcy Court authorizing a recoupment, no recoupment by the holder of a Claim or Interest shall be allowed.

7.     **Turnover**

**If the Liquidating Trust is <u>not</u> required to be established under the Plan**: On the Effective Date, any rights of the Estates to compel turnover of Assets under applicable nonbankruptcy law and pursuant to section 542 or 543 of the Bankruptcy Code shall be deemed transferred to and vested in the Reorganized Debtors.

**Alternatively, if the Liquidating Trust <u>is</u> required to be established under the Plan**: On the Liquidating Trust Effective Date, any rights of the Estates to compel turnover of Assets under applicable nonbankruptcy law and pursuant to section 542 or 543 of the Bankruptcy Code shall be deemed transferred to and vested in the Liquidating Trustee.

8.     **Automatic Stay**

The automatic stay pursuant to section 362 of the Bankruptcy Code, except as previously modified by the Bankruptcy Court, shall remain in effect until the Effective Date of the Plan as to the Debtors and all Assets. As of the Effective Date, the automatic stay shall be replaced by the injunction described in section 12.4 of the Plan.

**J.     Jurisdiction of Courts and Modifications to the Plan**

1.     **Retention of Jurisdiction**

Pursuant to sections 1334 and 157 of title 28 of the United States Code, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising in, arising under, and related to the Chapter 11 Cases and the Plan, for the purposes of sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

(a)     To hear and determine any and all Objections to or applications concerning the allowance of Claims or the allowance, classification, priority, compromise, estimation, or payment of any Administrative Expense or Claim;

(b)     To hear and determine any and all applications for payment of fees and expenses from the Estates made by any Professional pursuant to the Plan or pursuant to sections 330 or 503 of the Bankruptcy Code, or for payment of any other fees or expenses authorized to be paid or reimbursed from the Estates under the Plan or the Bankruptcy Code, and any and all objections thereto;

(c)     To hear and determine pending applications for the rejection, assumption, or assumption and assignment of Executory Contracts and the allowance of Claims resulting therefrom, and to determine the rights of any party in respect to the rejection, assumption, or assumption and assignment of any Executory Contract;

(d)     To hear and determine any and all adversary proceedings, applications, contested matters, including any remands;

(e)     To hear and determine all controversies, disputes, and suits which may arise in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan or in connection with the enforcement of any remedies made available under the Plan, including without limitation, (i) adjudication of all rights, interests or disputes relating to any of the Assets, (ii) the valuation of all Collateral, including hearing all Valuation

Motions, (iii) the determination of the validity of any Lien or claimed right of offset; and (iv) determinations of Objections to Contested Claims;

(f) To liquidate and administer any disputed, contingent, or unliquidated Claims, including the Allowance of all Contested Claims;

(g) To administer Distributions to holders of Allowed Claims as provided in the Plan;

(h) To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(i) To enable the Liquidating Trustee to prosecute any and all proceedings which may be brought to set aside Liens or encumbrances and to recover any transfers, assets, properties or damages to which the Liquidating Trustee may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state, or local laws, including Estate Claims, controversies, disputes, and conflicts between the Liquidating Trustee and any other party, including but not limited to, any Estate Claims or Objections to Claims, preferences or fraudulent transfers and obligations or equitable subordination.

(j) To consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation the Confirmation Order;

(k) To enforce the discharge and injunction described in the Plan and Confirmation Order;

(l) To the extent deemed necessary by the Liquidating Trustee, approve the sale after the Liquidating Trust Effective Date of any of the Assets free and clear of all Liens, claims, and interests by the Liquidating Trustee;

(m) To enter and implement all such orders as may be necessary or appropriate to execute, interpret, construe, implement, consummate, or enforce the terms and conditions of the Plan and the transactions required or contemplated pursuant thereto;

(n) To hear and determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan;

(o) To determine proceedings pursuant to section 505 of the Bankruptcy Code; and

(p) To enter final decrees closing the Chapter 11 Cases.

2. **Abstention and Other Courts**

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of or relating to the Chapter 11 Cases, the Plan shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

### 3. Non-Material Modifications

The Plan Proponents may, with the approval of the Bankruptcy Court and without notice to all holders of Claims and Interests, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable. The Plan Proponents may undertake such nonmaterial modification pursuant to section 13.3 of the Plan insofar as it does not adversely change the treatment of the Claim of any Creditor or the Interest of any Interest holder who has not accepted in writing the modification.

### 4. Material Modifications

Modifications of the Plan may be proposed in writing by the Plan Proponents at any time before the Confirmation Date, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code. The Plan may be modified at any time after the Confirmation Date and before its Substantial Consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modification. A holder of a Claim or Interest that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such holder changes its previous acceptance or rejection.

## K. Miscellaneous Provisions

### 1. Severability

Should the Bankruptcy Court determine any provision of the Plan is unenforceable either on its face or as applied to any Claim or Interest or transaction, the Reorganized Debtors or the Liquidating Trustee, as the case may be, may modify the Plan so that any such provision shall not be applicable to the holder of any Claim or Interest. Such a determination of unenforceability shall not (a) limit or affect the enforceability and operative effect of any other provision of the Plan or (b) require the resolicitation of any acceptance or rejection of the Plan.

### 2. Oral Agreements; Modification of Plan; Oral Representations or Inducements

The terms of the Plan, Disclosure Statement and Confirmation Order may not be changed, contradicted or varied by any oral statement, agreement, warranty or representation. The Plan may only be modified, amended or supplemented in writing signed by the Plan Proponents or the Liquidating Trustee, as the case may be, with appropriate authority. Neither the Debtors nor their attorneys have made any representation, warranty, promise or inducement relating to the Plan or its confirmation except as expressly set forth in the Plan, the Disclosure Statement, or the Confirmation Order or other order of the Bankruptcy Court.

### 3. Waiver

Neither the Reorganized Debtors nor the Liquidating Trustee shall be deemed to have waived any right, power or privilege pursuant to the Plan unless the waiver is in writing and signed by the Reorganized Debtors or the Liquidating Trustee, as the case may be. There shall be no waiver by implication, course of conduct or dealing, or through any delay or inaction by the

Reorganized Debtors or the Liquidating Trustee, of any right pursuant to the Plan, including the provisions of section 14.3 of the Plan. The waiver of any right under the Plan shall not act as a waiver of any other or subsequent right, power or privilege.

### 4. Construction

The Plan shall control over any inconsistent term of the Disclosure Statement or the Plan Documents. The Confirmation Order shall control over any inconsistent provision of the Plan, the Disclosure Statement, or the Plan Documents.

### 5. Notice

Any notice or communication required or permitted by the Plan shall be given, made or sent as follows:

(a) If to a Creditor, notice may be given as follows: (i) if the Creditor has filed no proof of Claim, then to the address reflected in the Schedules, or (ii) if the Creditor has filed a proof of Claim, then to the address reflected in the proof of Claim.

(b) If to the Reorganized Debtors, notice shall be sent to the following address:

Stringer Farms, Inc.
Charles Blake Stringer
130 North Dumas Avenue
Dumas, Texas 79029

Concurrently with service of such notice on the Reorganized Debtors, a copy thereof shall be concurrently served in the same manner on the following legal counsel as follows:

Jeff P. Prostok
Matthew G. Maben
Forshey & Prostok, L.L.P.
777 Main Street, Suite 1290
Fort Worth, Texas 76102
(817) 877-4151 FAX
E-mail: jprostok@forsheyprostok.com
E-mail: mmaben@forsheyprostok.com

(c) If to the Liquidating Trustee, notice shall be sent to the following address:

Tyrone H. Tyll, Trustee
4511 Isabella
Dallas, Texas 75229

Concurrently with service of such notice on the Liquidating Trustee, a copy thereof shall be served in the same manner on the legal counsel designated by the Liquidating Trustee.

(d) Any Creditor desiring to change its address for the purpose of notice may do so by giving notice to the Reorganized Debtors or the Liquidating Trustee, as the case may be, of its new address in accordance with the terms of section 14.5 of the Plan.

(e)     Any notice given, made or sent as set forth above shall be effective upon being (i) deposited in the United States Mail, postage prepaid, addressed to the addressee at the address as set forth above; (ii) delivered by hand or messenger to the addressee at the address set forth above; (iii) telecopied to the addressee as set forth above, with a hard confirmation copy being immediately sent through the United States Mail; or (iv) delivered for transmission to an expedited or overnight delivery service such as FedEx.

**6.      Compliance with All Applicable Laws**

If notified by any governmental authority that they are or it is in violation of any applicable law, rule, regulation, or order of such governmental authority relating to their businesses or its business, the Reorganized Debtors or the Liquidating Trustee, as the case may be, shall comply with such law, rule, regulation, or order; provided, however, that nothing contained in the Plan shall require such compliance if the legality or applicability of any such requirement is being contested in good faith in appropriate proceedings and, if appropriate, an adequate reserve has been set aside on the books of the Reorganized Debtors or the Liquidating Trust, as the case may be.

**7.      Duties to Creditors**

No agent, representative, accountant, financial advisor, attorney, shareholder, officer, affiliate, member or employee of the Plan Proponents or the Liquidating Trustee shall ever owe any duty to any Person (including any Creditor) other than the duties owed to the Estates, for any act, omission, or event in connection with, or arising out of, or relating to, any of the following:  (a) the Chapter 11 Cases, including all matters or actions in connection with or relating to the administration of the Estates, (b) the Plan, including the proposal, negotiation, confirmation and consummation of the Plan, or (c) any act or omission relating to the administration of the Plan after the Effective Date.

**8.      Binding Effect**

The Plan shall be binding upon, and shall inure to the benefit of the Reorganized Debtors or the Liquidating Trustee, as the case may be, the holders of the Claims or Liens, the holders of Interests, and their respective successors in interest and assigns.

**9.      Governing Law, Interpretation**

Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, the internal laws of the State of Texas shall govern the construction and implementation of the Plan and any Plan Documents without regard to conflicts of law.

**10.     Payment of Statutory Fees**

All fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid on or before the Effective Date, and thereafter shall be paid by the Reorganized Debtors or the Liquidating Trustee, as the case may be, as such statutory fees become due.

**11.     Filing of Additional Documents**

On or before Substantial Consummation of the Plan, the Plan Proponents or the

Liquidating Trustee, as the case may be, may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 12. Computation of Time

If the final day for any Distribution, performance, act or event under the Plan is not a Business Day, then the time for making or performing such Distribution, performance, act or event shall be extended to the next Business Day. Any payment or Distribution required to be made under the Plan on a day other than a Business Day shall be due and payable on the next succeeding Business Day.

### 13. Elections by the Reorganized Debtors or the Liquidating Trustee

Any right of election or choice granted to the Reorganized Debtors or the Liquidating Trustee under the Plan may be exercised, at the Reorganized Debtors' election or the Liquidating Trustee's election, as the case may be, separately as to each Claim, Creditor or Person.

### 14. Release of Liens

Except as otherwise provided in the Plan or the Confirmation Order, all Liens against any of the Assets shall be deemed to be released, terminated and nullified.

### 15. Rates

The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

### 16. Retiree Benefits

To the extent that the Debtors provide any retiree benefits that are subject to Section 1129(a)(13) of the Bankruptcy Code, such retiree benefits shall continue to be provided by the Reorganized Debtors or the Liquidating Trustee, as the case may be, from and after the Effective Date for the period the Debtors are obligated to provide such benefits. No such benefits have been identified at this time.

### 17. Compliance with Tax Requirements

In connection with the Plan, the Reorganized Debtors or the Liquidating Trustee, as the case may be, shall comply with all withholding and reporting requirements imposed by federal, state and local Taxing Authorities and all Distributions under the Plan shall be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution under the Plan.

### 18. Notice of Entry of Confirmation Order

Promptly after entry of the Confirmation Order, the Plan Proponents, as directed by the Bankruptcy Court, shall serve on all known parties in interest and holders of Claims and Interests,

notice of entry of the Confirmation Order.

### 19. Notice of Occurrence of the Effective Date

Promptly after occurrence of the Effective Date, the Reorganized Debtors, as directed by the Bankruptcy Court, shall serve on all known parties in interest and holders of Claims and Interests, notice of the occurrence of the Effective Date. In the event of occurrence of the Liquidating Trust Effective Date, the Liquidating Trustee shall promptly file notice of same with the Bankruptcy Court and shall send such notice to holders of Claims whose counsel of record are not registered for ECF notice.

### 20. Interest and Attorney's Fees

Interest after the Petition Date will accrue and be paid on Allowed Claims only to the extent specifically provided for in the Plan, the Confirmation Order, or as otherwise required by the Bankruptcy Court or by applicable law. Except as set forth in the Plan or as ordered by the Bankruptcy Court, no award or reimbursement of attorney's fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim.

### 21. No Admissions

As to contested matters, adversary proceedings and other causes of action or threatened causes of action, the Plan shall not constitute or be construed as an admission by the Plan Proponents or the Liquidating Trustee, as the case may be, of any fact or liability, stipulation, or waiver, but shall constitute and be construed as a statement made in settlement negotiations. The Plan shall not be construed to be conclusive advice on the tax, securities, and other legal effects of the Plan as to holders of Claims against, and Interests in, the Debtors or their affiliates, as debtors and debtors in possession in the Chapter 11 Cases.

## VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE PLAN AND ITS RELATED TAX CONSEQUENCES ARE COMPLEX. MOREOVER, MANY OF THE INTERNAL REVENUE CODE PROVISIONS DEALING WITH THE FEDERAL INCOME TAX ISSUES ARISING FROM THE PLAN HAVE BEEN THE SUBJECT OF RECENT LEGISLATION AND, AS A RESULT, MAY BE SUBJECT TO AS YET UNKNOWN ADMINISTRATIVE OR JUDICIAL INTERPRETATIONS. THE DEBTORS HAVE NOT REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE (THE "IRS") OR AN OPINION OF COUNSEL WITH RESPECT TO THESE MATTERS. ACCORDINGLY, NO ASSURANCE CAN BE GIVEN AS TO THE INTERPRETATION THAT THE IRS WILL ADOPT. THERE ALSO MAY BE STATE, LOCAL OR OTHER TAX CONSIDERATIONS APPLICABLE TO EACH CREDITOR. CREDITORS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE CONSEQUENCES OF THE PLAN TO THEM UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND OTHER TAX LAWS.

## IX. CONFIRMATION OF THE PLAN

### A. Solicitation of Votes; Voting Procedures

#### 1. Ballots and Voting Deadlines

A Ballot to be used for voting to accept or reject the Plan, together with a postage-paid

return envelope, is enclosed with all copies of this Disclosure Statement mailed to all holders of Claims entitled to vote. BEFORE COMPLETING YOUR BALLOT, PLEASE READ CAREFULLY THE INSTRUCTION SHEET THAT ACCOMPANIES THE BALLOT.

The Bankruptcy Court has directed that, in order to be counted for voting purposes, Ballots for the acceptance or rejection of the Plan must be received no later than 5:00 p.m., Central Time, on January 5, 2018 at the following address:

> Forshey & Prostok, L.L.P.
> 777 Main Street, Suite 1290
> Fort Worth, Texas 76102
> Attn: Linda Breedlove

YOUR BALLOT MAY NOT BE COUNTED IF IT IS RECEIVED AT THE ABOVE ADDRESS AFTER 5:00 P.M., CENTRAL TIME, ON JANUARY 5, 2018.

## 2. Parties in Interest Entitled to Vote

The holder of a Claim or Interest may vote to accept or reject the Plan only if the Plan impairs the Class in which such Claim or Interest is classified. Under the Plan, Classes 1, 2, 3, 4, 8 and 9 are impaired. Classes 5, 6, 7 and 10 are not impaired and are deemed to have accepted the Plan.

Any Claim or Interest as to which an Objection has been filed is not entitled to vote unless the Bankruptcy Court, upon application of the holder to whose Claim or Interest an Objection has been made, temporarily allows such Claim or Interest in an amount that it deems proper for the purpose of accepting or rejecting the Plan. Any such application must be heard and determined by the Bankruptcy Court on or before commencement of the Confirmation Hearing. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT COUNSEL FOR THE DEBTORS AT THE FOLLOWING ADDRESS:

> Jeff P. Prostok
> Matthew G. Maben
> Forshey & Prostok, L.L.P.
> 777 Main Street, Suite 1290
> Fort Worth, Texas 76102
> (817) 877-8855
> (817) 877-4151 fax
> Email: jprostok@forsheyprostok.com
> Email: mmaben@forsheyprostok.com

## 3. Vote Required for Class Acceptance

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots for acceptance or rejection of the plan. Thus, class

acceptance takes place only if at least two-thirds in amount and a majority in number of the holders of claims voting cast their ballots in favor of acceptance.

The Bankruptcy Code defines acceptance of a plan by a class of interests as acceptance by holders of at least two-thirds in amount of the interests of that class that actually cast ballots for acceptance or rejection of the plan. Thus, class acceptance takes place only if at least two-thirds in amount of the holders of interests voting cast their ballots in favor of acceptance.

**B.      Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. By order of the Bankruptcy Court, the Confirmation Hearing has been scheduled for January 8, 2018, at 9:30 a.m. Central Time, in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division. In addition to considering confirmation of the Plan, the Bankruptcy Court will consider final approval of this Disclosure Statement at such hearing. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan and/or final approval of this Disclosure Statement must be made in writing and filed with the Bankruptcy Court on or before January 5, 2018, at the following address:

> Office of the Clerk
> U.S. Bankruptcy Court
> Eldon B. Mahon U.S. Courthouse
> 501 W. Tenth Street
> Fort Worth, Texas 76102-3643

In addition, any such objection must be served upon the following parties, together with proof of service, on or before January 5, 2018:

| | |
|---|---|
| Jeff P. Prostok<br>Matthew G. Maben<br>Forshey & Prostok, L.L.P.<br>777 Main Street, Suite 1290<br>Fort Worth, Texas 76102<br>(817) 877-4151 fax<br>Email: jprostok@forsheyprostok.com<br>Email: mmaben@forsheyprostok.com | United States Trustee<br>Attn: Erin Schmidt, Trial Attorney<br>1100 Commerce Street, Room 976<br>Dallas, TX 75242<br>Email: Erin.Schmidt2@usdoj.gov |

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**C.      Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court must determine whether the

Bankruptcy Code's requirements for confirmation of the Plan have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. As set forth in section 1129 of the Bankruptcy Code, these requirements are as follows:

      1.     The plan complies with the applicable provisions of the Bankruptcy Code.

      2.     The proponents of the plan complied with the applicable provisions of the Bankruptcy Code.

      3.     The plan has been proposed in good faith and not by any means forbidden by law.

      4.     Any payment made or promised by the debtor, by the plan proponent, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in, or in connection with, the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of the Bankruptcy Court as reasonable.

      5.     (a)     (i)     The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

            (ii)     the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

            (b)     the proponent of the plan has disclosed the identity of any Insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

      6.     Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

      7.     With respect to each impaired class of claims or interests:

            (a)     each holder of a claim or interest of such class has accepted the plan or will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date; or

            (b)     if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, the holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

      8.     With respect to each class of claims or interests:

            (a)     such class has accepted the plan; or

            (b)     such class is not impaired under the plan.

      9.     Except to the extent that the holder of a particular claim has agreed to a different

treatment of such claim, the plan provides that:

      (a)   with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

      (b)   with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive:

      (i)   if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

      (ii)   if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

      (c)   with respect to a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim regular installment payments in cash:

      (i)   of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

      (ii)   over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

      (iii)   in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b) of the Bankruptcy Code); and

      (d)   with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8) of the Bankruptcy Code, but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in 9(c) above.

      10.    If a class of claims is impaired under the plan, at least one class of claims that is impaired has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim of such class.

      11.    Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

      12.    All fees payable under 28 U.S.C. section 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

      13.    The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114, at any time prior to confirmation of the plan, for the duration of the period the Debtor has obligated itself to provide

such benefits.

14.     If the debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the debtor has paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition.

15.     In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan:

(a)     the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(b)     the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2) of the Bankruptcy Code) to be received during the five year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

16.     All transfers of property under the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

The Debtors believe that the Plan satisfies all of the applicable statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtors have complied or will have complied with all the requirements of chapter 11, and that the Plan is proposed in good faith.

The Debtors believe that holders of all Allowed Claims impaired under the Plan will receive payments under the Plan having a present value, as of the Effective Date, not less than the amounts likely to be received if the Debtors were liquidated in a case under chapter 7 of the Bankruptcy Code.   At the Confirmation Hearing, the Bankruptcy Court will determine whether holders of Allowed Claims would receive greater distributions under the Plan than they would receive in a liquidation under chapter 7.

These facts and others demonstrating the confirmability of the Plan will be shown at the Confirmation Hearing.

**D.     Cramdown**

In the event that any impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to that Class. A plan of reorganization "does not discriminate unfairly" within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims or interests.

"Fair and equitable" has different meanings with respect to the treatment of secured and unsecured claims.  As set forth in section 1129(b)(2) of the Bankruptcy Code, those meanings are as follows:

1.     With respect to a class of secured claims, the plan provides:

(a)    (i)    that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(ii)    that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(b)    for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) and (b) of this subparagraph; or

(c)    the realization by such holders of the "indubitable equivalent" of such claims.

2.    With respect to a class of unsecured claims, the plan provides:

(a)    that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(b)    the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115 of the Bankruptcy Code, subject to the requirements of section 1129(a)(14) of the Bankruptcy Code.

3.    With respect to a class of interests, the plan provides:

(a)    that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest; or

(b)    that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

In the event that one or more Classes of impaired Claims or Interests reject the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable with respect to, and does not discriminate unfairly against, any rejecting impaired Class of Claims or Interests.

## X.  RISK FACTORS

The following is intended as a summary of certain risks associated with the Plan, but it is not exhaustive and must be supplemented by the analysis and evaluation made by each holder of a Claim or Interest of the Plan and this Disclosure Statement as a whole with such holder's own advisors.

## A.   Variances from Projections

While the Debtors are very confident regarding the projections in support of the Plan, there are various risk factors that must be considered.

### 1.   General

The Plan is premised on the financial analyses and projections attached to the Disclosure Statement as Exhibit "B". The projections include, among other items, assumptions concerning general economic conditions, the ability to make necessary capital expenditures, and other factors. The Debtors believe that the assumptions underlying the projections are reasonable and that the Reorganized Debtors will be able to perform their obligations under the Plan. There are certain other factors, however, that relate to the Reorganized Debtors' ability to achieve the projections.

### 2.   Income and Expenses

The Debtors believe that the projections of future income are reasonable based on history and Stringer's knowledge. However, market fluctuations – particularly with respect to commodity prices – may affect the profitability of the Reorganized Debtors' operations. While the Reorganized Debtors will take steps to minimize risk and exposure to such market fluctuations, including through hedging activities, changes in commodity prices are beyond the Debtors' control and, if severe, could negatively impact the ability of the Reorganized Debtors to meet income projections. The projections also contemplate substantial future revenue from the Wind Leases beginning in 2019. Because construction of the wind farms has not commenced, it cannot be guaranteed that the wind turbines and related infrastructure will be in place in time for the Wind Leases to begin generating revenue as projected. Any unexpected delays in obtaining regulatory approval for the wind farms and/or in construction of the wind farms could substantially delay the point in time when the Reorganized Debtors begin to obtain revenue from the Wind Leases.

The Debtors also believe the projections of future expenses are reasonable based on history and Stringer's knowledge. However, while the Debtors believe the projections are sufficiently conservative, expenses in future years are difficult to predict. If expenses increase significantly beyond the Debtors' projections, it could have an adverse impact on the Reorganized Debtors' business operations and ability to perform their obligations under the Plan.

### 3.   Economic Recession

The Debtors' projections are based on experience and take into account normal fluctuations in the economy generally. Nonetheless, severe recession or economic depression could adversely affect the Reorganized Debtors' businesses. Although the Debtors believe the projections are conservative, the Debtors cannot guarantee them. In the event that a severe economic downturn occurs, it is possible that the Reorganized Debtors could face difficulties in meeting the projections.

### 4.   Uncertain Recoveries if the Liquidating Trust **is** Required to be Established Under the Plan

If the Liquidating Trust **is** required to be established under the Plan, there is a risk under the Plan that the sale proceeds realized through an orderly liquidation of the Debtors' farmland are materially less than the appraised values, in which case the holders of Unsecured (General)

Claims would receive proportionately less on account of such Claims.

## B. Bankruptcy Risks

### 1. Insufficient Acceptances

For the Plan to be confirmed, each impaired Class of Claims is given the opportunity to vote to accept or reject the Plan. With regard to such impaired voting Classes, the Plan will be deemed accepted by a Class of impaired Claims if the Plan is accepted by Claimants of such Class actually voting on the Plan who hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the total Allowed Claims of the Class voted. Only those members of a Class who vote to accept or reject the Plan will be counted for voting purposes. The Debtors reserve the right to request confirmation pursuant to the cramdown provisions in section 1129(b) of the Bankruptcy Code, which will allow confirmation of the Plan regardless of the fact that a particular Class of Claims has not accepted the Plan. However, there can be no assurance that any impaired Class of Claims under the Plan will accept the Plan or that the Debtors would be able to use the cramdown provisions of the Bankruptcy Code for confirmation of the Plan.

### 2. Confirmation Risks

The following specific risks exist with respect to confirmation of the Plan:

(a) Any objection to confirmation of the Plan can either prevent confirmation of the Plan, or delay such confirmation for a significant period of time.

(b) Since the Debtors may be seeking to obtain approval of the Plan over the rejection of one or more impaired Classes of Claims, the cramdown process could delay confirmation.

### 3. Conditions Precedent

Confirmation of the Plan and occurrence of the Effective Date are subject to certain conditions precedent that may not occur. The Debtors, however, are working diligently to ensure that all conditions precedent are satisfied.

## XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have evaluated several reorganization alternatives to the Plan, including the liquidation of the Debtors. After studying these alternatives, the Debtors concluded that the Plan is the best alternative and will maximize recoveries by holders of Claims, regardless of whether the Liquidating Trust is or is not required to be established under the Plan. The following discussion provides a summary of the Debtors' analysis leading to its conclusion that the Plan will provide the highest value to holders of Claims.

## A. Liquidation of the Debtors

The Debtors analyzed whether a chapter 7 liquidation of the Assets of the Debtors would be in the best interest of holders of Claims. The Debtors' analysis is reflected in the document attached hereto as **Exhibit "F"** (the "Liquidation Analysis"). The Liquidation Analysis reflects a liquidation value that is materially lower than the value that may be realized through the Plan. The Debtors believe that liquidation would result in substantial diminution in the value to be realized

by holders of Claims because of (a) additional administrative expenses involved in the appointment of a trustee or trustees, attorneys, accountants, and other professionals to assist such trustee(s) in the case of chapter 7 proceedings; (b) diminished recovery on account of the SFI Farmland and Stringer Farmland due to a quick marketing period for such Assets in liquidation; and (c) the substantial time which would elapse before Creditors would receive any distribution in respect of their Claims.

**B.    Foreclosure by Sandton**

If the Plan is confirmed, but the Liquidating Trust is required to be established under the Plan, an orderly liquidation of the Debtor's non-exempt Assets shall occur. If the Plan is not confirmed or does not become effective, orderly liquidation of the Debtors' non-exempt Assets may not be an option. Pursuant to the DIP Loan Documents and DIP Financing Order, Sandton was granted Liens on all Assets of the Debtors. As set forth in the DIP Financing Order, the appointment of a chapter 11 trustee or the conversion of either of the Debtors' chapter 11 cases to chapter 7 constitute events of default. Thus, if the Plan is not confirmed or does not become effective, the Debtors believe there is a significant risk that Sandton will declare one or more events of default. If Sandton declares an event of default that is not cured or determined by the Bankruptcy Court to not constitute an event of default within ten (10) days of notice of the alleged event of default, then the DIP Financing Order provides that the Debtors shall have thirty (30) days during which they may seek Bankruptcy Court approval to sell their Assets pursuant to section 363 of the Bankruptcy Code. The DIP Financing Order further provides that if at the end of such thirty-day period the Bankruptcy Court has not approved a sale pursuant to section 363 of the Bankruptcy Code which provides for full payment of all amounts owed to Sandton from proceeds of the sale and Sandton is not paid in full within fifteen (15) days from entry of an order approving the sale, then Sandton may exercise all of its rights and remedies under the DIP Loan Documents. Consequently, if the Plan is not confirmed, it is possible that Sandton will ultimately foreclose its Liens against the Assets. In that scenario, the Debtors believe that the value that might be obtained for the Assets could be materially less than what the Assets would generate even in a liquidation under chapter 7 of the Bankruptcy Code.

**C.    Alternatives if the Plan is Not Confirmed**

If the Plan is not confirmed, Wells Fargo and Zions may choose to pursue confirmation of the Wells Fargo – Zions Plan, which contemplates an orderly liquidation of the Debtors' Assets. The provisions of the Debtors' Plan that apply if the Liquidating Trust **is** required to be established under the Debtors' Plan effectively mirror the provisions of the Wells Fargo – Zions Plan. Thus, the same orderly liquidation that is contemplated under the Wells Fargo – Zions Plan is contemplated by the Debtors' Plan in the event that establishment of the Liquidating Trust becomes mandatory under the Debtors' Plan. If the Debtors' Plan is not confirmed, the Debtors or any other party in interest in the Chapter 11 Cases could attempt to formulate and propose a different plan or plans of reorganization. Such plans might involve either a reorganization and continuation of the Debtors' businesses, a sale of the Debtors' businesses as going concerns, an orderly liquidation of the Debtors' Assets, or a combination thereof. Further, if no plan of reorganization can be confirmed, the Chapter 11 Cases may be converted to liquidation proceedings under chapter 7 of the Bankruptcy Code. In chapter 7 cases, a trustee or trustees would be elected or appointed to liquidate the Assets of the Debtors. The proceeds of the liquidation would be distributed to the Creditors of the Debtors in accordance with the priorities established by the Bankruptcy Code.

## XII. <u>CONCLUSION</u>

The Debtors urge holders of Claims in impaired Classes to vote to **ACCEPT** the Plan and to evidence such acceptance by returning their Ballots so that they will be received on or before 5:00 p.m., Central Time, on January 5, 2018.

[The remainder of this page has been left intentionally blank.]

Dated:  December 4, 2017.

Respectfully submitted,


/s/  *Charles Blake Stringer*
Charles Blake Stringer, Individually


**STRINGER FARMS, INC.**

By:      /s/  *Charles Blake Stringer*
            Charles Blake Stringer, President


APPROVED:

/s/  Jeff P. Prostok
Jeff P. Prostok
State Bar No. 16352500
Matthew G. Maben
State Bar No. 24037008
FORSHEY & PROSTOK LLP
777 Main St., Suite 1290
Ft. Worth, TX  76102
Telephone: (817) 877-8855
Facsimile:  (817) 877-4151
jprostok@forsheyprostok.com
mmaben@forsheyprostok.com

ATTORNEYS FOR STRINGER FARMS, INC.
AND CHARLES BLAKE STRINGER, DEBTORS
AND DEBTORS IN POSSESSION


L:\BFORSHEY\Stringer, Blake #5849 (C11)\Plan and Disclosure Statement\Disclosure Statement re First Amended Plan 12.01.17.docx